**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JAY C. MARTIN
    *Plaintiff,*

    v.

NETWORKS PRESENTATIONS, LLC,
*et al.,*

    *Defendants*.

Civil No. ELH-25-3473

**MEMORANDUM OPINION**

In this employment discrimination case, plaintiff Jay C. Martin, known professionally as
Jack McLeod,[1] asserts a host of claims against LMS22 Touring, LLC ("LMS22") and NETworks
Presentations, LLC ("Networks" or "NETworks"), defendants. ECF 1 (the "Complaint"). Plaintiff
identifies each defendant as a former employer. Among other things, plaintiff claims that he was
wrongfully terminated on July 2, 2023, because of his age, and because he challenged defendants'
"discriminatory practices and demanded proper medical care for his workplace injuries." ECF 1
at 2; *id.* ¶¶ 14, 74, 112.[2] Moreover, plaintiff alleges that he was terminated because of his health
conditions, including Chronic Obstructive Pulmonary Disease ("COPD"). *Id.* ¶¶ 19, 127, 135.

The Complaint contains six counts. In Count I, plaintiff alleges age discrimination, in
violation of the Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. § 621
*et seq.* (ECF 1, ¶¶ 96–116); Count II asserts disability discrimination, in violation of the Title I of
the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12101 *et seq.*

---

[1] Because plaintiff refers to himself by the name of "McLeod," I shall do the same.

[2] Throughout the Memorandum Opinion, the Court cites to the electronic pagination.
However, the electronic pagination does not necessarily correspond to the page number imprinted
on a particular submission.

(ECF 1, ¶¶ 117–138); Count III asserts retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (ECF 1, ¶¶ 139–47); Count IV alleges retaliation, in violation of the ADA (*id.* ¶¶ 148–58); Count V asserts discrimination and retaliation claims, in violation of the Maryland Fair Employment Practices Act ("MFEPA"), § 20-601 *et seq.* of the State Government Article ("S.G.") of the Maryland Code (2021 Repl. Vol., 2025 Supp.) (ECF 1, ¶¶ 159–65); and Count VI asserts "Wrongful Termination Against Public Policy (Retaliation for Workers' Compensation Claim)" (*id.* ¶¶ 166–78).  McLeod seeks declaratory and injunctive relief as well as compensatory and punitive damages, attorneys' fees, and costs. *Id.* at 36–38.

Defendants have moved to dismiss the Complaint (ECF 17), pursuant to Fed. R. Civ. P. 12(b)(6).  The motion is supported by a memorandum (ECF 17-1) (collectively, the "Motion") and multiple exhibits, docketed collectively at ECF 17-2.  Defendants dispute that Networks was plaintiff's employer.  They also contend that plaintiff failed to exhaust remedies under a collective bargaining agreement and failed to comply with arbitration procedures under a settlement agreement.  Further, they claim that the Complaint fails to state claims for discrimination, wrongful termination, and retaliation.  *See generally* ECF 17-1.  Additionally, defendants assert that plaintiff's claims are preempted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151–169, as amended by the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*

Plaintiff opposes the Motion. ECF 18 (the "Opposition").  The Opposition is supported by numerous exhibits.  *See* ECF 18-1 to ECF 18-15.  Defendants replied.  ECF 22.

Defendants have also moved to strike plaintiff's Opposition.  ECF 21 ("Motion to Strike"). They claim that the exhibits to the Opposition are "unauthenticated and clearly outside of the pleadings and, therefore, cannot be considered by this Court without converting Defendants'

Motion to Dismiss into a Motion for Summary Judgment." *Id.* ¶ 12.  Defendants also claim that because the Opposition relies upon "facts outside of the Complaint," the Court should "strike Plaintiff's Opposition in its entirety." *Id.* ¶ 16.  Plaintiff opposes the Motion to Strike.  ECF 23.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion.  And, I shall grant the Motion to Strike in part and deny it in part.

## I.      Factual Background[3]

McLeod is a professional stage manager who has worked in the theater industry for over thirty-five years.  ECF 1, ¶ 13.  During his career, McLeod "maintained a long-term working relationship with NETworks and Executive Producers Trinity Wheeler, Seth Sklar-Heyn, and Seth Wenig." *Id.* ¶ 18.  Over a period of about eight years, Networks hired McLeod to work on "multiple back-to-back touring productions" for a variety plays. *Id.* ¶ 18(a).

On August 5, 2022, McLeod entered into a Short Engagement Touring Agreement ("SETA") with LMS22 to serve as the Production Stage Manager for the national tour of *Les Misérables*. *Id.* ¶ 17.  He "was also scheduled for the 2026 tour of Cameron Mackintosh presents Andrew Lloyd Webber's The Phantom of the Opera to be directed by Seth Sklar-Heyn." *Id.* ¶ 18(c).  But, Wheeler and Wenig terminated plaintiff on July 2, 2023, when he was 57 years old. *Id.* ¶¶ 14, 74.  At that time, plaintiff had "an unblemished record, with no prior discipline throughout his career[.]" *Id.* ¶ 15; *see id.* ¶ 16.

McLeod alleges that "[d]uring his employment" he "was subjected to frequent age-related harassment, including being the recipient of 'old man' jokes by coworkers and age-based bias by

---

[3] As discussed, *infra,* at this juncture I must assume the truth of the facts alleged in the suit. *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019).  Therefore, the factual summary is derived largely from the Complaint and certain exhibits, as discussed, *infra*.

management[.]" *Id.* ¶ 20.  He describes a series of incidents involving alleged harassment.

Plaintiff alleges: "In August 2022, during the New York rehearsal period, Plaintiff claimed a large number of properties were missing from the rehearsal inventory." *Id.* ¶ 21.  The Property Master, Jason Coombs, "insisted that Mr. McLeod was wrong and the properties were not missing." *Id.* ¶ 22.  According to plaintiff, "Coombs subsequently and repeatedly claimed Mr. McLeod was 'too old and senile' to be doing his job in front of other stage managers, production assistants, and directors, including Ryan Gardner, Claire Farrokh, Tiffanie Lane, Emily Huber, Richard Barth, and Megan Kraft." *Id.* ¶ 23.

According to plaintiff, Coombs "shared his discriminatory opinions of McLeod's alleged 'senility' with NETworks employees Senior Production Manager Jason Juenker and Production Manager Hector Guivas, who took no action to curtail this inappropriate workplace harassment and age-based discrimination." *Id.* ¶ 24.  Additionally, plaintiff claims that at a meeting on September 27, 2022, attended by approximately 30 designers, producers, and management personnel, Coombs "publicly asserted that Plaintiff was 'senile' regarding the missing properties, accompanied by making gestures suggesting mental instability." *Id.* ¶ 25(a).

In another instance of alleged age discrimination, "Production Assistant Tiffanie Lane created a text message group specifically labeled 'Jack and the Millennials,' deliberately emphasizing the age disparity between Plaintiff and his younger assistants." *Id.* ¶ 25(b). According to plaintiff, "[w]hen Producers Wheeler, Sklar-Heyn, and Company Manager Danner were informed of this age-based targeting, none took corrective action." *Id.*  Plaintiff also claims that "Wheeler made age-discriminatory comments to Mr. McLeod[.]" *Id.* ¶ 26.  And, "[i]n December 2022, while preparing for a show in Detroit, Claire Farrokh told a local crew member to ignore Mr. McLeod's instructions, stating, 'Don't listen to Jack.  It's just the ramblings of an

old man.'" *Id.* ¶ 27. And, on February 6, 2023, "Executive Producer Wenig asked Mr. McLeod why he was 'still out here touring at [his] age' and why he had not 'just retire[d].'" *Id.* ¶ 28 (alterations in original). Moreover, on many occasions Juenker "would refer to Mr. McLeod as 'old man,' as documented in a text message sent on April 4, 2023." *Id.* ¶ 30.

According to plaintiff, many "witnesses were present during these age-discriminatory incidents," including Coombs, Kraft, Gardner, Farrokh, and Casey Nellis, "who observed the systematic 'senile' campaign and 'old man' harassment at production meetings and rehearsals." *Id.* ¶ 25(c). He asserts: "It was a common occurrence where Mr. McLeod was criticized for his age, as backstage crew members often would state 'old man on deck' upon his arrival, causing other members present to laugh at the Plaintiff's expense." *Id.* ¶ 29.

On March 11, 2023, while McLeod was "on assignment in Omaha, Nebraska," he "suffered a severe workplace accident in his hotel room, falling and losing consciousness[.]" *Id.* ¶ 31. He characterizes his injuries as "catastrophic." *Id.* They "included two skull fractures with a clean break across the frontal lobe, nose broken in five places, collapse of both left and right sinus cavities due to the impact, [and] damage to the muscles supporting his left eye socket . . . ." *Id.* ¶ 32. McLeod "was hospitalized with a concussion requiring overnight observation." *Id.* ¶ 33. When assistant stage managers Gardner and Farrokh "visited" Mr. McLeod in his hospital room, they told "the night staff that Mr. McLeod was their grandfather." *Id.* ¶ 34.

Because of the injuries, McLeod filed a workers' compensation claim (the "WC Claim"). *See id.* ¶¶ 35–49. Plaintiff contends that the filing "constituted" a "protected activity under federal and state anti-retaliation laws . . . ." *Id.* ¶ 35. But, he asserts that defendants' "insurance broker," Bobby Thatvihane, "failed to file Plaintiff's workers' compensation claim properly . . . ." *Id.* ¶ 36. As a result, plaintiff's attorneys could not locate the WC Claim "in the Maryland workers'

compensation database." *Id.* ¶ 37.  Rather, plaintiff alleges that his "claim was buried in Berkley Insurance's 'commercial agribusiness operations' division . . . rather than the proper entertainment division in an apparent attempt to . . . avoid paying benefits." *Id.* ¶ 38.[4]

Then, plaintiff "was unable to access appropriate medical care for nearly an entire month" because "he was restricted to seeing only doctors authorized under the workers' compensation system." *Id.* ¶ 41.  According to plaintiff, because he did not obtain "proper medical intervention," he "developed a 'raging infection' in his head and face, resulting in permanent hearing loss on his right side, permanent vision loss in his left eye, 50% nasal obstruction on his right side, and constant pain levels averaging 5 out of 10, with some days reaching level 9." *Id.* ¶ 44.  According to McLeod, "[t]hese permanent disabilities could have been prevented with proper and timely medical intervention that was denied due to Defendants' mishandling of his workers' compensation claim." *Id.* ¶ 45.

Further, plaintiff asserts that, on or after March 14, 2023, Thatvihane emailed defendants' manager, Elle Aghabala, and *Les Mis* tour leaders, recommending denial of his WC Claim due to his COPD as well as "his 'heart issues'– despite Mr. McLeod having informed [Thatvihane] that there were no heart issues." *Id.* ¶ 46.  Then, on March 28, 2023, "seventeen days following his accident, Plaintiff was informed" that his WC Claim was denied by the Workers' Compensation

---

[4] Plaintiff also claims that the adjuster, Bobby Thatvihane, "violated Plaintiff's HIPAA rights" by "improperly shar[ing] medical information" and spreading "false information that Mr. McLeod had severe 'heart issues,' including 'high blood pressure.'" ECF 1, ¶¶ 36, 39.  McLeod explains that "his primary care medical records inadvertently contained a code indicating that he had a prior heart transplant." *Id.* ¶ 39(a).  McLeod maintains that he never had a heart transplant, and he told both Thatvihane and defendants' manager, Elle Aghabala, of the error.  *Id.*  Nevertheless, he asserts that "the false medical information was shared with company management and used to justify denying his workers' compensation claim." *Id.* ¶ 40.  But, there is no allegation that Thatvihane was defendants' employee.

Commission ("WCC" or the "Commission").  *Id.*¶ 47.[5]  He claims that this "trigger[ed] a chaotic day of phone calls and emails with contradictory information during which his private medical information was freely and openly discussed and shared amongst NETworks, the *Les Misérables* Tour Management Team, the *Les Misérables* Producers, the adjuster at Berkley and the insurance broker."  *Id.*

According to plaintiff, because of his workplace injury and the "mishandling" of his WC Claim, he was "forced to take a 10-week medical leave . . . ."  *Id.* ¶ 49.  Plaintiff posits that "[t]aking medical leave for a disability constituted protected activity" under the ADA and the Family and Medical Leave Act "and should have been accommodated without adverse employment consequences."  *Id.* ¶ 51.  Indeed, he alleges that, on an unspecified date, Executive Producer Wheeler sent him a text, stating: "'So Jack just take your time to fully recover.  But no brain bleeding.  Yes.  Your job here is forever.'"  *Id.* ¶ 50.  But, plaintiff alleges: "Company management actively worked against [his] timely return to the workplace by falsifying statements to producers and deliberately delaying his return by two weeks after he was medically cleared, causing him to lose significant income and health insurance weeks."  *Id.* ¶ 57.  Yet, "Wheeler required Mr. McLeod to work from home . . . ."  *Id.* ¶ 58.  According to plaintiff, "[t]hese two weeks of work-from-home evolved into a union grievance as the Defendants refused to pay salary and benefits to Mr. McLeod."  *Id.* ¶ 59.

While plaintiff was on medical leave, "his 26-year-old Assistant Stage Manager was

---

[5] In November 2024, plaintiff appealed the denial of his WC Claim by the WCC.  *See Jay Martin v. LMS22 Touring Inc., et al.,* C-13-CV-24-000934.  On March 6, 2026, the Circuit Court for Howard County remanded the case to the Commission, pursuant to a joint motion to withdraw/dismiss plaintiff's appeal.  *See id.*, Docket, https://perma.cc/TDR5-VRJC (last accessed Apr. 27, 2026).

assigned to Plaintiff's position[.]" *Id.* ¶ 55. According to plaintiff, this demonstrates defendants' "discriminatory assumptions about Plaintiff's ability to return to work due to age-related stereotypes about older employees' capacity to work after health issues." *Id.* Moreover, when plaintiff returned to work on May 23, 2023, "the work environment had become more antagonistic." *Id.* ¶ 68. Plaintiff claims that Senior Production manager Jason Juenker stated: "'What are you doing here? I was told that you weren't coming back.'" *Id.*

Also in 2023, plaintiff's co-employee, Emily Somé, "fell in her hotel room and sustained injuries requiring multiple surgeries." *Id.* ¶ 52. Plaintiff contends that her injuries were "identical" to the ones he sustained. *Id.* ¶ 54(a). Yet, he claims that "Somé received completely different treatment: she was assigned a different insurance adjuster, received full workers' compensation coverage, was placed on paid medical leave, she was fairly compensated and received every benefit promised" by the Actors' Equity Association ("AEA") and "Worker's Compensation as she was placed on paid workers' compensation leave." *Id.* ¶ 53; *see id.* ¶ 54(a). McLeod asserts: "The differential treatment between Mr. McLeod and Ms. Somé demonstrated that the problems with Mr. McLeod's claims were not procedural, but targeted mishandling based on his disability and age." *Id.* ¶ 54.

On March 25, 2023, while McLeod was on medical leave, "Company Manager Chris Danner informed Acting Production Stage Manager Ryan Gardner of the implementation of new 'rules' that conflicted with the governing collective bargaining agreement ('CBA')." *Id.* ¶ 60.[6]

---

[6] Defendants appended to their Opposition several agreements that they contend constitute the "Short Engagement Routing Collective Bargaining Agreement (hereinafter 'CBA') between the Broadway League and Actors' Equity Association union." ECF 17-2, ¶ 4. The CBA consists of the following agreements: the AEA League Memorandum of Agreement (*id.* at 3–55); Form Overage Statement (*id.* at 56); AEA Agreement and Rules Governing Employment Under the

Plaintiff asserts that this "new policy restricted time off to one male or one female employee at a time. The implementation of a sex-based leave policy was not only discriminatory, but violated clearly established union contract provisions." *Id.* ¶ 61.

Gardner "contacted" McLeod by phone on March 25, 2023, and told him about this new "'rule' and questioned its validity under the CBA." *Id.* ¶ 62. Then, on March 28, 2023, "Plaintiff contacted AEA business representative Kylie Kirk to inform him of the policy and inquire as to compliance with the CBA." *Id.* ¶ 63. According to plaintiff, Kirk "confirmed that the new 'rule' violated the CBA and was unenforceable." *Id.* ¶ 64. Kirk indicated that "she would bring this matter to the attention of her supervisor, Dana Gal." *Id.*[7]

Plaintiff "challenged the discriminatory policy, citing the applicable union agreement in accordance with his obligations as Production Stage Manager to ensure compliance with the collective bargaining agreement." *Id.* ¶ 65. He "continued to perform due diligence and inform the touring union deputies of a contract violation", which he asserts "was a standard professional obligation." *Id.*

On an unspecified date, plaintiff also informed Danner that the "new 'policy change' violated the CBA." *Id.* ¶ 66. But, "Danner continued to push Mr. McLeod to implement the policy." *Id.* In an email to plaintiff on June 6, 2023, Danner wrote: "'Trinity and SSH were clear that only one male and one female should be out to avoid any potentially cut shows.'" *Id.* ¶ 67(a). According to plaintiff, "[t]his email directly contradicts Defendants' subsequent denials of implementing a gender-based policy and serves as documentary evidence of the discriminatory

---

Short Engagement Touring Agreement (*id.* at 57–214); Actor's Equity Association Agreement and Rules Governing Employment Under the Equity/League Production Contract (*id.* at 215–371).

[7] Plaintiff refers to Kirk as "him" (ECF 1, ¶ 63) as well as "Ms." and "she" (*id.* ¶ 64).

directive Plaintiff was ordered to enforce." *Id.* Plaintiff also claims that "Danner's email acknowledged a prior face-to-face conversation with Plaintiff about this policy, stating, 'I know we just talked about this[.]'" *Id.* ¶ 67(b). Indeed, plaintiff alleges: "Defendants had repeatedly instructed Plaintiff to implement the gender-discriminatory policy despite his objections that it violated the collective bargaining agreement." *Id.*

Plaintiff participated in a Zoom meeting on June 22, 2023. *Id.* ¶ 73.[8] He claims that, during the meeting, defendants "demanded" that plaintiff "enforce the discriminatory" sex-based leave policy. *Id.*

The next day, June 23, 2023, "McLeod met with Associate Company Manager Elle Aghabala in Salt Lake City to inquire as to the reason why he was removed from access to the Defendants' Uber account, which she managed." *Id.* ¶ 70. The Uber account "was used for work-related travel and had been accessible to Mr. McLeod until on or around June 23." *Id.* During this meeting, plaintiff told Aghabala that he never had a heart transplant (*id.* ¶ 70(a)) and that his COPD was his only "medical concern." *Id.* ¶ 70(b).[9] After this meeting, Aghabala sent an email "to management describing Mr. McLeod as 'just EXHAUSTING !!!!!'" *Id.* ¶ 71.

On June 27, 2023, five days after defendant was told to enforce the new leave policy, plaintiff "approved time off for two male employees (Kyle Adams and Benjamin Moore) in accordance with the union agreement." *Id.* In a telephone call to plaintiff on July 2, 2023, Wheeler and Wenig, Executive Producers of Networks, terminated plaintiff's employment. *Id.* ¶¶ 74, 75.

---

[8] Plaintiff does not identify the participants in the Zoom meeting. *See* ECF 1, ¶ 73.

[9] Plaintiff asserts: "Defendants maintained video surveillance equipment ('nanny cam') in the company management office where Plaintiff's June 23, 2023 meeting with Elle Aghabala occurred." ECF 1, ¶ 71(a). He states that he has "requested this recorded footage from the Defendants, but it has not been provided." *Id.*

During the phone call, which lasted approximately 3 minutes, *id.* ¶ 107, "Defendants stated that they were 'taking the stage management department in a new direction' without providing any specific explanation or legitimate business justification." *Id.* ¶ 76; *see id.* ¶ 107. McLeod "inquired whether he had done anything wrong[.]" *Id.* ¶ 77. According to plaintiff, "Defendants refused to provide any explanation . . . ." *Id.* They said: "'There is nothing more to say, Jack.'" *Id.* ¶ 108. Yet, plaintiff also asserts: "Defendants denied age discrimination claims but stated their reason for termination was that Plaintiff was an 'instigator[.]'" *Id.* ¶ 113.

According to plaintiff, he was terminated "without cause in direct retaliation for his protected activities." *Id.* ¶ 74. The Assistant Stage Manager, who was 26 years old, took plaintiff's position. *Id.* ¶ 114; *see id.* ¶ 78.

Plaintiff maintains that the termination "was carried out through a coordinated effort." *Id.* ¶ 109. He asserts: "During the call, Defendants simultaneously emailed the entire company announcing Plaintiff's termination, demonstrating a coordinated effort to immediately isolate Plaintiff, and canceled Plaintiff's accounts and changed all relevant passwords as part of a coordinated termination process[.]" *Id.* ¶ 79. McLeod characterizes the manner of his termination as "unusually hostile" and "unprecedented in his 35-year professional career." *Id.* ¶ 106.[10]

McLeod alleges that after his termination, "Defendants unlawfully withheld $31,053.19 in wages and benefits owed to Plaintiff in violation of both federal law and the applicable union agreement, causing substantial financial hardship to Plaintiff and risked cancellation of Mr. McLeod's union provided health care." *Id.* ¶ 81. Moreover, McLeod asserts: "Defendants failed to remit payment for a period of 252 days[.]" *Id.* ¶ 82. He contends that "this withholding of

---

[10] According to McLeod, terminations usually consisted "of an in-person meeting with the relevant officials." ECF 1, ¶ 110.

wages constituted ongoing retaliation for Plaintiff's protected activities, including his workers' compensation claim and opposition to discriminatory practices, violating both federal law and the applicable union agreement and continuing the pattern of retaliatory conduct." *Id.*

According to plaintiff, on April 9, 2024, "under economic duress and risk of losing necessary work weeks to qualify for union-provided health care from the prolonged wage withholding after 252 days of unlawful withholding, [he] was compelled to settle his unpaid wage claims." *Id.* ¶ 83; *see* ECF 18-14 ("Settlement Agreement").  But, McLeod states: "The wage settlement specifically preserved Plaintiff's right to pursue discrimination and retaliation claims, as it only resolved grievances arising under the collective bargaining agreement, explicitly maintaining his right to seek redress for the unlawful discrimination and retaliation." ECF 1, ¶ 95.

Under the terms of the Settlement Agreement, plaintiff "was contractually barred from future employment" with LMS22; Cameron Mackintosh Limited; Networks; and Gentry & Associates, Inc.  ECF 1, ¶ 84; *see* ECF 18-14, ¶ 7.  According to plaintiff, these terms "effectively blacklist him from major theater productions and destroy his career prospects in the industry after 35+ years of professional service."  ECF 1, ¶ 84.  Plaintiff posits: "This industry blacklisting constitutes ongoing retaliation that continues to harm Plaintiff's career and earning capacity . . . ." *Id.* ¶ 85.  For example, he posits that the "contractual blacklisting" had "devastating consequences for his anticipated role as Production Stage Manager for the upcoming *Phantom of the Opera* production."  *Id.* ¶ 86.[11]  Based on plaintiff's "planned retirement at age 63," *id.* ¶ 85, he claims "projected lost earnings" of approximately $2.17 million.  *Id.* ¶ 86(b).

---

[11] Plaintiff claims that before he was terminated, he spoke to Executive Producer Sklar-Heyn about serving as Production Stage Manager for a new production of *The Phantom of the Opera*.  ECF 1, ¶ 87.  Gardner and Farrokh witnessed the discussion.  *Id.* ¶ 88.  And, "[i]n a phone call on April 14, 2023," co-director James Powell "expressed concern" that "27-year-old Ryan Gardner and 25-year-old Claire Farrokh lacked the experience and judgment for their positions"

In addition, plaintiff asserts: "This blacklisting violates the industry norm established by the League and Actors' Equity Association ['AEA'], which 'pledge themselves to use their best efforts to prevent blacklisting in the theatre,' defining blacklisting as 'the use of private lists published or unpublished of persons not to be employed in theatrical productions.'" *Id.* ¶ 93. Furthermore, he claims: "The coordinated exclusion from multiple major theatrical entities constitutes ongoing retaliation that continues to harm Mr. McLeod's career prospects in direct response to his protected activities." *Id.* ¶ 94.

On September 18, 2023, plaintiff filed discrimination charges with the Equal Employment Opportunity Commission (the "EEOC"), alleging "unlawful termination based on age, disability, and retaliation." *Id.* ¶ 8.[12]  On July 24, 2025, the EEOC issued Notice of Right to Sue letters as to McLeod's charges against LMS22 and Networks. *Id.* ¶ 10.  Plaintiff timely filed suit. *Id.* ¶ 12.

Additional facts are included, *infra.*

## II.    Legal Standards

### A.  Fed. R. Civ. P. 12(b)(6)

Defendants have moved to dismiss the Complaint, pursuant to Fed. R. Civ. P. 12(b)(6). *See* ECF 17; ECF 17-1.  A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *Nadendla v. WakeMed*, 24 F.4th 299, 304–05 (4th Cir. 2022); *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021); *Fessler v. Int'l Bus. Machs. Corp.*, 959 F.3d 146, 152 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit*

---

and was "grateful that Plaintiff was returning to his role." *Id.* ¶ 86(c).  But,  as of the filing of the suit, Farrokh "serves as the Assistant Stage Manager of the *Phantom* tour." *Id.* ¶ 87.

[12] In August 2024, "pursuant to a federal-state work-sharing agreement, Mr. McLeod's case was transferred from the EEOC to the Maryland Commission on Civil Rights ('MCCR') for continued processing." ECF 1, ¶ 9.

*Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *cert. denied*, 583 U.S. 1008 (2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).    Thus, "a ruling under Rule 12(b)(6) presents a pure question of law[.]"  *Guzman v. Acuarius Night Club LLC*, 167 F.4th 217, 221 (4th Cir. 2026).

The "court's role under Rule 12(b)(6) is to evaluate the sufficiency of a complaint . . . ." *Doriety v. Sletten*, 109 F.4th 670, 679 (4th Cir. 2024).  Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  *See Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325–26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002).  Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *see Brown-Hyatt v. Brenner*, SAG-25-1737, 2025 WL 2855769, at *2 (D. Md. Oct. 8, 2025) (same).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions'"); *see also Rice v. Adams,* 172 F.4th 428, 432 (4th Cir. 2026); *United States ex rel. Sheldon v. Allergan Sales, LLC*, 170 F.4th 227, 242 (4th Cir. 2026); *L.M. by Roe #1 v. Graham*, 168 F.4th 196, 200 (4th Cir. 2026);  *Johnson v. Baltimore*

- 14 -

*City, Maryland*, 163 F.4th 808, 814 (4th Cir. 2026); *Harmon v. Coleman Worldwide Moving, LLC*, 2025 WL 3764220, at *1 (4th Cir. Dec. 30, 2025) (per curiam); *Seabrook v. Driscoll*, 148 F.4th 264, 269 (4th Cir. 2025); *Sysco Mach. Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025); *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021); *Fauconier v. Clarke*, 966 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan*, 918 F.3d at 317–18; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).

A plausible claim is one that is more than merely conceivable or speculative. *Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see Sheldon*, 170 F.4th at 242. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

As the Fourth Circuit has recognized, plaintiffs are not required "to prove [their] case in the complaint." *Robertson v. Sea Pines Real Est. Cos., Inc.*, 679 F.3d 278, 291 (4th Cir. 2012) (recognizing that "[t]he requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset"); *see Lowy v. Daniel Defense, LLC,* 167 F.4th 175, 193 (4th Cir. 2026). Furthermore, Rule 12(b)(6) "does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations." *See Neitzke v. Williams*, 490 U.S. 319, 327 (1989). Indeed, it is "error" for a district judge to give "a serious claim the back of its hand" because it does not believe the plaintiff's allegations. *See Colon Health Ctrs. of Am., LLC v. Hazel,* 733 F.3d 535, 545 (4th Cir. 2013).

Rather, in considering a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Env't Hydrogeological Consultants, Inc. v. N. Am. Risk Servs., Inc.*, 2026 WL 674349, at *2 (4th Cir. Mar. 10, 2026); *Cooper v. City of Wheeling*, 169 F.4th 220, 223 (4th Cir. 2026); *Walls v. Prince George's Cnty.*, 2026 WL 497988, at *1 (4th Cir. Feb. 23, 2026) (per curiam); *Johnson*, 163 F.4th at 814; *Bermeo v. Andis*, 163 F.4th 87, 93 (4th Cir. 2025)*; Hebb v. City of Asheville, N. Carolina,* 145 F.4th 421, 432 (4th Cir. 2025); *Barbour v. Garland,* 105 F.4th 579, 589 (4th Cir. 2024); *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). However, "a court is not required to accept legal conclusions drawn from the facts." *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cnty.*, 628 F.3d 140, 146 (4th Cir. 2010). Nor does the court accept "'legal conclusions couched as facts . . . .'" *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (citation omitted).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012). "Mere recitals of a cause of action, supported only by conclusory statements, are insufficient to survive" a Rule 12(b)(6) motion. *Morrow v. Navy*

*Federal Credit Union*, 2022 WL 2526676, at \*2 (4th Cir. July 7, 2022); *see Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021).

That said, a plaintiff need not include "detailed factual allegations" to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (per curiam). However, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted); *see Johnson v. Navy Fed. Credit Union*, 2025 WL 2437832, at \*2 (4th Cir. Aug. 25, 2025) (per curiam).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555; *see Aljizzani v. Middle E. Broad. Networks, Inc.*, 178 F.4th 863, 868 (4th Cir. 2026) (same). "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief. *Iqbal*, 556 U.S. at 678; *see Katti v. Arden*, 161 F.4th 217, 224 (4th Cir. 2025). Instead, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable, and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

Ordinarily, when ruling on a Rule 12(b)(6) motion, a court does not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citation omitted); *see Megaro v. McCollum*, 66 F.4th 151, 157

(4th Cir. 2023); *Bing v. Brivo Sys.*, *LLC*, 959 F.3d 605, 616 (4th Cir. 2020).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear [ ] *on the face of the complaint.*'" *Goodman*, 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst*, 4 F.3d at 250); *see L.N.P. v. Kijakazi*, 64 F.4th 577, 585–86 (4th Cir. 2023).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448); *see Goines*, 822 F.3d at 166 (citation omitted) (a court may properly consider documents that are "explicitly incorporated into the complaint by reference . . . and those attached to the complaint as exhibits"); *see also Redding v. Noem,* 168 F.4th 203, 205 (4th Cir. 2026); *Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Moreover, a court may "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Qader v. Federal Home Loan Mortgage Corp.,* 2026 WL 1818380, at *2 (4th Cir. June 24, 2026) (unpublished); *Finn v. Humane Soc'y of the United States*, 160 F.4th 92, 96 n.2 (4th Cir. 2025); *Doriety,* 109 F.4th at 679; *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Carrington Sturgis v. Warden Jeff Nines*, SAG-25-841, 2025 WL 3240039, at *2 (D. Md. Nov. 20, 2025); *Moody v. The Board of Education of Wicomico* County, SAG-25-00642, 2025 WL 3119201, at *4 (D. Md. Nov. 7, 2025). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (emphasis in *Chesapeake Bay Found., Inc.*) (citation omitted); *see Brentzel v. Fairfax Transfer and Storage, Inc.,* 2021 WL 6138286, at *2 (4th Cir. Dec. 29, 2021) (per curiam).

In the usual course, the "exhibit-prevails rule" applies. It "provides that 'in the event of [a] conflict between the bare allegations of the complaint and any exhibit attached . . . the exhibit prevails.'" *Goines*, 822 F.3d at 166 (citing *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the [party] attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows

- 19 -

that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Goines*, 822 F.3d at 167. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

In the context of a Rule 12(b)(6) motion, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011); *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may only take judicial notice of adjudicative facts if they are "not subject to reasonable dispute," in that they are "(1) [ ] generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

In addition, a court "may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment." *Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015), *aff'd*, 639 F. App'x 200 (4th Cir. 2016). And, the Fourth Circuit has stated that a district court may take "judicial notice of its own records." *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990); *see also Thurman v. Robinson*, 51 F.3d 268, 1995 WL 133350, at *2 (4th Cir. Mar. 28, 1995) (per curiam); *United States Fidelity & Guar. Co. v. Lawrenson,* 334

F.2d 464, 467 (4th Cir. 1964).  Courts may also take judicial notice of matters of public record.

*Wooten v. Univ. of Maryland, Baltimore*, 733 F. Supp. 3d 402, 418 (D. Md. 2024).[13]

Fed. R. Civ. P. 12(d) is also pertinent.  It provides: "If, on a motion under Rule 12(b)(6)

. . . , matters outside the pleadings are presented and not excluded by the court, the motion must

be treated as one for summary judgment under Rule 56."   *Wilson-Cook Medical, Inc. v. Wilson*,

942 F.2d 247, 252 (4th Cir. 1991); *see also Fonte v. Board of Mgers. of Continental Towers*

*Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("If the district court *considered* the affidavit in disposing

of the Rule 12(b)(6) motion, it erred in failing to convert the motion to one for summary judgment

as the rule requires.") (citations omitted; emphasis added); *Goldman v. Belden*, 754 F.2d 1059,

1066 (2nd Cir. 1985) ("Rule 12(b) provides that to the extent that the court decides to consider

matters outside of the complaint in ruling on a motion pursuant to Rule 12(b)(6), 'the motion shall

be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .'").

Under Rule 12(d), a court has "'complete discretion to determine whether or not to accept

the submission of any material beyond the pleadings that is offered in conjunction with a Rule

12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider

it.'" *Sager v. Hous. Comm'n,* 855 F. Supp. 2d 524, 542 (D. Md. 2012) (quoting 5C Charles Alan

Wright et al., *Federal Practice & Procedure* § 1366 (3d ed. 2004, 2011 Supp.)).  However, it

---

[13] The consequences of a court taking judicial notice can be significant. For example, where the trial court has taken judicial notice of a fact in a civil matter, the judge must instruct the jury to accept that fact as conclusive.  Fed. R. Evid. 201(g).  A court that takes judicial notice may also preclude the introduction of evidence to disprove the noticed fact.  *See* Fed. R. Evid. 201(g) Advisory Committee Note (discussing controversy surrounding whether evidence may be admitted to disprove facts judicially noticed).  As stated in the Advisory Committee Notes to Rule 201, a "tradition of circumspection" surrounds judicial notice of adjudicative facts, and courts should exercise caution in taking judicial notice, doing so only when the matter is beyond reasonable controversy.  Fed. R. Evid. 201(b) Advisory Committee Note.

would be improper for the Court to convert the Motion to one for summary judgment before discovery has begun, and because plaintiff has not received notice. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5 (1986) ("[S]ummary judgment [must] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition."); *E.I. du Pont de Nemours & Co.,* 637 F.3d at 448–49 (finding summary judgment inappropriate "where the parties have not had an opportunity for reasonable discovery"); *Laughlin v. Metro Washington Airports Auth.*, 149 F. 3d 253, 261 (4th Cir. 1998) (stating that a district court "clearly has an obligation to notify parties regarding any court—instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *see also Adams Hous., LLC v. City of Salisbury, Md.*, 672 F. App'x 220, 220 (4th Cir. 2016) (per curiam) ("The court must give notice to ensure that the party is aware that it must 'come forward with all of [its] evidence.'").

A plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See, e.g.*, *Henderson v. City of Roanoke*, 2022 WL 704351, at *3 (4th Cir. Mar. 9, 2022) (per curiam) ("[N]o litigant is exempt from the well-established rule 'that parties cannot amend their complaints through briefing or oral advocacy.'") (quoting *So. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013)); *Glenn v. Wells Fargo Bank, N.A.*, DKC-15-3058, 2016 WL 3570274, at *3 (D. Md. July 1, 2016) (declining to consider declaration attached to brief opposing motion to dismiss because, among other things, it included allegations not included in the suit); *Zachair Ltd. v.*

*Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).  But, in civil rights cases, at the Rule 12(b)(6) stage, courts "must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts alleged*."  *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (internal quotations and citations omitted) (emphasis in original).

### B.  Fed. R. Civ. P. 12(f)

Fed. R. Civ. P. 12(f) governs motions to strike. It provides, in part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  *See, e.g.*, *Oliver v. Navy Fed. Credit Union*, 167 F.4th 106, 111 (4th Cir. 2026); *Haley Paint Co. v. E.I. du Pont de Nemours & Co.*, 279 F.R.D. 331, 335 (D. Md. 2012).  In determining whether to grant a motion to strike, the court "enjoys wide discretion . . . in order to minimize delay, prejudice and confusion by narrowing the issues for discovery and trial." *Haley Paint*, 279 F.R.D. at 336 (citation and quotation marks omitted).

To be sure, "Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic."  *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (internal quotation marks omitted); *see also Renaissance Greeting Cards, Inc. v. Dollar Tree Stores*, 227 Fed. Appx. 239, 247 (4th Cir. 2007).  Therefore, "[w]hen reviewing a motion to strike, 'the court must view the pleading under attack in a light most favorable to the pleader.'"  *Piontek*

*v. Serv. Ctrs. Corp.*, PJM-10-1202, 2010 WL 4449419, at \*8–9 (D. Md. Nov. 5, 2010) (citation omitted).

Ordinarily, a Rule 12(f) motion "will be denied unless the matter under challenge has 'no possible relation to the controversy and may prejudice the other party.'" *U.S. ex rel. Ackley v. Int'l Bus. Machines Corp.*, 110 F. Supp. 2d 395, 406 (D. Md. 2000) (quoting *Steuart Inv. Co. v. Bauer Dredging Constr. Co.*, 323 F. Supp. 907, 909 (D. Md. 1971)); *accord Williams v. Kettler Mgmt. Inc.*, CCB-12-1226, 2014 WL 509474, at \*1 (D. Md. Feb. 5, 2014); *E.E.O.C. v. Spoa, LLC*, CCB-13-1615, 2014 WL 47337, at \*3 (D. Md. Jan. 3, 2014). In contrast, "'the disfavored character of Rule 12(f) is relaxed in the context of scandalous allegations, *i.e.*, those that improperly cast a derogatory light on someone.'" *Asher & Simons, P.A. v. J2 Global Canada, Inc.*, 965 F. Supp. 2d 701, 702 (D. Md. 2013) (citation omitted), *partial reconsideration on other grounds*, 977 F. Supp. 2d 544 (D. Md. 2013).

A motion to strike a defense "should not be granted when the sufficiency of the defense depends upon disputed issues of fact or unclear questions of law." *NCUA v. First Union Capital Mtks. Corp.*, 189 F.R.D. 158, 163 (D. Md. 1999); *see Federal Ins. Co. v. Edenbaum*, JKS-12-410, 2012 WL 2803739, at \*2 (D. Md. July 9, 2012). Moreover, "Rule 12(f) motions often are not granted in the absence of a showing of prejudice to the moving party.[ ]" Wright and Miller, Federal Practice and Procedure: Civil 3d § 1381 at 422.

### C. The Labor Management Relations Act and Preemption

Congress enacted the LMRA in 1947 as an amendment to the NLRA. *See* 29 U.S.C. § 141 *et seq.*; *Snead v. Bd. of Educ. of Prince George's Cnty.*, 815 F. Supp. 2d 889, 895 n.6 (D. Md. 2011). Congress recognized that "[i]ndustrial strife" often "interferes with the normal flow of commerce," which could be "substantially minimized" by the uniform application of labor law.

29 U.S.C. § 141. Therefore, it sought "to protect the rights of individual employees in their relations with labor organizations" and to "prescribe the legitimate rights of both employees and employers[.]" *Id.*

Section 301 of the LMRA grants jurisdiction to federal courts as to claims within its scope. It states, 29 U.S.C. § 185:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

In the Motion (ECF 17), defendants seek dismissal only of Counts V and VI, arguing that plaintiff's claims for discrimination, retaliation, and wrongful discharge under Maryland law are preempted by the LMRA. *Id.* ¶¶ 6, 7. But, in their legal memorandum (ECF 17-1), they contend that McLeod's claims, "particularly his Title VII discrimination and retaliation claims involving the leave policy," are preempted by the LMRA because the claims require interpretation of the CBA. *Id.* at 9. They assert, *id.*: "Federal labor law is 'given precedence' over Title VII, the ADA, and most other generally applicable anti-discrimination statutes." And, in the Reply (ECF 22), defendants contend that all of the employment claims "are inextricably intertwined with the interpretation of the CBA and, therefore, the Complaint is preempted by the LMRA." *Id.* at 4.

Plaintiff counters that the "critical inquiry for LMRA preemption" is whether the WC Claim depends upon the meaning of a collective bargain agreement. ECF 18 at 25. He asserts that Section 301 of the LMRA does not preempt plaintiff's "independent federal statutory claims," because the claims do not require interpretation of a CBA. *Id.* at 24.

The doctrine of complete preemption "applies to claims under § 301 of the LMRA." *Hall v. Bayer Cropscience, LP*, JRG-15-07589, 2015 WL 5838577, at *4 (S.D.W. Va. Oct. 5, 2015).

The complete preemption doctrine is a "corollary of the well-pleaded complaint rule." *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *see In re Blackwater Sec. Consulting, LLC*, 460 F.3d 576, 584 (4th Cir. 2006).[14]  It exists where Congress "so completely pre-empt[s] a particular area that any civil complaint raising this select group of claims is necessarily federal in character." *Taylor*, 481 U.S. at 63–64.

The Supreme Court has explained: "When [a] federal statute *completely* pre-empts [a] state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003) (emphasis added).  Therefore, federal question jurisdiction is satisfied "when a federal statute wholly displaces the state-law cause of action through complete pre-emption." *Id.* Indeed, complete preemption is a jurisdictional doctrine that "'converts an ordinary state common-

---

[14] Ordinary and complete preemption are entirely distinct doctrines. *See Meade v. Avant of Colo., LLC*, 307 F. Supp. 3d 1134, 1140 (D. Colo. 2018) ("[T]he doctrine of complete preemption should not be confused with ordinary preemption."); *see also Powell v. Huntington Nat'l Bank*, 226 F. Supp. 3d 625, 630 (S.D.W. Va. 2016) ("The linguistic resemblance between complete preemption and ordinary or conflict preemption does not signify a similarly close jurisprudential relationship.").

Ordinary preemption stems from the Supremacy Clause of the Constitution, art. VI, cl. 2, which "provides a clear rule that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting art. VI); *see Hencely v. Fluor Corp.*, 608 U.S. __, 146 S. Ct. 1086, 1093 (2026).  As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 314 (2019) (observing that "'state laws that conflict with federal law are without effect'") (citation omitted); *see also Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013).  "Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 136 (2016).

But, "the question whether a certain state action is pre-empted by federal law is one of congressional intent." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 208 (1985).  And, this depends on congressional purpose.  *Id.*; *see Malone v. Whitemotor Corp.*, 435 U.S. 497, 504 (1978).

law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987) (quoting *Taylor*, 481 U.S. at 65); *see Vaden v. Discover Bank*, 556 U.S. 49, 61 (2009); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207–08 (2004); *Pinney v. Nokia, Inc.*, 402 F.3d 430, 449 (4th Cir. 2005); *see also Lontz v. Tharp*, 413 F.3d 435, 439 (4th Cir. 2005) (noting that the complete preemption doctrine is an "exception" to the well-pleaded complaint rule).

The complete preemption doctrine "recognizes that some federal laws evince such a strong federal interest that, when they apply to the facts underpinning the plaintiff's state-law claim, they convert that claim into one arising under federal law." *In re Blackwater*, 460 F.3d at 584. In that circumstance, "there is 'no such thing' as the state action, since the federal claim is treated as if it appears on the face of the complaint because it effectively displaces the state cause of action." *Lontz*, 413 F.3d at 441 (quoting *Beneficial*, 539 U.S. at 11). But, for a court to find that a state law claim is completely preempted, "exacting standards" must be satisfied. *Lontz*, 413 F.3d at 441.

Notably, "in enacting § 301 Congress intended doctrines of federal labor law uniformly to prevail over inconsistent local rules." *Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962). Section 301 requires federal courts to apply federal law to all lawsuits with claims that fall within § 301's mandate. *Id.* at 103–04; *see Lingle v. Norge Div. of Magic Chef, Inc.,* 486 U.S. 399, 404 (1988) ("§ 301 mandate[s] resort to federal rules of law in order to ensure uniform interpretation of collective-bargaining agreements, and thus to promote the peaceable, consistent resolution of labor-management disputes."); *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 451 (1957) (stating that § 301 "authorizes federal courts to fashion a body of federal law for the enforcement of [CBAs]"). The Supreme Court has made clear that "judges can determine questions of state law involving labor-

management relations only if such questions do not require construing collective-bargaining agreements." *Lingle*, 486 U.S. at 411.

The Supreme Court has applied the doctrine of complete preemption to certain state law tort claims. In *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985), a union-member employee brought a state tort action, claiming bad faith handling of a non-work related disability insurance claim. *Id.* at 204–06. The union and the employer were parties to a collective bargaining agreement that incorporated by reference a separately negotiated group health and disability plan. *Id.* at 204. The collective bargaining agreement contained a four-step grievance procedure that culminated in final and binding arbitration to adjudicate employee contract grievances. *Id.* However, the employee did not attempt to grieve his dispute concerning the handling of his disability claim. *Id.* at 206. The Court considered whether the state tort claim "as applied, would frustrate the federal labor-contract scheme established in § 301." *Id.* at 209.

The Court observed that the LMRA "require[s] that labor-contract disputes be resolved by reference to federal law . . . [and] require[s] that the meaning given a contract phrase or term be subject to uniform federal interpretation." *Id.* at 211. The Court said: "If the policies that animate § 301 are to be given their proper range . . . the pre-emptive effect of § 301 must extend beyond suits alleging contract violations." *Id.* at 210. It added, *id.* at 211: "[Q]uestions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." Therefore, said the Court, "[i]f the state tort law purports to define the meaning of the contract relationship, that law is pre-empted." *Id.* at 213.

The Court defined state law rights and duties that "do not exist independently of private agreements" as ones that *can* be waived or altered by agreements between private parties. *Id.* But, it stated that "§ 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law . . . [I]t would be inconsistent with congressional intent under that section to preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.[]" *Id.* at 212.

Notably, the Court stated, *id.* at 220: "The full scope of the pre-emptive effect of federal labor-contract law remains to be fleshed out on a case-by-case basis." But, it held "that when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law." *Id.* On this basis, it determined that the suit should have been dismissed for "failure to make use of the grievance procedure established" in the CBA. *Id.* at 221.[15]

When an employee covered by a CBA brings a tort claim against an employer, the question becomes whether it is a "real" tort claim or a "disguised" tort claim, *i.e.*, one that is, in reality, a claim for breach of the CBA. The Court has termed the latter as a "tortious breach-of-contract" claim. *See Int'l Bhd. of Elec. Workers, AFL-CIO v. Hechler*, 481 U.S. 851, 861 (1987). The reviewing court must determine whether a tort claim is actually a "tortious breach-of-contract" claim, such that it falls within the scope of § 301. *Id.* at 859 ("Inasmuch as federal law must control the uniform meaning given to contract terms in a collective-bargaining agreement . . . an employee's state-law tort action that necessarily rests on an interpretation of those terms is pre-empted by § 301.").

---

[15] The Court did not address preemption of federal statutory claims.

However, "not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." *Allis-Chalmers Corp.,* 471 U.S. at 211.  Rather, "preemption occurs only when resolution of a state law claim depends upon the meaning of the collective bargaining agreement . . . or when resolution of the state law claim is 'inextricably intertwined with consideration of the terms of the labor contract.'" *Owen v. Carpenters' Dist. Council*, 161 F.3d 767, 773 (4th Cir. 1998) (quoting *Allis-Chalmers Corp.*, 471 U.S. at 213).

Moreover, "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law." *Livadas v. Bradshaw,* 512 U.S. 107, 123 (1994).  The *Livadas* Court explained, 512 U.S. at 123 n.17, that "Congress is understood to have legislated against a backdrop of generally applicable labor standards, *see*, *e.g., Lingle,* 486 U.S., at 411–412, and . . . the scope of the arbitral promise is not itself unlimited, *see Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960) ('[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit').".

That a CBA may set forth duties that parallel those required under state law does not alter the characterization of the state law rights as "independent" of the CBA for the purpose of a preemption analysis.  *See Lingle*, 486 U.S. at 409 ("§ 301 pre-emption merely ensures that federal law will be the basis for interpreting collective-bargaining agreements, and says nothing about the substantive rights a State may provide to workers when adjudication of those rights does not depend upon the interpretation of such agreements."); *Humble v. Boeing Co.*, 305 F.3d 1004, 1009 (9th Cir. 2002) (concluding that a reasonable accommodation claim was not preempted simply because a CBA covered the subject matter in dispute).  "[T]he bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim

to be extinguished[.]" *Livadas,* 512 U.S. at 124.   Rather, "substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements." *Lingle,* 486 U.S. at 411.

In sum, "LMRA preemption applies to state law claims, not claims based upon federal statutes." *Clark v. Eagle Ottawa, LLC*, LRR-06-2028, 2007 WL 581650, at *4 (N.D. Iowa Feb. 20, 2007).   Moreover, "[i]t is well established that a state law cause of action may in certain circumstances be completely preempted by § 301 of the LMRA.  If so, then § 301 provides the exclusive cause of action, and the course of the litigation is governed by § 301 and the law interpreting it." *Smith v. Giant Food, LLC*, 931 F. Supp. 2d 717, 721 (D. Md. 2013).  In other words, "when resolution of a state law claim depends substantially on the analysis of a collective bargaining agreement's terms, it must either be treated as a claim under § 301, subject to dismissal if the collective bargaining agreement's grievance and arbitration procedures have not been followed, or alternatively be dismissed as preempted by § 301." *Barton v. House of Raeford Farms, Inc.*, 745 F.3d 95, 107 (4th Cir. 2014); *see Allis-Chalmers*, 471 U.S. at 220 (stating that "when resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, *see Avco Corp. v. Aero Lodge 735,* 390 U.S. 557 (1968), or dismissed as pre-empted by federal labor-contract law"); *Jenkins v. Nettles*, 121 F.3d 698, at *1 (4th Cir. 1997) (per curiam) (unpublished table decision) ("A purportedly state law claim that depends for resolution on analysis of the terms of a collective bargaining agreement must be treated as a § 301 claim or dismissed as preempted.").

### D.  Arbitration

Defendants assert that plaintiff "failed to exhaust mandatory grievance and arbitration procedures under the CBA and his Settlement Agreement." ECF 17-1 at 11.  Although "exhaustion

of contractual grievance procedures is not a prerequisite to a Title VII suit," *Crites v. Kaiser Aluminum & Chem. Corp.*, 959 F.2d 231, at *2 (4th Cir. 1992) (unpublished table decision), defendants maintain that the case must be dismissed.

"Arbitration is a contractually grounded out-of-court procedure that can be more efficient in resolving a dispute than a court proceeding, which is draped with many more mandated and authorized procedures." *Goldman Sachs Bank USA v. Brown*, 170 F.4th 249, 255 (4th Cir. 2026); *see Coinbase, Inc. v. Suski*, 602 U.S. 143, 144 (2024); *Volt Info. Sciences, Inc. v. Bd. of Trs. of Leland Stanford J. Univ.*, 489 U.S. 468, 478 (1989); *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 291 (4th Cir. 2022); *see also Mey v. DIRECTV, LLC*, 971 F.3d 284, 288 (4th Cir. 2020) ("Arbitration is a matter of contract."). "To that end, the Supreme Court has recognized . . . that arbitration obligations are grounded in contract law, including by emphasizing recently that under the FAA [Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*], arbitration agreements are as enforceable as other contracts, but not more so." *Sessoms v. USHealth Advisors, LLC*, 176 F.4th 795, 802 (4th Cir. 2026) (cleaned up) (alternations, citation, and quotation marks omitted).[16]

To be sure, "arbitration is . . . favored as a matter of public policy[.]" *Goldman Sachs*, 170 F.4th at 256.  But, if there is "no agreement to arbitrate" then the "'liberal federal policy favoring arbitration agreements' that is embodied in the Federal Arbitration Act (FAA)" is not implicated. *Thomas v. EOTech, LLC*, 169 F.4th 259, 267 (4th Cir. 2026) (quoting *In re Cotton Yarn Antitrust*

---

[16] Neither party has discussed the FAA.  Moreover, defendants do not move to compel arbitration of plaintiff's claims.  And, "Section 1 of the [FAA] provides that 'nothing' in the law shall be used to compel arbitration in disputes involving the 'contracts of employment' of any class of workers 'engaged in . . . interstate commerce.'" *Flowers Foods, Inc. v. Brock*, 608 U.S. __, 146 S. Ct. 1358, 1362 (2026) (quoting 9 U.S.C. § 1).

*Litig.*, 505 F.3d 274, 281 (4th Cir. 2007)); *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

Defendants' contention requires the application of a two-step inquiry. *See Krueger v. Angelos*, GLR-20-885, 2021 WL 662184, at \*5 (D. Md. Feb. 19, 2021), *aff'd,* 26 F.4th 212 (4th Cir. 2022). The Court must first "determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if [the court] conclude[s] that the court is the proper forum in which to adjudicate arbitrability, [the court] then decide[s] *whether* the dispute is, in fact, arbitrable." *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012) (emphases in original); *see Think Tank, Inc. v. ITegrity, Inc.,* TDC-22-1587, 2023 WL 3955346, at \*4 (D. Md. June 9, 2023); *Diesselhorst v. Munsey Bldg., L.L.L.P.*, AMD-04-3302, 2005 WL 327532, at \*4 (D. Md. Feb. 9, 2005) (stating that the second step of the inquiry concerns "the issue of arbitrability of the parties' dispute").

Although the Fourth Circuit has "adopted a 'general policy-based, federal presumption in favor of arbitration,' that presumption is not applied 'to resolve questions of the arbitrability of arbitrability issues themselves.'" *Peabody*, 665 F.3d at 102 (quoting *Carson v. Giant Food, Inc.*, 175 F.3d 325, 329 (4th Cir. 1999)). "Courts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable' evidence that they did so." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)) (internal brackets omitted); *accord Gibbs v. Haynes Investments, LLC*, 967 F.3d 332, 337 (4th Cir 2020); *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 265–66 (4th Cir. Jan. 4, 2019); *Del Webb Communities, Inc. v. Carlson*, 817 F.3d 867, 874 (4th Cir.), *cert. denied*, 580 U.S. 1019 (2016); *Carson*, 175 F.3d 329.

The "'clear and unmistakable' standard is exacting, and the presence of an expansive arbitration clause, without more, will not suffice." *Peabody*, 665 F.3d at 102; *see Berkeley Cnty. Sch. Dist. v. Hub Int'l Ltd.*, 130 F.4th 396, 402 (4th Cir. 2025) (same), *cert. denied*, 146 S. Ct. 187 (2025). This requirement "pertains to the parties' *manifestation of intent*, not the agreement's *validity*." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69 n.1 (2010) (emphasis in original).

For example, "'broad arbitration clauses that generally commit all interpretive disputes 'relating to' or 'arising out of' the agreement *do not* satisfy the clear and unmistakable test[.]'" *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527 (4th Cir. 2017) (quoting *Carson*, 175 F.3d at 330) (emphasis in *Simply Wireless*), *abrogated on other grounds by Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63 (2019); *see E.I. DuPont de Nemours & Co. v. Martinsville Nylon Emps.' Council Corp.*, 78 F.3d 578, at *1 (4th Cir. 1996) (unpublished) (concluding that the clear and unmistakable test was not met where the contract provided for arbitration of "[a]ny question as to the interpretation of this Agreement or as to any alleged violation of any provision of this Agreement"); *see also Peabody*, 665 F.3d at 102. However, "[t]hose who wish to let an arbitrator decide which issues are arbitrable need only state that 'all disputes concerning the arbitrability of particular disputes under this contract are hereby committed to arbitration,' or words to that clear effect." *Carson*, 175 F.3d at 330-31.

"In general, union members with a grievance under the CBA 'must attempt to use the contract grievance procedure agreed upon by employer and union as the mode of redress.'" *Windsor v. Bd. of Educ. of Prince George's Cnty.*, TDC-14-2287, 2016 WL 4939294, at *14 (D. Md. Sept. 13, 2016) (quoting *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965)) (alteration in *Maddox*) (cleaned up). If an employee "resorts to the courts before the grievance procedures have been fully exhausted, the employer may well defend on the ground that the

exclusive remedies provided by such a contract have not been exhausted." *Vaca v. Sipes*, 386 U.S. 171, 184 (1967).

In *Wright v. Universal Maritime Service Corp.*, 525 U.S. 70 (1998) ("*Universal Maritime*"), the Supreme Court "made clear that for claims brought pursuant to federal nondiscrimination statutes to be found subject to mandatory arbitration under a collective bargaining agreement, the agreement must include 'clear and unmistakable' language to that effect." *Moody*, 2025 WL 3119201, at *5. Accordingly, "an employee is not required to arbitrate federal employment discrimination claims when the collective bargaining agreement 'does not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum[.]'" *Id.* (quoting *Universal Maritime*, 525 U.S. at 82). But, "there is no inherent conflict between arbitration and the underlying purposes of the Disabilities Act or Title VII" and "age discrimination claims may be arbitrated[.]" *Austin v. Owens-Brockway Glass Container, Inc.*, 78 F.3d 875, 882 (4th Cir. 1996).

"The question whether the parties to a CBA agreed to arbitrate discrimination claims arising under the ADA—or any other federal statutory antidiscrimination law—is one of contract interpretation." *Brown v. ABF Freight Sys., Inc.*, 183 F.3d 319, 321 (4th Cir. 1999). But, in making that determination, the court does "not apply the usual interpretive presumption in favor of arbitration. Rather, under the rule of *Universal Maritime,* [the court] will not find an intent to arbitrate statutory claims absent a clear and unmistakable waiver of an employee's statutory right to a judicial forum for claims of employment discrimination." *Id.* (cleaned up) (internal quotation marks and citations omitted).

"Waivers of statutory claims in CBAs are subject to a stricter standard, because the right to a judicial forum is so important that it must 'be protected against less-than-explicit union

waiver.'" *Eastern Associated Coal Corp. v. Massey*, 373 F.3d 530, 533 (4th Cir. 2004) (quoting *Universal Maritime*, 525 U.S. at 80). Therefore, "[g]eneral arbitration clauses, such as those referring to 'all disputes' or 'all disputes concerning the interpretation of the agreement,' taken alone do not meet the clear and unmistakable requirement of *Universal Maritime*." *Carson*, 175 F.3d at 332. "In the collective bargaining context, the parties 'must be particularly clear' about their intent to arbitrate statutory discrimination claims." *Id.* at 331.

*Carson* sets forth two approaches to achieve "the requisite degree of clarity," as follows, *id.* at 331–32:

> The first is the most straightforward. It simply involves drafting an explicit arbitration clause. Under this approach, the CBA must contain a clear and unmistakable provision under which the employees agree to submit to arbitration all federal causes of action arising out of their employment. Such a clear arbitration clause will suffice to bind the parties to arbitrate claims arising under a host of federal statutes, including Title VII, 42 U.S.C. § 1981, the ADEA, and the ADA.

> The second approach is applicable when the arbitration clause is not so clear. General arbitration clauses, such as those referring to 'all disputes' or 'all disputes concerning the interpretation of the agreement,' taken alone do not meet the clear and unmistakable requirement of *Universal Maritime*. When the parties use such broad but nonspecific language in the arbitration clause, they must include an 'explicit incorporation of statutory antidiscrimination requirements' elsewhere in the contract. *Universal Maritime,* 119 S.Ct. at 396. If another provision, like a nondiscrimination clause, makes it unmistakably clear that the discrimination statutes at issue are part of the agreement, employees will be bound to arbitrate their federal claims.

### E. Title VII Discrimination and Retaliation

Plaintiff has lodged claims of retaliation under Title VII (Count III) and the ADA (Count IV), and claims of discrimination under the ADEA (Count I) and the ADA (Count II). Plaintiff has also alleged discrimination and retaliation in violation of MFEPA (Count V).[17]

---

[17] Before filing suit under Title VII, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union,* 491 U.S. 164 (1989), *superseded on other grounds by* 42 U.S.C. § 1981(b); *see also Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 384 (4th Cir. 2022);

Title VII prohibits an employer from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," and from "limit[ing], segregat[ing], or classify[ing] . . . employees or applicants from employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a). "These two proscriptions, often referred to as the 'disparate treatment' (or 'intentional discrimination') provision and the 'disparate impact' provision, are the only causes of action under Title VII." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015); *see Roberts v.*

---

*McCray v. Md. Dep't of Trans.*, 662 F. App'x 221, 224 (4th Cir. 2016) (per curiam); *Bryant v. Bell Atlantic, Md., Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). The same is true under the ADA, the ADEA, and MFEPA. *See, e.g.*, *Bush v. Frederick Cnty. Pub. Schs.*, 2024 WL 639255, at *3 (4th Cir. Feb. 15, 2024) (per curiam) ("Both Title VII and the [MFEPA] require a plaintiff alleging employment discrimination to exhaust administrative remedies before filing their lawsuit, or else the claim is time barred."). Defendants do not contend that plaintiff failed to exhaust administrative remedies.

To exhaust, a plaintiff must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of when "the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1); s*ee Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) *abrogated on other grounds by Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019); *Bush*, 2024 WL 639255, at *3; *Williams v. Giant Food Inc.*, 370 F.3d 423, 428 (4th Cir. 2004). This period is extended to 300 days in a deferral state, such as Maryland. *See Jones*, 551 F.3d at 300; *Bush*, 2024 WL 639225, at *3; *Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4 n.8 (D. Md. Jan. 3, 2018); *Valderrama v. Honeywell Tech. Sols., Inc.*, 473 F. Supp. 2d 658, 662 n.4 (D. Md. 2007), *aff'd*, 267 F App'x 256 (4th Cir. 2008).

"[A] complainant is entitled to a 'right-to-sue' notice 180 days after the charge is filed." *Fort Bend Cnty.*, 587 U.S. at 545 (citing § 2000e-5(f)(1); 29 CFR § 1601.28). "And within 90 days following such notice, the complainant may commence a civil action against the allegedly offending employer." *Fort Bend Cnty.*, 587 U.S. at 545 (citing § 2000e-5(f)(1)).

The administrative claims process is "an integral part" of the Title VII enforcement scheme. *See Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 593 (4th Cir. 2012). However, exhaustion is not jurisdictional. It is, instead, a "claim-processing rule[ ] that must be timely raised to come into play." *Fort Bend Cnty.*, 587 U.S. at 544.

*Glenn Industrial Group, Inc.*, 998 F.3d 111, 117 (4th Cir. 2021); *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015).

The Supreme Court has referred to discrimination based on one of the five characteristics specified above—race, color, religion, sex, or national origin—as "status-based discrimination." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 351 (2013). The phrase "terms, conditions or privileges of employment" is regarded as "an expansive concept." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (quotation marks and citation omitted).

Of import, "the analysis of ADEA and ADA discrimination claims follow the same framework as a Title VII claim[.]" *Hughley v. Marion*, GLR-22-1654, 2023 WL 5957185, at *5 n.7 (D. Md. Sept. 13, 2023); *see Bomar v. Board of Education of Harford County et al.*, 2026 WL 1031816, at *4 (4th Cir. Apr. 16, 2026) (per curiam). And, claims brought under MFEPA use "the same legal frameworks as claims brought under Title VII, the ADEA, and the ADA." *DeSantis v. Mayor & City Council of Baltimore*, DKC-20-3165, 2023 WL 170424, at *16 (D. Md. Jan. 12, 2023); *see*, *e.g.*, *Bush v. Frederick Cnty. Pub. Schs.*, 2024 WL 639255, at *4 (4th Cir. Feb. 15, 2024) (per curiam) (MFEPA); *Laird v. Fairfax Cnty.*, 978 F.3d 887, 893 n.5 (4th Cir. 2020) (ADA); *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 391 (4th Cir. 2001) (ADA); *Buckmaster v. Nat'l R.R. Passenger Corp.*, RDB-19-3203, 2022 WL 1081947, at *6 (D. Md. Apr. 11, 2022) (ADA and MFEPA); *Hawkins v. Leggett*, 955 F. Supp. 2d 474, 497 (D. Md. 2013) (MFEPA). But, "where the MFEPA materially departs from the language of Title VII, the MFEPA is not read in lockstep with the federal statute." *Watrous v. AIRtec, Inc.*, TJS-24-2076, 2025 WL 2494324, at *10 (D. Md. Aug. 28, 2025).[18]

---

[18] In October 2022, in regard to a hostile work environment claim, "the MFEPA was amended to clarify that harassment need not be severe or pervasive in all circumstances to be actionable." *Watrous*, 2025 WL 2494324, at * 10.

Title VII's retaliation provision is found at 42 U.S.C. § 2000e-3(a). It states: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this title [*i.e.*, Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title."

"Title VII bars retaliation against an employee [who] has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Cosby v. S.C. Prob., Parole & Pardon Servs.*, 93 F.4th 707, 718 (4th Cir. 2024) (quoting 42 U.S.C. § 2000e-3(a)); *see Perkins v. Int'l Paper Co.*, 936 F.3d 196, 213 (4th Cir. 2019) (Title VII prohibits an employer from retaliating against an employee for "participating in a Title VII proceeding or opposing an employer's discriminatory practices"); *see* 42 U.S.C. § 2000e-3; *see also McIver v. Bridgestone Americas, Inc.*, 42 F.4th 398, 410–11 (4th Cir. 2022). The provision's "'purpose is to protect employees who complain about real or perceived discrimination in the workplace from retaliation, which threatens to chill the willingness of employees to speak up.'" *Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (quoting *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir. 2002)). I discuss retaliation in more detail, *infra*.

The ADA's retaliation provision is found at 42 U.S.C. § 12203(a). And, the MFEPA retaliation provision is found at S.G. § 20-606(f).

At trial, a plaintiff may establish a discrimination or retaliation claim "through two avenues of proof." *Hill v. Lockheed Martin Logistics Management, Inc.*, 354 F.3d 277, 284 (4th Cir. 2004), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see*

*Bomar*, 2026 WL 1031816, at \*4.  The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'"  *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997); *see Thomas v. Delmarva Power & Light Company*, 715 F. App'x 301, 302 (4th Cir. 2018).  The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *Young v. United Parcel Service, Inc.*, 575 U.S. 206, 213 (2015) (construing the Pregnancy Discrimination Act); *Massaro v. Fairfax Co.*, 95 F.4th 895, 902 (4th Cir. 2024); *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649–50 (4th Cir. 2021).

As to a claim of discrimination, if the plaintiff chooses at trial to proceed under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination."  *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Cent. Intel. Agency*, 848 F.3d 305, 315 (4th Cir. 2017).  "To establish a *prima facie* case of discrimination, a plaintiff must make four showings: (1) that [he] belongs to a protected class, (2) that [he] was subject to an adverse employment action, (3) that [he] had been meeting [his] employer's legitimate expectations, and (4) that circumstances raise a reasonable inference that the adverse action constitutes unlawful discrimination."  *Bah v. Sampson Bladen Oil Co., Inc.*, 2026 WL 1507086, at \*2 (4th Cir. May 29, 2026) (per curiam) (alterations added); *see Johnson*, 163 F.4th at 815; *Cosby*, 93 F.4th at 714; *Matias v. Elon Univ.*, 780 F. App'x 28, 31 (4th Cir. 2019) (per curiam); *Rayyan v. Va. Dep't of Transp.*, 719 F. App'x 198, 203 (4th Cir. 2018); *Goode v. Cent. Va. Legal Aid Soc., Inc.*, 807 F.3d 619, 626 (4th Cir. 2015).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce

evidence of a legitimate, nondiscriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 255 (1981). In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant" and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993). Put another way, "[w]here a defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case," by establishing a nondiscriminatory reason for the adverse action, "whether the plaintiff did [make a prima facie case] is no longer relevant." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (alteration added).

If the defendant establishes a nondiscriminatory reason for an adverse action, the burden shifts to the plaintiff to prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516–20; *see also Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in *Adams* and *Jiminez*). In other words, even under the *McDonnell Douglas* approach, the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 142 (quoting

*Burdine*, 450 U.S. at 253); *see also Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 726 (4th Cir. 2019); *Hoyle*, 650 F.3d at 336.[19]

"To prevail on a retaliation claim pursuant to the *McDonnell-Douglas* framework, a plaintiff must first establish a prima facie case by showing that: (1) she engaged in protected activity, (2) the employer took adverse action against her, and (3) a causal relationship existed between the protected activity and the adverse employment action." *Johnson*, 163 F.4th at 819; *see Bomar*, 2026 WL 1031816, at *6; *Piscitelli v. Gitlab, Inc.*, 2026 WL 936898, at *2 (4th Cir.

---

[19] The *McDonnell Douglas* proof scheme is "a 'pretext' framework, under which the [plaintiff], after establishing a prima facie case of discrimination, demonstrates that the employer's proffered permissible reason for taking an adverse employment action is actually a pretext for discrimination." *Hill*, 354 F.3d at 285 (citing *Burdine*, 450 U.S. at 252–53, and *McDonnell Douglas Corp.*, 411 U.S. at 807). "To establish pretext, a plaintiff must present evidence to allow a reasonable juror to find that (1) the legitimate, nondiscriminatory reasons were 'unworthy of credence' and (2) unlawful discrimination was the actual motive for the decision." *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 573 (D. Md. 2010) (quoting *Reeves*, 530 U.S. at 143); *see Congress v. Gruenberg*, 643 F. Supp. 3d 203, 230 (D.D.C. 2022) ("A plaintiff may make this showing of pretext by relying on '(1) evidence establishing the plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the employer.'") (quoting *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006)).

A plaintiff may introduce "evidence that demonstrates (or at least creates a question of fact) that the proffered 'expectation' is not, in fact, legitimate at all." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 517 (4th Cir. 2006). But, "[o]nce an employer has provided a non-discriminatory explanation for its decision, the plaintiff cannot seek to expose that rationale as pretextual by focusing on minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it. The former would not create a "'genuine' dispute, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986), [and] the latter would fail to be 'material,' *see Anderson,* 477 U.S. at 248." *Hux v. City of Newport News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). Moreover, in assessing a defendant's proffered reasons for its actions, the Fourth Circuit has "repeatedly observed" that it is not a court's "'province to decide whether an employer's reason for terminating an employee was wise, fair, or even correct, ultimately, so long as it truly was the reason for the employee's termination.'" *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014) (alterations and citation omitted).

Apr. 7, 2026); *Andrews v. Dejoy*, 2026 WL 74575, at \*3 (4th Cir. Jan. 9, 2026) (per curiam); *Anthony v. United Airlines, Inc.*, 2026 WL 35963, at \*3 (4th Cir. Jan. 6, 2026) (per curiam); *Imungi v. Virginia Commonwealth Univ.,* 2025 WL 2612761, at \*4 (4th Cir. Sept. 10, 2025); *Seabrook*, 148 F.4th at 272; *Jones v. Eli Lilly & Co.,* 2025 WL 1823950, at \*2 (4th Cir. July 2, 2025) (per curiam); *Curry v. S.C. State Election Comm'n*, 2025 WL 1806876, at \*1 (4th Cir. July 1, 2025) (per curiam); *Parker v. Children's Nat'l Med. Ctr., Inc.*, 2025 WL 1540954, at \*3 (4th Cir. May 30, 2025) (per curiam); *Barnhill v. Bondi*, 138 F.4th 123, 132 (4th Cir. 2025); *Decoster v. Becerra*, 119 F.4th 332, 342 (4th Cir. 2024); *Tutt v. Wormuth*, 2024 WL 4144397, at \*1 (4th Cir. Sept. 11, 2024) (per curiam); *Cosby*, 93 F.4th at 718; *Sempowich*, 19 F.4th at 653; *Roberts*, 998 F.3d at 122; *Kitlinski v. United States Department of Justice*, 994 F.3d 224, 232 (4th Cir. 2021), *cert. denied* 142 S. Ct. 778 (2022); *Strothers*, 895 F.3d at 327; *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 217 (4th Cir. 2016).

However, the *McDonnell Douglas* proof scheme is merely "a procedural device, designed only to establish an order of proof and production" at trial. *St. Mary's Honor Ctr.*, 509 U.S. at 521 (emphasis omitted); *see Ennis v. National Ass'n of Business and Educational Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995)). "The prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic.'" *Aikens*, 460 U.S. at 715 (quoting *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577 (1978)). Rather, it is "'a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Aikens*, 460 U.S. at 715 (quoting *Furnco Construction Corp.*, 438 U.S. at 577). It is intended to be flexible, "not onerous," and is designed to uncover "circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. But, it "is inapplicable

where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

Of course, this case is at the motion to dismiss stage, not summary judgment or trial. "[A]t the motion to dismiss stage, a plaintiff need not establish a prima facie case" under Title VII. *Johnson*, 163 F.4th at 819. This is because the "prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz*, 534 U.S. at 510; *see Barbour*, 105 F.4th at 590. Rather, a plaintiff must merely assert allegations that, if proven, state a claim for relief. *Iqbal*, 556 U.S. at 678; *Johnson*, 163 F.4th at 819; *Bing*, 959 F.3d at 616; *see also Jiang v. Duke University*, 2026 WL 1623430, at *4 (4th Cir. June 5, 2026) (per curiam).

Put another way, a plaintiff need only "offer facts that plausibly support inferences that" the elements of his claim are satisfied. *Laurent-Workman*, 54 F.4th at 210; *see Aljizzani*, 178 F.4th at 869; *Jiang*, 2026 WL 1623430, at *4; *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) ("[W]hile a plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, factual allegations must be enough to raise a right to relief above the speculative level.") (cleaned up), *aff'd*, 566 U.S. 30 (2012). Moreover, "the Federal Rules do not contain a heightened pleading standard for employment discrimination suits[.]" *Swierkiewicz*, 534 U.S. at 515.

Nevertheless, reference to the elements of a claim and the proof methodologies serves to inform a court's evaluation of the sufficiency of the allegations, and whether they state a plausible claim for relief. *Coleman*, 626 F.3d at 190; *see also Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003); *Cloud v. Brennan*, 436 F.Supp.3d 1290, 1300–01 (N.D. Cal. 2020); *Young v. Giant Food Stores, LLC*, 108 F. Supp. 3d 301, 314 (D. Md. 2015). In particular, "the complaint must 'state a plausible claim for relief' that 'permits the court to infer more than the

mere possibility of misconduct' based upon 'its judicial experience and common sense.'" *Coleman*, 626 F.3d at 190 (alterations omitted) (citing *Iqbal*, 556 U.S. at 679). Although "plaintiff is not required to plead facts that constitute a prima facie case in order to survive a motion to dismiss, '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Coleman*, 626 F.3d at 190 (internal citation omitted) (citing *Twombly*, 550 U.S. at 555); *see Francis*, 588 F.3d at 193.

With regard to a retaliation claim, there "is no requirement that the complaint contain facts rebutting any legitimate, nondiscriminatory reason articulated by the employer for its allegedly retaliatory action." *Barbour,* 105 F.4th at 590. "At bottom, in order to adequately plead a Title VII retaliation claim, the complaint must allege facts supporting a plausible inference that the employer took an adverse employment action against the plaintiff because of the plaintiff's protected activity." *Id.* (cleaned up) (citation and quotation marks omitted).

With respect to the first element of the claim for retaliation, the Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005); *see Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018). "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

"Protected activity under Title VII includes complaints of discrimination based upon 'race, color, religion, sex or national origin.'" *Landino v. Sapp*, 520 F. App'x 195, 198 (4th Cir. 2013) (per curiam) (citation omitted). And, "[c]omplaints raised through internal company procedures are recognized as protected activity." *Roberts*, 998 F.3d at 122. As the Fourth Circuit has said,

"[t]o fall under the protection of the opposition clause . . . behavior need not rise to the level of formal charges of discrimination. The opposition clause has been held to encompass informal protests, such as voicing complaints to employers or using an employer's grievance procedures." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981) (citation omitted); *see Laughlin*, 149 F.3d at 259 ("Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.")

However, "for an employee's activity to constitute protected 'opposition,' [he] must show (1) that [he] reasonably believed that the employment action [he] opposed constituted a Title VII violation, and (2) that [his] conduct in opposition was reasonable." *Netter*, 908 F.3d at 937–38 (citation omitted); *see also Cosby*, 93 F.4th at 718–19.

The second element is that of an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added). In other words, the adverse action "need not be employment- or workplace-related in order to sustain a retaliation claim." *Id.*; *see Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."). Thus, "[t]he scope of Title VII's anti-retaliation provision . . . is broader than the anti-discrimination provision." *Strothers*, 895 F.3d at 327; *see Herkert v. Bisignano*, 151 F.4th 157, 165 (4th Cir. 2025) ("The anti-retaliation provision, by contrast, is not tied to the terms and conditions of employment, and so may 'include a wider variety of conduct within its scope.'") (quoting *Laurent-Workman*, 54 F.4th at 213).

"Although Title VII's anti-retaliation provision is not tied to the terms and conditions of employment, only materially adverse actions serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination will satisfy this element of a Title VII retaliation claim." *McGuire v. Harford County*, RDB-25-1433, 2026 WL 874154, at *10 (D. Md. Mar. 31, 2026) (cleaned up) (quotation marks and citation omitted); *see Herkert*, 151 F.4th at 165–66; *Ray v. Int'l Paper Co.*, 909 F.3d 661, 667 (4th Cir. 2018); *Weide v. City of Cumberland*, SAG-25-03566, 2026 WL 1084921, at *5 (D. Md. Apr. 22, 2026).  In other words, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, CCB-08-183, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation." *Spencer v. Va. State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).  Rather, actions such as "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions.  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  "This standard is sometimes referred to as a 'significant harm' requirement[.]" *Herkert,* 151 F.4th at 166.[20]

The burden of pleading plausible allegations includes the element of causation.  *Jiang*, 2026 WL 1623430, at *5.  To survive a motion to dismiss, the complaint must contain "connective allegations" that permit the court to make the inferential leap that "[d]efendants' actions were motivated by unlawful motivations[.]" *Id.*

---

[20] The Fourth Circuit has clarified that although the Title VII retaliation "'significant harm' requirement" has "some linguistic overlap with the heightened threshold of harm rejected by *Muldrow* . . . because the 'materially adverse' standard was 'adopted . . . for reasons peculiar to the retaliation context,' *Muldrow*'s analysis of discrimination claims leaves it unchanged." *Herkert,* 151 F.4th at 166 (quoting *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 357 (2024)).

To prevail on a retaliation claim, the plaintiff must "show a causal link between his protected activity . . . and the adverse action taken against him." *Lee v. West Va. Univ. Medical Corp.*, ___ F.4th ___, 2026 WL 1993164, at *7 (4th Cir. July 10, 2026). But, "establishing a 'causal relationship' at the prima facie stage is not an onerous burden." *Strothers*, 895 F.3d at 335. Indeed, "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Roberts*, 998 F.3d at 127 (citing *Burgess v. Bowen*, 466 F. App'x 272, 283 (4th Cir. 2012)); *see Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021).

To show causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see Crouch v. SunCakes NC, LLC*, 2026 WL 497985, at *3 (4th Cir. Feb. 23, 2026) (unpublished); *Hall Haggins v. Wilson Air Ctr., LLC*, 163 F.4th 872, 881 (4th Cir. 2026); *Irani v. Palmetto Health,* 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam). This requirement of but-for causation imposes a higher burden on a plaintiff than the mixed-motive standard in Title VII's antidiscrimination provision. *See Foster v. University of Maryland-Eastern Shore*, 787 F.3d 243, 249–50 (4th Cir. 2015). In other words, the plaintiff must allege that he suffered an adverse action because he engaged in protected activity. *Massaro*, 2024 WL 1162061, at *5.

"In order to demonstrate the requisite causal relationship," the Fourth Circuit has "'consistently required proof of a decisionmaker's knowledge of protected activity to support a Title VII retaliation claim.'" *Anthony*, 2026 WL 35963, at *3 (quoting *McIver*, 42 F.4th at 412). "Knowledge of a protected activity means not only knowledge that the activity occurred, but also knowledge that the employee engaged in the protected activity *because* the employee had a

reasonable belief that a Title VII violation occurred." *McIver*, 42 F.4th at 412 (emphasis in original) (citation omitted).

A plaintiff may attempt to establish that a protected activity caused an adverse action "'through two routes.'" *Roberts*, 998 F.3d at 123 (quoting *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783–84 (4th Cir. 2021) (per curiam)); *see Johnson*, 163 F.4th at 819; *CSRA*, 12 F.4th at 417. The two avenues are: "(1) by establishing a 'temporal proximity between the protected activity and adverse action,' or (2) by establishing that 'other relevant evidence indicates continuing retaliatory conduct and animus toward the plaintiff.'" *Johnson*, 163 F.4th at 819 (quoting *Alberti v. Rector & Visitors of the Univ. of Virginia*, 65 F.4th 151, 156 (4th Cir. 2023)) (cleaned up).

In general, "temporal proximity suffices to show a causal relationship." *Sempowich*, 19 F.4th at 654; *see Seabrook*, 148 F.4th at 273; *Haggins,* 163 F.4th at 881. In *Strothers*, 895 F.3d at 335–36, the Court said: "An employee may establish *prima facie* causation simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee soon after becoming aware of such activity." *See also Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005) ("In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in protected activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653 (4th Cir. 1998)).

The Fourth Circuit has "held that causation can be inferred when 'the employer takes adverse employment action against an employee shortly after learning of the protected activity.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Penley v. McDowell Cnty. Bd. of Educ.*, 876 F.3d 646,

656 (4th Cir. 2017)).  But, the Fourth Circuit has cautioned that "'the temporal proximity must be very close.'" *Massaro*, 2024 WL 1162061, at *5 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (cleaned up).  Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'"  *Massaro*, 2024 WL 1162061, at *5 (citation omitted).

Pertinent here, the Fourth Circuit has determined that a "one-month interim between [plaintiff's] protected activity and discharge, standing alone, does not suffice to show the causal link needed for her prima facie case of retaliation."  *Haggins,* 163 F.4th at 881; *see Barnhill,* 138 F.4th at 132 ("While there is not a bright-line rule instructing when temporal proximity is sufficient to establish causation, without other evidence of causation, the gap between the protected activity and the adverse employment action can generally be no longer than two months."); *Clarke v. DynCorp Int'l LLC*, JFM-12-3267, 962 F. Supp. 2d 781, 790 (D. Md. 2013) ("[A] lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'") (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)); *Roberts*, 998 F.3d at 126 (three months); *but see Hollis v. Morgan State Univ.*, 153 F.4th 369, 384 (4th Cir. 2025) (finding "a degree of temporal proximity that our precedent suggests may allow a jury to infer a causal connection" when the "protected activity and adverse action were separated by less than three months").

Notably, "'[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's]

probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"); *see Jones*, 2025 WL 1823950, at \*2.

However, temporal proximity is not the sole avenue to establish causation. *CSRA*, 12 F.4th at 417. Indeed, "the absence of temporal proximity alone is not fatal" to a plaintiff's retaliation claim. *Johnson*, 163 F.4th at 819. A plaintiff can "overcome an absence of temporal proximity" through "'evidence of recurring retaliatory animus during the intervening period' . . . ." *Massaro*, 2024 WL 1162061, at \*6 (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)) (cleaned up); *see Barbour,* 105 F.4th at 593. The alternative path contemplates the existence of "a pervasive sequence of intervening events indicating disdain for or intermeddling with the protected activity." *Barnhill,* 138 F.4th at 132.

### F.  The ADEA

The ADEA, enacted in 1967, makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1); *see Lee*, 2026 WL 1993164, at \*5; *Tickles v. Johnson*, 805 F. App'x 204, 206–07 (4th Cir. 2020); *Hartman v. Univ. of Md. at Balt.*, 595 F. App'x. 179, 181 (4th Cir. 2014) (per curiam); *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009) *abrogated on other grounds by Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541 (2019). Congress sought "'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment.'" *EEOC v. Balt. Cnty.*, 904 F.3d 330, 333-34 (4th Cir. 2018) (quoting 29 U.S.C. § 621(b)) (alteration in *EEOC*); *see also Spivey v.*

*Mohawk ESV, Inc.*, 2023 WL 3918674, at \*1 (4th Cir. June 9, 2023) (per curiam).  The ADEA's protections are "limited to individuals who are at least 40 years of age."  29 U.S.C. § 631(a).

To state a prima facie claim of employment discrimination under the ADEA, a plaintiff must allege that: "(1) he is 'a member of a protected class'—that is, 40 years or older; (2) he 'suffered an adverse employment action'; (3) he 'was performing [his] job duties at a level that met [his] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open' or he was replaced by a substantially younger person."  *Bodkin v. Town of Strasburg, Va.*, 386 F. App'x. 411, 413-14 (4th Cir. 2010) (per curiam) (alterations in *Bodkin*) (quoting *Hill*, 354 F.3d at 285 (Title VII discrimination)); *see Palmer v. Liberty University, Inc.*, 72 F.4th 52, 63 (4th Cir. 2023); *Baqir v. Principi*, 434 F.3d 733, 742 (4th Cir. 2006), *abrogated in part on other grounds by Gross*, 557 U.S. 167; *see also Tickles*, 805 Fed. Appx. at 207 (stating that the elements of an ADEA claim are: "[T]he plaintiff is (1) over the age of 40, and (2) experienced discrimination by an employer (3) because of his age").

Given that ADEA liability hinges on discrimination "because of . . . age," 29 U.S.C. § 623(a)(1) (emphasis added), the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action."  *Gross*, 557 U.S. at 177; *see Lee*, 2026 WL 1993164, at \*5; *Bandu v. City of Salem*, 59 F.4th 705, 715 (4th Cir. 2023); *Hartman*, 595 F. App'x. at 181.  In other words, "an employee cannot prevail on an age discrimination claim by showing that age was one of multiple motives for an employer's decision; the employee must prove that the employer *would not have* [taken the adverse employment action] in the absence of age discrimination."  *Westmoreland*, 924 F.3d at 725 (emphasis in original); *see Gross*, 557 U.S. at 175 (stating the ADEA does not permit "a mixed-motives age discrimination claim").

At trial, "[a] plaintiff can prove a violation of the ADEA through direct or circumstantial evidence." *Cole v. Fam. Dollar Stores of Maryland, Inc.*, 811 F. App'x 168, 172 (4th Cir. 2020); *see Lee*, 2026 WL 1993164, at *5; *Tickles,* 805 Fed. Appx. at 207.  But, on a motion to dismiss, the court must only determine "whether the Complaint contains factual allegations 'sufficient to raise a right to relief above the speculative level' and that support a 'reasonable inference' that [defendant] discriminated against [plaintiff] 'because of' his age." *Tickles*, 805 Fed. App'x at 207 (quoting *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 586 (4th Cir. 2015)).

In other words, "[t]o survive a Rule 12(b)(6) motion to dismiss for failure to state an ADEA claim, [the plaintiff] is not required to plead a prima facie case of discrimination, *Swierkiewicz*, 534 U.S. at 515, but he must 'allege facts to satisfy the elements of a[n] [ADEA] cause of action[.]'" *Tickles,* 805 Fed. App'x at 207 (quoting *McCleary-Evans*, 780 F.3d at 585) (first and second alterations added).  But, "'reference to the elements' of a prima facie discrimination claim 'is helpful to gauge the sufficiency of the allegations.'"  *Rios-Grajales v. Bondi*, BAH-24-297, 2025 WL 2484169, at *10 n.5 (D. Md. Aug. 28, 2025) (quoting *Gaines v. Baltimore Police Dep't*, 657 F. Supp. 3d 708, 734 (D. Md. 2023)).  And, "a complaint states [an ADEA] claim, if it provides sufficient factual allegations to 'support a reasonable inference that the decision makers were motivated by bias,' even if the complaint does not specifically address each element of a prima facie case of discrimination." *Washington v. Baltimore City Police Dep't*, LKG-22-02212, 2023 WL 6308090, at *4 (D. Md. Sept. 28, 2023) (quoting *McCleary-Evans*, 780 F.3d at 586).

### G.  The ADA

The ADA, 42 U.S.C. §§ 12101 *et seq.*, was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with

disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). To that end, the statute "prohibits discrimination against persons with disabilities in three major areas of public life: employment, under Title I, 42 U.S.C. §§ 12111–12117; public services, under Title II, 42 U.S.C. §§ 12131-12165; and public accommodations, under Title III, 42 U.S.C. §§ 12182-12189." *A Helping Hand, LLC v. Baltimore Cnty.*, 515 F.3d 356, 361 (4th Cir. 2008) (citing *Tennessee v. Lane*, 541 U.S. 509, 516-17 (2004)).[21]

Title I of the ADA, which concerns employment, is relevant here. It prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees . . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see Finn*, 160 F.4th at 99; *Jones v. Fairfax Cnty. Sch. Bd.*, 2025 WL 2813607, at *2 (4th Cir. Oct. 3, 2025) (per curiam); *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab.*, 141 F.4th 568, 573 (4th Cir. 2025), *cert. denied*, 146 S. Ct. 367 (2025); *Greene v. ICON Gov't & Pub. Health Sols.*, 2025 WL 1589254, at *1 (4th Cir. June 5, 2025) (per curiam).

"To plead a claim of disability discrimination under the ADA, a plaintiff must allege that (1) [he] had a disability as defined in the ADA; (2) [he] was a 'qualified individual,' *i.e.,* able to perform the essential functions of [his] job with or without reasonable accommodation; and (3) [his] employer took an adverse action against [him] on account of [his] disability." *Craddock v. Lincoln Nat. Life Ins. Co.*, 533 F. App'x 333, 336 (4th Cir. 2013) (per curiam) (alterations added)

---

[21] The ADA contains five titles: Title I, Employment; Title II, Public Services; Title III, Public Accommodations; Title IV, Telecommunications; and Title V, Miscellaneous Provisions. Plaintiff does not specify the title on which his ADA claim is based. *See* ECF 1; ECF 18.

(quoting *Young v. United Parcel Serv., Inc.,* 707 F.3d 437, 443 (4th Cir. 2013)); *see Ruth v. Bd. of Educ. of Montgomery Cnty.*, DLB-25-1727, 2026 WL 607620, at \*6 (D. Md. Mar. 4, 2026); *Gagnon v. Bd. of Educ. of Montgomery Cnty.,* 760 F. Supp. 3d 359, 370 (D. Md. 2024).

To establish a prima facie claim of discrimination under the ADA,[22] the plaintiff is generally required to demonstrate that (1) the employee is a qualified individual with a disability; (2) the employee was discharged or subjected to other adverse employment action; (3) at the time of the adverse employment action, the employee was "'performing the job at a level that met [the] employer's legitimate expectations'"; and (4) the adverse employment action or "'discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.'" *Coursey v. Univ. of Md. E. Shore*, 577 F. App'x 167, 174 (4th Cir. 2014) (quoting *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001)); *see Turner v. Wal-Mart Assocs., Inc.*, 2025 WL 2049054, at \*1 (4th Cir. July 22, 2025) (per curiam); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 572 (4th Cir. 2015) (quoting *E.E.O.C. v. Stowe-Pharr Mills, Inc.*, 216 F.3d 373, 377 (4th Cir. 2000)); *Summers v. Altarum Inst., Corp.*, 740 F.3d 325, 328 (4th Cir. 2014); *Harris v. Reston Hosp. Ctr., LLC*, 523 F. App'x 938, 947 (4th Cir. 2013) (per curiam); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1264–65 (4th Cir. 1995).  "[T]he plaintiff may establish the fourth element of the prima facie case 'either by showing that [comparably qualified] persons outside the protected class were retained in the same position or by producing some other evidence indicating that the

---

[22] As discussed, to survive a motion to dismiss under Rule 12(b)(6), the plaintiff is not required to establish a "prima facie case." *See Swierkiewicz,* 534 U.S. at 510.  Rather, "the ordinary rules for assessing the sufficiency of a complaint apply." *Id.* at 511.  Thus, as with any challenge to a pleading under Rule 12(b)(6), the plaintiff need only allege facts sufficient to "state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570.

employer did not treat [disability] neutrally.'" *Innocent v. Cnty. of Georgetown*, RMG-10-2598, 2012 WL 1655294, at *4 (D.S.C. Apr. 13, 2012) (alterations in *Innocent*), *report and recommendation adopted*, 2012 WL 1655283 (D.S.C. May 10, 2012).

A disability is defined as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment[.]"  42 U.S.C. § 12102(1); *see Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting 29 C.F.R. § 1630.2(k)(1)); *see also Finn*, 160 F.4th at 99 ("The ADA defines disability as a 'physical or mental impairment that substantially limits one or more of the individual's major life activities.'") (quoting *Davis v. Univ. of N. Carolina*, 263 F.3d 95, 99 (4th Cir. 2001)).

Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A), (B).[23] An individual with a "a record of such an impairment[,]" or who is "regarded as having such an impairment," is considered to have a disability.  42 U.S.C. § 12102(1)(B), (C). An individual has a "record of disability" if he can show that he "'has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'"  *Foore v. Richmond*, 6 Fed. App'x 148, 153 (4th Cir. 2001) (per curiam) (quoting 29 C.F.R. § 1630.2(k)(1)).

---

[23] In the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, Congress broadened the definition of disability, as well as the standard for "substantially limits." *See Miller v. Md. Dep't of Natural Resources*, 813 F. App'x 869, 875 (4th Cir. 2020) (per curiam); *Summers*, 740 F.3d at 329.

"The question of whether a plaintiff is disabled under the ADA is 'a question of law for the court.'" *Coghill v. Bd. of Educ. of Prince George's Cnty.*, GJH-14-2767, 2017 WL 1049470, at *5 (D. Md. Mar. 17, 2017) (citation omitted), *aff'd*, 703 F. App'x 211 (4th Cir. 2017) (per curiam).  To resolve this question, the court must make "an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001).  The analysis to determine whether a plaintiff is "regarded as" having a disability "'focuses on the reactions and perceptions of the [employer].'" *Finn*, 160 F. 4th at 100 (quoting *Wilson v. Phoenix Specialty Mfg. Co.*, 513 F.3d 378, 385 (4th Cir. 2008)) (alterations in *Finn*).

"That an employee has a disability does not automatically mean [he] is entitled to the ADA's protections." *Haggins*, 163 F.4th at 877.  A plaintiff must also show that he is a qualified individual.  *Id.*  A "qualified individual" is defined in the ADA as a person who, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); *see Robinson v. Mountaire Farms of N. Carolina Corp.,* 2026 WL 297172, at *3 (4th Cir. Feb. 4, 2026) (per curiam).  The "date of an adverse employment decision is the relevant date for determining whether a plaintiff is a 'qualified individual with a disability.'" *Stowe-Pharr Mills, Inc.*, 216 F.3d at 379.

There are three parts to establish the "prerequisite" that a plaintiff is a qualified individual. *Haggins*, 163 F.4th at 877.  They are as follows, *id.* at 877–78:

> First, even when an employee cannot perform a job on its face, she may still be a qualified individual if a 'reasonable accommodation' enables her to so perform . . . .  Second, regardless of any accommodation suggested by the employee or offered by the employer, the claimant must be able to do the job's 'essential functions.' . . . Third, implied in the definition of a "qualified individual" is a reciprocal obligation between the employee and employer to engage in a good faith, collaborative search for a reasonable accommodation.

Discrimination against a qualified individual on the basis of disability includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(B). The ADA also bars the discharge of a qualified employee because he is disabled. *See Summers*, 740 F.3d at 328.

Moreover, "[d]iscrimination can include failing to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024) (quoting 42 U.S.C. § 12112(b)(5)(A)); *see Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 344 (4th Cir. 2013); *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 311 (4th Cir. 2011). However, there is an exception if the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. 12112(b)(5)(A). Moreover, "'employers do not need to change a job's essential functions or split them across multiple employees' to satisfy the ADA." *Jones*, 2025 WL 2813607, at *4 (quoting *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1013 (4th Cir. 2020)).

To establish a prima facie claim of failure to accommodate, a plaintiff must allege: "'(1) that [he] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [his] disability; (3) that with reasonable accommodation [he] could perform the essential functions of the position; and (4) that the employer refused to make such accommodations.'" *Jacobs*, 780 F.3d at 579 (quoting *Wilson*, 717 F.3d at 345) (alterations added); *see Tartaro-McGowan*, 91 F.4th at 164 (citing 29 C.F.R. § 1630.2(n)); *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 219 (4th Cir. 2016) (per curiam); *Wilson*, 717 F.3d at 345; *Rhoads*, 257 F.3d at 387 n.11. A plaintiff must plead these elements to survive a motion to dismiss. *See Terry v. Perdue*, 2021 WL 3418124, at *2 (4th Cir. Aug. 5, 2021) (per curiam); *Lewis v. Didlake, Inc.*,

DKC-25-1015, 2026 WL 233980, at *3 (D. Md. Jan. 29, 2026); *Gagnon,* 760 F. Supp. 3d at 371; *Price v. Howard Cnty. Pub. Sch. Sys.*, GLR-22-541, 2023 WL 170425, at *7 (D. Md. Jan. 11, 2023).

In the context of the ADA, "[d]isability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs*, 780 F.3d at 572 (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49–50, 49 n.3 (2003)); *see McDonnell Douglas*, 411 U.S. at 802–04; *see also Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001) ("Because the ADA echoes and expressly refers to Title VII, and because the two statutes have the same purpose—the prohibition of illegal discrimination in employment—courts have routinely used Title VII precedent in ADA cases"); *Rhoads*, 257 F.3d at 391–92 (applying the Title VII framework). Thus, the same avenues of proof available for Title VII apply to a disability discrimination claim. *See Baird ex rel. Baird v. Rose*, 192 F.3d 462, 468–70 (4th Cir. 1999) (holding that Title VII's mixed-motive causation requirement, and not the Rehabilitation Act's "solely because of" causation requirement, applies to the ADA).

As discussed, the ADA "forbids retaliation against employees who have engaged in protected activity." *Haggins*, 163 F.4th at 880 (citing 42 U.S.C. § 12203). "[T]his antiretaliation provision covers everyone—not just qualified individuals." *Id.* But, to establish a prima facie case for retaliation, there must be "some showing that 'a causal connection existed between the protected activity and the adverse action.'" *Id.* at 881.

The ADA "does not provide a statute of limitations." *Semenova*, 845 F.3d at 566. In Maryland, "ADA claims are subject to Maryland's three-year statute of limitations governing general civil actions." *Id.* at 568; *see Jeandron v. Bd. of Regents of Univ. Sys. of Md.*, 510 F. App'x

223, 226 (4th Cir. 2013) (per curiam) ("Maryland courts apply the three-year limitations period governing general civil actions to ADA" claims).

### III.     Motion to Strike

### A.  Exhibits and Plaintiff's Opposition

Defendants ask the Court to strike the Opposition (ECF 18) to the Motion "in its entirety" (ECF 21, ¶ 16), as well as the exhibits appended to the Opposition (ECF 18-1 to ECF 18-15).  ECF 21, ¶ 13.  According to defendants, plaintiff has functionally amended his Complaint by way of the Opposition without following the procedural requirements under Fed. R. Civ. P. 15(a) and Local Rule 103.6.  ECF 21 at 3.  They also cite Fed. R. Civ. P. 12(b)(6) and 12(d).  ECF 21 at 1.

Fed. R. Civ. P. 12(f) generally governs motions to strike.  But, the rule "concern[s] pleadings, not motions."   *Reyes v. Cioccia*, BO-21-451, 2022 WL 1274392, at *2 (E.D.N.C. Apr. 28, 2022); *see McLaughlin v. Copeland*, 435 F. Supp. 513, 519 (D. Md. 1977) (stating that  Rule 12(f) "relates to matters to be stricken from pleadings.").   In the Motion to Strike, defendants do not seek to strike any portion of the Complaint.[24]  But, they seek to strike the Opposition.

Defendants maintain that, with the exception of the Settlement Agreement (ECF 18-14),[25] plaintiff's exhibits "are entirely extraneous and unauthenticated materials that are irrelevant to the sufficiency of the facts pled in the Complaint, which is the matter at issue in the Motion to Dismiss."  ECF 21, ¶ 3; *see id.* ¶ 9.  Additionally, defendants claim that the exhibits are "clearly outside of the pleadings and . . . cannot be considered by this Court without converting Defendants'

---

[24] As discussed, *infra*, in the Motion defendants seek to strike the blacklisting allegations in the Complaint.  ECF 17-1 at 22-23.

[25] Defendants recognize that the Settlement Agreement (ECF 18-14) "is integral to the Complaint[.]"  ECF 21*, ¶ 8 n.1.

Motion to Dismiss into a Motion for Summary Judgment." *Id.* ¶ 12.  And, because "the parties have not had any opportunity to engage in discovery," defendants assert that this Court "cannot convert the motion" into one for summary judgment. *Id.* ¶ 13.

In addition, defendants contend that the Court is "precluded from considering the arguments set forth in the Opposition that rely upon those extraneous exhibits to establish new facts not set forth in the Complaint." *Id.* ¶ 14.  They argue that pages 3 through 9 of the Opposition contain "facts" that are "heavily reliant upon the exhibits to add facts not properly pled in the Complaint." *Id.* ¶ 15.

Plaintiff counters that "all fifteen exhibits are properly considered under established Fourth Circuit standards." ECF 23 at 1.  He asserts: "Multiple exhibits are expressly incorporated by reference in the Complaint through direct quotation, including the discriminatory leave policy email [ECF 18-1], termination letter [ECF 18-4], adjuster's disability-based denial email [ECF 18-10], and EEOC charges [ECF 18-15]." ECF 23 at 1.  Moreover, plaintiff contends that "[o]ther exhibits are integral to the Complaint because their very existence gives rise to Plaintiff's claims or because the Complaint relies heavily on their terms and effect, including the CBA [Collective Bargaining Agreement] governing the employment relationship [ECF 18-2], the Settlement Agreement both parties agree is integral [ECF 18-14], and medical records establishing disability [ECF 18-9]." ECF 23 at 1–2.  Additionally, plaintiff posits: "All exhibits demonstrate what Plaintiff said, did, or experienced–from age-based harassment he endured via text [ECF 18-8] to the discriminatory policy he opposed [ECF 18-1] to the termination he suffered [ECF 18-4]." ECF 23 at 2.

Further, plaintiff claims: "Defendants have waived any objection to authenticity." *Id.*  He asserts that "Defendants had [the] opportunity" to challenge the authenticity of the exhibits but

failed to do so because they "filed a comprehensive Reply engaging with Plaintiff's exhibits on the merits." *Id.* (citing ECF 22). Plaintiff posits: "Defendants cannot use documents' substance in their arguments while claiming those same documents are 'extraneous' or 'unauthenticated.'" ECF 23 at 2. Moreover, plaintiff insists that the Motion to Strike the entire Opposition is "grossly disproportionate to the alleged harm" to defendants. *Id.* at 13.

Defendants allude generally to the factual background set forth in the Opposition to support their argument. *See* ECF 21, ¶ 15. But, reading plaintiff's recitation of the facts in his Opposition, he largely cites to the Complaint. *See* ECF 18 at 3–9. Almost all the references to exhibits are paired with a corresponding citation to the Complaint. *See, e.g., id.* at 12 ("NETworks Senior Production Manager Jason Juenker frequently referred to Plaintiff as 'old man,' including in a text message dated April 4, 2023—less than three months before termination. ECF No. 1, ¶ 30; *see* Exh. H [ECF 18-8] (Text Message: 'How you feeling old man'")). Indeed, the only factual assertions that plaintiff makes without a corresponding citation to an allegation in the Complaint are quotations from the decision of the Commission, denying plaintiff's claim, and a reference to the subsequent petition that plaintiff filed for judicial review of that decision. ECF 18 at 6–7.[26] The Complaint indicates that the WC Claim was denied. *See* ECF 1, ¶ 126.

The Motion to Strike the Opposition in its entirety is akin to hitting a fly with a sledgehammer. Indeed, the need for the Court to address such an unreasonable request unnecessarily burdens the Court. Accordingly, I shall deny defendants' Motion to Strike the Opposition in its entirety.

---

[26] Plaintiff does not state in his Complaint that he sought judicial review of the WCC's decision. But, he describes it in his Opposition. *See* ECF 18 at 6–7 (citing ECF 18-12). Plaintiff's request for judicial review is not integral to any claims. But, it is subject to judicial notice.

As to the exhibits, defendants assert that the "exhibits consist of various communications from unknown sources that are not properly authenticated." ECF 21, ¶ 9. Based on the email addresses and names in plaintiff's exhibits, the communications that defendants reference are apparently emails and texts from or to defendants' employees. *See* ECF 18-3 (Email from Wenig, Networks employee); ECF 18-4 (Email from Vander Ploeg, Networks employee); ECF 18-8 (screenshot of text message with Juenker, Networks employee); ECF 18-10 (email to the *Les Mis* Tour Associate Company Manager at Networks). Defendants proffer no basis to challenge the authenticity of the communications of their own employees. *See Goines*, 822 F.3d at 166.

In the Complaint, plaintiff quoted from various exhibits appended to the Opposition. For example, he quoted the email communication from Danner (ECF 18-1), addressed to plaintiff, dated June 6, 2023. *See* ECF 1, ¶ 67(a). Similarly, plaintiff quoted from the text message from Juenker (ECF 18-8) to McLeod. *See* ECF 1, ¶ 30. Additionally, plaintiff quoted an email from Thatvihane to Aghabala (ECF 18-10). *See* ECF 1, ¶ 125.

"A document is 'integral' to a complaint if it is quoted, relied upon, or incorporated by reference in the complaint." *Mullan v. Antero Res. Corp.*, TSK-24-62, 2025 WL 746523, at *3 (N.D.W. Va. Mar. 7, 2025) (quoting *Roberts v. Barnes*, TSK-22-65, 2023 WL 3656892, at *4 (N.D.W. Va. May 25, 2023)); *see Celester v. Baker Buick & GMC,* 2023 WL 4422533, at *4 (D.S.C. June 21, 2023) (concluding that a document has "been incorporated into the Complaint by reference" when the "Plaintiff quotes several of the provisions [of the document] with his Complaint"), *report and recommendation adopted*, BHH-22-1748, 2023 WL 4421817 (D.S.C. July 10, 2023); *Harris v. Virginia*, JRS-07-701, 2008 WL 4145923, at *2 (E.D. Va. Sept. 8, 2008) ("[T]he court may consider . . . documents that are central to the plaintiff's claim, and documents quoted or incorporated by reference in the plaintiff's complaint, provided that their authenticity is

not disputed.")  To be sure, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  But here, the documents are incorporated by reference.  Therefore, they are reviewable to adjudicate the Motion.

The Court may also consider the EEOC Charge (ECF 18-15) appended to the Opposition. "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions."  *Campbell v. Mayorkas*, MOC-20-697, 2021 WL 2210895, at *1 n.3 (W.D.N.C. June 1, 2021) (citing *Golden v. Mgmt. & Training Corp.*, 319 F. Supp. 3d 358, 366 n.2 (D.D.C. 2018)); *see Jacques v. Balt. City Police Dep't*, SAG-21-02682, 2022 WL 1061980, at *3 (D. Md. Apr. 8, 2022); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 907 n.1 (D. Md. 2017), *aff'd in part, vacated in part on other grounds*, 716 F. App'x 164 (4th Cir. 2017).  The EEOC charge filed by plaintiff on September 7, 2023 (ECF 18-15) is integral to the suit.  *See, e.g., Parker v. Whole Food Mkt. Grp., Inc.*, JRR-23-03321, 2025 WL 403734, at *2 n.4 (D. Md. Feb. 4, 2025) ("In the employment discrimination context, courts regularly conclude that EEOC charges are integral to a plaintiff's complaint."); *Webb v. Potomac Elec. Power Co.*, TDC-18-3303, 2020 WL 1083402, at *2 (D. Md. Mar. 6, 2020) ("[T]he Court will consider Webb's EEOC Charge, submitted with the Motion, as a document integral to the Amended Complaint because Webb referenced the EEOC Charge in the Amended Complaint and he has not objected to its authenticity."); *Evans v. Md. State Hwy. Admin.*, JKB-18-935, 2018 WL 4733159, at *1 n.1 (D. Md. Oct. 2, 2018) (same); *White v. Mortg. Dynamics, Inc.*, 528 F. Supp. 2d 576, 579 (D. Md. 2007) (same).

In addition, "[a]t the motion to dismiss stage, the court may consider . . . materials that are subject to judicial notice."  *Hicks v. Ward*, PX-17-258, 2017 WL 4786616, at *1 n.2 (D. Md. Oct. 24, 2017).  Notably, "[i]t is not uncommon for courts to take judicial notice of factual information

found on the world wide web." *O'Toole v. Northrop Grumman Corp.,* 499 F.3d 1218, 1225 (10th Cir. 2007).  Of relevance, a "court may take judicial notice of information publicly announced on a party's web site, so long as the web site's authenticity is not in dispute and 'it is capable of accurate and ready determination.'" *Jeandron*, 510 F. App'x at 227(quoting Fed. R. Evid. 201(b)); *see Carroll v. ABNB Fed. Credit Union*, MSD-17-521, 2018 WL 1180317, at *1 n.3 (E.D. Va. Mar. 5, 2018) (taking "judicial notice under Federal Rule of Evidence 201 of information available on Defendant's commercial website"); *Caner v. Autry*, 16 F. Supp. 3d 689, 694 n.5 (W.D. Va. 2014) ("Information about Plaintiff's degrees comes directly from his website, and I take notice of it as an indisputable fact under Federal Rule of Evidence 201(b)(2)."); *Sampson v. Glover*, DCN-08-3623, 2008 WL 8182895, at *1 n.1 (D.S.C. Dec. 2, 2008) ("A court may take judicial notice of information on a website."), *report and recommendation adopted*, 2008 WL 8182480 (D.S.C. Dec. 30, 2008), *aff'd,* 333 F. App'x 766 (4th Cir. 2009)  (per curiam); *Renaissance Greeting Cards, Inc. v. Dollar Tree Stores, Inc.*, 405 F. Supp. 2d 680, 684 n.9 (E.D. Va. 2005) (concluding that "web site information is appropriate for judicial notice pursuant to Rule 201, Fed. R. Evid."), *aff'd,* 227 F. App'x 239 (4th Cir. 2007).

Plaintiff appended two screenshots of pages from the Networks website, titled "Staff" and "About."  *See* ECF 18-5 (Networks "Staff" Webpage); ECF 18-6 (Networks "About" Webpage). The Networks website has the same information as the screenshots submitted by plaintiff.  *See Staff,* NETWORKS THEATRICAL PRODUCTION COMPANY, https://perma.cc/ZWX9-ALPP (last accessed March 30, 2026); *About,* NETWORKS THEATRICAL PRODUCTION COMPANY, https://perma.cc/EN4A-DE3U (last accessed March 30, 2026).  Accordingly, the Court may take judicial notice of both exhibits because they contain information that is identical to publicly available information on Networks' own website. *See* ECF 18-5; ECF 18-6.

Both the denial of plaintiff's WC Claim (ECF 18-11) and plaintiff's petition for judicial review of that denial (ECF 18-12), filed in the Circuit Court for Howard County, are public records for which the Court may take judicial notice, without assuming the truth of the content. *See Philips*, 572 F.3d at 180 ("In reviewing a Rule 12(b)(6) dismissal, we may properly take judicial notice of matters of public record."). Furthermore, plaintiff's claim of wrongful termination and retaliation are premised on his contention that he was fired in retaliation for filing the WC Claim. *See, e.g.,* ECF 1, ¶¶ 163, 166–78. Because the filing of plaintiff's WC Claim, as evidenced by its denial, is integral to plaintiff's Complaint, the Court may consider the denial of the WC Claim (ECF 18-11) and plaintiff's petition for judicial review (ECF 18-12).

Plaintiff also submitted the "Termination Notice" sent to him via email by Gregory Vander Ploeg, dated July 2, 2023. ECF 18-4 ("Termination Notice"). Plaintiff brings a wrongful termination claim (Count VI), alleging that his termination was discriminatory, in violation of the ADEA (Count I), the ADA (Count II), and MFEPA (Count V). When a plaintiff lodges a wrongful discharge claim, the termination notice and any agreement memorializing the termination are integral. *See, e.g., McGuire v. Lord Corp.,* LWF-19-25, 2019 WL 4858850, at *2 (E.D.N.C. Sept. 30, 2019) (finding that "the Separation Agreement is integral to the complaint because it sets forth the terms of plaintiff's termination that forms the basis for claims of discrimination and retaliatory discharge"). Accordingly, I may consider the Termination Notice (ECF 18-4).

Similarly, the SETA Contract (ECF 18-2) memorialized McLeod's employment as the Production Stage Manager for *Les Misérables*. *See id.* at 1. Plaintiff explicitly references the SETA Contract in his Complaint. *See* ECF 1, ¶ 17. Plaintiff's employment gives rise to his claims of discrimination. Accordingly, I will consider the SETA Contract.

Both plaintiff and defendants append the Settlement Agreement to their submissions.  *See* ECF 17-2 at 372–77; ECF 18-14.  Defendants acknowledge that the Settlement Agreement "is integral to the Complaint and" is "properly authenticated[.]"  ECF 21 at 2 n.1.  It is also explicitly referenced in the Complaint.  ECF 1, ¶ 83.[27]  Because the Settlement Agreement is integral to the Complaint, I shall consider it.

McLeod appended to his Opposition copies of three grievance letters filed on his behalf by the AEA.  ECF 18-13 ("AEA Grievances").  Plaintiff claims (ECF 23 at 12) that he referenced the Grievances in the following allegations in the Complaint, ECF 1, ¶¶ 81–82, 95:

81. Following termination, Defendants unlawfully withheld $31,053.19 in wages and benefits owed to Plaintiff in violation of both federal law and the applicable union agreement, causing substantial financial hardship to Plaintiff and risked cancellation of Mr. McLeod's union-provided health care.

82. Defendants failed to remit payment for a period of 252 days, and this withholding of wages constituted ongoing retaliation for Plaintiff's protected activities, including his workers' compensation claim and opposition to discriminatory practices, violating both federal law and the applicable union agreement and continuing the pattern of retaliatory conduct.

***

95. The wage settlement specifically preserved Plaintiff's right to pursue discrimination and retaliation claims, as it only resolved grievances arising under the collective bargaining agreement, explicitly maintaining his right to seek redress for the unlawful discrimination and retaliation.

---

[27] Plaintiff explains that the Settlement Agreement "preserved" his "right to pursue discrimination and retaliation claims."  ECF 1, ¶ 95.  And, he alleges that the terms of this Settlement Agreement "contractually barred" him from future employment with a variety of companies, "effectively blacklisting" plaintiff "from major theater productions and destroying his career prospects in the industry[.]"  *Id.* ¶ 84.  Moreover, plaintiff relies upon these allegations in his claims of retaliation and to buttress his claims for damages.  *Id.* at 38 (plaintiff seeking damages "for the unlawful industry blacklisting that continues to harm Plaintiff's career prospects"); *id.* ¶ 85 (describing the "industry blacklisting" allegedly arising from the settlement agreement as "ongoing retaliation that continues to harm Plaintiff's career and earning capacity").

These allegations do not explicitly reference the AEA grievances that plaintiff appended to his Complaint.  But, for the Court to understand the scope of the Settlement Agreement and what rights plaintiff did or did not relinquish by signing it, the Court must examine the underlying grievances.  Accordingly, the AEA Grievances are integral to the Complaint and the Court will consider them in ruling on defendants' Motion.

Several exhibits submitted by plaintiff are not integral to the Complaint.

Plaintiff appended to his Opposition a 2015 email from Wenig to Vander Ploeg, on which plaintiff is copied.  ECF 18-3.  The email references a Networks *Dirty Dancing* production.  *Id.* Wenig seems to suggest that plaintiff would work on the *Dirty Dancing* production after completing work on another show, *Kinky Boots. Id.*  Plaintiff avers that this email is integral to his allegations because it "demonstrates the continuity of the employment relationship and hiring authority" that Networks exercised that is "necessary to establish joint employment and the pattern of rehiring relevant to pretext analysis, which are integral to the allegations."  ECF 23 at 8.

In the Complaint, plaintiff claims that for about eight years, he "had been hired and rehired [by Networks] for multiple back-to-back touring productions including: Tick, Tick… Boom!, Dirty Dancing, The Sound of Music, and the pre-COVID tour of *Les Misérables*[.]"  ECF 1, ¶ 18(a).  The Court must assume the truth of plaintiff's allegations. Nevertheless, the Complaint does not explicitly reference the email, nor does Mr. McLeod's previous working relationship with Networks give rise to the legal rights plaintiff pursues in this case.  Accordingly, this email (ECF 18-3) is not integral to the Complaint.

Plaintiff also appended a copy of the *Les Misérables* Tour Handbook.  *See* ECF 18-7 ("Handbook").   He claims that because the Handbook "governs employment policies" it "demontrat[es] NETworks' joint employer role."  ECF 23 at 10.  Further, plaintiff argues that the

Handbook should be considered because he relied on it to support allegations regarding Networks' control of his employment as to supervision, termination, and workplace policies, and thus it is integral. ECF 23 at 10 (citing ECF 1, ¶¶ 23–28, 67–68, 75–76).

The allegations that plaintiff cites do not reference the Handbook. Nor do these allegations reference the overall structure of Networks or its relationship with LMS22. Moreover, the Handbook does not give rise to any of the legal rights that plaintiff asserts. Accordingly, the Court will not consider the Handbook.

Plaintiff submits a discharge summary from the Nebraska Medical Center, dated March 12, 2023. ECF 18-9. It describes the injuries plaintiff sustained as a result of "a severe workplace accident in his hotel room in Omaha, Nebraska" on March 11, 2023. *See* ECF 18 at 5. Plaintiff claims that the Court should consider this discharge summary because "Courts routinely permit consideration of medical records establishing disability status." ECF 23 at 11.

Plaintiff cites *Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749 (D. Md. 1997), *aff'd,* 151 F.3d 180 (4th Cir. 1998), to support his position. *See* ECF 23 at 11. In *Biospherics*, the plaintiff brought suit against a New York corporation that publishes a national business magazine, Forbes, and one of its writers, claiming that the defendants "published false statements which caused a diminution in the 'value' of [plaintiff's] stock." *Biospherics*, 989 F. Supp. at 749. In ruling on defendants' motion to dismiss, Judge Chasanow considered whether she could review "a photocopy of the page from the magazine which contains the purportedly offending article." *Id.* Because the plaintiff had not raised an "objection to the inclusion of the photocopy with Defendants' motion and, in fact, ha[d] appended to its response two exhibits, one of which is a retyped version of the same article", the court considered the photocopy of the article in ruling on the motion to dismiss. *Id.* at 750 (alteration added). But, *Biospherics,* 989 F. Supp.

748, does not establish that courts "routinely permit consideration of medical records" to establish "disability status." ECF 23 at 11.

The Complaint does not mention the medical discharge summary. So, it is not incorporated by reference. But, the Complaint describes plaintiff's health issues, such as COPD and the workplace accident that allegedly resulted in multiple injuries. *See, e.g.,* ECF 1, ¶¶ 19, 32, 44. The medical discharge summary reflects that plaintiff suffered "a face strike to the floor", and injuries that he sustained from that fall. *See* ECF 18-9 at 3; *see id.* at 1. However, it is not integral to the Complaint. In any event, plaintiff sets forth in detail the medical ailments he alleges constitute a disability. At this stage, the Court must credit his allegations.

Defendants appended one exhibit to their Motion. ECF 17-2. But, it actually consists of many exhibits. It includes the "Affidavit of LMS22 Touring, LLC", authored by Gregory Vander Ploeg, the General Manager for LMS22 (ECF 17-2 at 1–2); the AEA League Memorandum of Agreement (*id.* at 3–55); Form Overage Statement (*id.* at 56); AEA Agreement and Rules Governing Employment Under the Short Engagement Touring Agreement (*id.* at 57–214); Actor's Equity Association Agreement and Rules Governing Employment Under the Equity/League Production Contract (*id.* at 215–371); and the Settlement Agreement (*id.* at 372–377).

The Vander Ploeg Affidavit attests to the authenticity of the records that defendants appended to their Motion. ECF 17-2 (Vander Ploeg Affidavit), ¶ 6. Plaintiff does not dispute the authenticity. Nor does he contest the Court's consideration of these documents. *See* ECF 22; ECF 23.

Vander Ploeg refers collectively to the AEA League Memorandum of Agreement (ECF 17-2 at 3–55); Form Overage Statement (*id.* at 56); AEA Agreement and Rules Governing Employment Under the SETA (*id.* at 57–214); and the AEA Agreement and Rules Governing

Employment Under the  Equity/League Production Contract (*id.* at 215–371) as "the CBA governing Plaintiff's contract." ECF 17-2 (Vander Ploeg Affidavit), ¶ 4.  According to defendants, the CBA "requires that any dispute between the parties to a governed contract relating to the interpretation or application of the CBA shall be submitted to the Grievance Committee or established board of arbitrators" and contains a provision that "requires any claimed violation" of the non-discrimination provision of the contract to "be submitted under the grievance and arbitration procedures in the CBA." ECF 17-1 at 5.

To the extent that defendants present the CBA to support their "arguments regarding Plaintiff's failure to exhaust [his] contractual remedies", *see* ECF 17-1 at 11–12, "the Court can consider the document." *Moody,* 2025 WL 3119201, at *5; *see Willis v. Reynolds Metals Co.*, 840 F.2d 254, 255 (4th Cir. 1988) ("While the well-pleaded complaint rule in general forecloses looking beyond the allegations of the complaint for a federal question to confer jurisdiction, there is an exception for situations where the complaint asserted can be resolved only by referring to the terms of the collective bargaining agreement."); *Thornton v. Habibi*, PX-20-2468, 2021 WL 1856648, at *2 (D. Md. May 10, 2021) ("Where, as here, the motion rests on a written agreement to arbitrate disputes, the Court may look to the contents of that agreement even if outside the four corners of the complaint."); *Parsons v. Kroger Ltd. P'ship I*, JTCJ-20-00392, 2021 WL 1234526, at *10 (S.D.W. Va. Mar. 31, 2021) ("As the court's preemption analysis in the preceding section demonstrates, the Collective Bargaining Agreement is integral to the complaint inasmuch as the success of the [state law] claim hinges on whether [plaintiff] is entitled to the pay she seeks thereunder.") (alterations added); *Bowman v. Jack Cooper Transp. Co. Inc.*, 399 F. Supp. 3d 447, 451 (D. Md. 2019) (considering a CBA Agreement and an Arbitration Panel's Decision appended to defendant's motion to dismiss; "Both documents concern the procedures governing Plaintiff's

employment termination, which are essential to this suit, and Plaintiff does not challenge their authenticity."); *see also Wilder v. Johns Hopkins Health Sys. Corp.*, GLR-19-2660, 2020 WL 5798091, at *4 (D. Md. Sept. 29, 2020).

Furthermore, plaintiff references the CBA in his Complaint and bases his Title VII retaliation claim in part on his opposition to a company policy he contends violated both the CBA's provisions and Title VII.  *See* ECF 1, ¶¶ 60, 62, 63, 64, 66.  Because the CBA is integral to the Complaint and incorporated by reference, I shall consider it.  *See Gyamerah v. Kaiser Found. Health Plan of the Mid-Atl. States, Inc.*, AAQ-24-00575, 2024 WL 4361854, at *6 n.4 (D. Md. Oct. 1, 2024) ("Defendant . . . attached the CBA to its Motion to Dismiss . . . . Plaintiff does not contest its authenticity, but as discussed above, bases his claim on provisions therein. Accordingly, the document is integral to the Complaint and may be considered at this stage without converting the Motion into one for summary judgment."); *Lucas v. United Parcel Serv., Inc.*, SAL-21-02328, 2022 WL 4533787, at *5 n.3 (D.S.C. Sept. 2, 2022) ("[B]ecause Plaintiffs base their retaliation claim on their actions seeking correct wage payment through the grievance procedure outlined in the CBA, the court finds that it may consider the CBA and arbitration documents provided by Defendant when addressing that claim.") (alteration added).

### B.  Allegations in the Complaint

Pursuant to Fed. R. Civ. P. 12(f), defendants seek to strike paragraphs 83–94 of the Complaint, arguing that allegations of blacklisting cannot support McLeod's claims.  ECF 17-1 at 22–23.  Defendants note that in the Complaint, plaintiff "contends that he voluntarily agreed not to be rehired by LMS22."  *Id.* at 22 (citing ECF 1, ¶¶ 83, 84).  According to defendants, "[t]hose allegations, combined with Plaintiff's grievance settlement agreement, undercut any claim that the Defendants unilaterally blacklisted him from future employment."  ECF 17-1 at 22–23.  Moreover,

defendants insist that "[t]he mutually agreed no-rehire clause of Plaintiff's settlement agreement cannot form the basis for an adverse employment action," and therefore "cannot support the elements of Plaintiff's retaliation and discrimination claims." *Id.* at 23.  Further, defendants maintain that allegations that plaintiff "entered the agreement under duress following the termination of his employment are simply irrelevant to his claims that his termination was discriminatory or retaliatory."  ECF 22 at 14.

Plaintiff asserts: "The blacklisting allegations are relevant to damages, demonstrating the scope and continuing nature of Defendants' retaliatory conduct."  ECF 18 at 19 (citing ECF 1, ¶¶ 83–94).  Moreover, he argues that the "settlement agreement's no-rehire clause was obtained under economic duress after 252 days of unlawfully withheld wages."  ECF 18 at 19.  According to plaintiff, "[t]hese provisions demonstrate ongoing retaliation and are probative of Defendants' discriminatory intent." *Id.* at 19–20.

Although defendants contend that plaintiff "voluntarily agreed not to be rehired by LMS22" (ECF 17-1 at 22), plaintiff alleges that he "was compelled to settle his unpaid wages claims" and entered the Settlement Agreement "under economic duress[.]"  ECF 1, ¶ 83.  If, as plaintiff asserts, he entered this contract under duress, then plaintiff is not necessarily barred from pursuing claims that are otherwise covered by the agreement.  *See Brown v. Potomac of Prince George's LLC, et al.*, No. 2272, Sept. Term 2024, 2026 WL 1113382, at \*6 n.18 (Md. App. Ct. Apr. 24, 2026) ("Standard legal principles generally bar challenges to a settlement absent a showing of some defect, such as fraud, *duress*, or undue influence.") (emphasis added).

The allegations regarding blacklisting are also part of plaintiff's damages claim.  ECF 1 at 38.  In particular, plaintiff seeks damages under Maryland Workers' Compensation anti-retaliation

law "for the unlawful industry blacklisting that continues to harm Plaintiff's career prospects[.]" *Id.* at 37–38.[28]

Defendants have not shown that plaintiff's allegations regarding the alleged blacklisting in the Complaint constitute "an insufficient defense" or are "redundant, immaterial, impertinent, or scandalous matter," such that the Court should strike them. *See* Fed. R. Civ. P. 12(f). Accordingly, I shall deny defendants' request to strike paragraphs 83–94 of the Complaint.

## IV.    Motion to Dismiss

### A.  Joint Employer

Plaintiff has sued both LMS22 and Networks. It is undisputed that LMS22 employed McLeod when the alleged discrimination took place. But, plaintiff also seeks to hold Networks liable on the ground that Networks was a joint employer. ECF 18 at 2, 20. He claims that he has set forth "detailed allegations that NETworks executives made all hiring and firing decisions, NETworks supervisors conducted day-to-day oversight, and NETworks provided equipment and training over an eight-year relationship." *Id.* at 2. Furthermore, plaintiff notes that, "[a]t the pleading stage, a plaintiff need only allege facts plausibly demonstrating such control; whether

---

[28] Defendants did not move to strike this aspect of the damages claim, presumably because Rule 12(f) is not the appropriate vehicle to do so. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974–75 (9th Cir. 2010) ("We therefore hold that Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law."); *B.R. v. F.C.S.B.*, RDA-19-917, 2023 WL 2464975, at *11 (E.D. Va. Mar. 10, 2023) ("Because many courts have held that a Motion to Strike cannot be used to strike a demand for emotional damages and because Plaintiff seeks emotional damages in many of her other claims, this Court concludes that it would be premature at this stage to strike Plaintiff's request for emotional harm damages"); *Black v. Wells Fargo & Co.*, RJC-15-270, 2016 WL 483135, at *3 n.2 (W.D.N.C. Feb. 5, 2016) ("Plaintiff's claim for extracontractual damages is not properly challenged in a motion to strike under Rule 12(f)").

joint employment ultimately exists is a fact-intensive determination inappropriate for resolution on a motion to dismiss." *Id.* at 20.

Defendants maintain that Networks is entitled to dismissal because the "Complaint fails to state a claim that [Networks] was Plaintiff's employer." ECF 17 at 1. According to defendants, "[t]here is no allegation that Networks ever exercised control over Plaintiff during his employment with LMS22 . . . . The allegations in the Complaint make clear that LMS22 was Plaintiff's direct employer, not Networks." ECF 17-1 at 8. Further, defendants observe that McLeod alleges that "he was engaged to serve as Production Stage Manager on this production of *Les Misérables* solely based upon a contract between him and LMS22, which affirms that they were his sole direct employer." *Id.* (citing ECF 1, ¶ 17).

Defendants add that the facts in the Complaint "could not establish joint employment." ECF 17-1 at 9. Rather, plaintiff has alleged "merely that prior to" his contract with LMS22, McLeod "had a long-standing relationship with Networks separate and distinct from that contract and retention for this tour." *Id.* at 8 (citing ECF 1, ¶ 18). In particular, defendants claim that the Complaint "fails to allege NETworks had authority to hire and fire Plaintiff, fail [sic] to allege Networks had a role in day-to-day supervision and discipline, fails to allege furnishing of equipment nor control over the location in which the work was performed." ECF 22 at 7. Because "[a]ll of the causes of action asserted by Plaintiff require the defendant to be an employer in order to be liable," *id.*, defendants maintain that the claims against Networks are subject to dismissal.

According to plaintiff, "Executive Producers Trinity Wheeler and Seth Wenig—both NETworks employees—made the decision to hire Plaintiff in August 2022 and personally terminated him on July 2, 2023." ECF 18 at 21 (citing ECF 1, ¶¶ 18, 73–75). Additionally, plaintiff asserts: "The termination letter calculating Plaintiff's severance was signed by Gregory

Vander Ploeg, NETworks' Senior Director of General Management." ECF 18 at 21–22 (citing ECF 1, ¶ 17 and ECF 18-5). Plaintiff also notes that he has alleged an "8+ year pattern of NETworks executives hiring and rehiring him across multiple productions." ECF 18 at 22 (citing ECF 1, ¶ 18(a)).

In addition, plaintiff contends that "NETworks supervisors managed Plaintiff's daily work." ECF 18 at 22. According to McLeod, "NETworks Senior Production Manager Jason Juenker and Production Manager Hector Guivas supervised Plaintiff's work throughout his employment [and] had knowledge of and involvement in Plaintiff's employment matters." *Id.*; *see also id.* at 4. Plaintiff asserts: "Juenker made age-discriminatory comments to Plaintiff, including referring to him as 'old man' in text messages." *Id.* at 4. Moreover, plaintiff contends that both "Juenker and Guivas were aware of Coombs['] age-based comments to the Plaintiff." *Id.* at 22 (citing ECF 1, ¶ 24).[29] Additionally, plaintiff claims: "NETworks provided Plaintiff's laptop and equipment, organized mandatory management retreats at its Maryland facility, and participated in all significant employment decisions." ECF 18 at 4.

In their Reply (ECF 22), defendants argue that plaintiff's contention that Networks is a joint employer is "based entirely upon facts not asserted in the Complaint[.]" *Id.* at 6. Specifically, defendants claim that "facts in the Opposition relating to the employers of particular individuals, the signatory of agreements, NETworks' alleged role in the termination decision and supervisory responsibilities of various individuals cannot be considered in this motion as they were not set forth in the Complaint." *Id.* at 7.

---

[29] As stated, a plaintiff may not cure a defect in a complaint or otherwise amend a complaint by way of opposition briefing. *See Henderson*, 2022 WL 704351, at *3. Accordingly, the Court must restrict its analysis to the facts alleged in the Complaint and the exhibits.

Notably, "'multiple entities may simultaneously be considered' an individual's employer for purposes of Title VII under the 'joint employment doctrine' adopted by" the Fourth Circuit. *Hoffman v. Inova Health Care Servs.*, 169 F.4th 207, 214 (4th Cir. 2026) (quoting *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 410 (4th Cir. 2015)). An entity may be a "joint employer" if it exercises sufficient control over the terms and conditions of the plaintiff's employment. *Butler*, 793 F.3d at 408; *see Delarosa v. Comsource Mgmt., Inc.*, GJH-20-3174, 2021 WL 3857813, at *4 (D. Md. Aug. 30, 2021); *Erbe v. Campbell*, GLR-20-3266, 2021 WL 1890610, at *5 (D. Md. May 11, 2021); *Sanders v. Bernhardt*, CMH-19-712, 2020 WL 6323731, at *2–3 (E.D. Va. Oct. 28, 2020), *aff'd sub. nom. Sanders v. Haaland*, 2021 WL 6067243 (4th Cir. Dec. 20, 2021) (per curiam); *Mason v. Sun Recycling, LLC*, GLS-18-2060, 2020 WL 1151046, at *6-7 (D. Md. Mar. 9, 2020); *Goldstein v. Univ. of Md.*, CCB-18-2376, 2019 WL 4467035, at *5 (D. Md. Sept. 17, 2019); *Dreher v. Maryland*, GLR-17-3832, 2019 WL 528192 at *3-4 (D. Md. Feb. 11, 2019).

The joint employer doctrine "specifically aims to pierce the legal formalities of an employment relationship to determine the loci of effective control over an employee, while not discounting those formalities entirely. Otherwise, an employer who exercises actual control could avoid Title VII liability by hiding behind another entity." *Butler*, 793 F.3d at 415. Indeed, "[t]he joint employment doctrine . . . prevents those who effectively employ a worker from evading liability[.]" *Id.* at 410. Moreover, "'Title VII should be liberally construed in light of its remedial purpose,' and . . . this broad interpretation extends to the definition of 'employer[.]'" *Evans*, 2018 WL 4733159, at *6 (quoting *Lee v. Mattis*, PX-17-2836, 2018 WL 3439261, at *9 (D. Md. July 17, 2018)).

Determining whether an entity is a joint employer is "a 'highly factual,' totality of the circumstances analysis[.]" *Aguilar v. David E. Harvey Builders, Inc.*, GLS-18-03953, 2023 WL

7166312, at *16 (D. Md. Oct. 31, 2023); *see Butler,* 793 F.3d at 410 (describing the joint employer test as a "highly fact specific" test "to determine . . . whether an entity exercises control over an employee to the extent that it should be liable under Title VII"); *Bile v. RREMC, LLC,* REP-15-51, 2015 WL 3902391, at *3 (E.D. Va. June 24, 2015) ("[T]he joint-employer-status inquiry is a fact-laden one."). And, "determining joint employer status often involves fact-intensive inquiries inappropriate for resolution on a motion to dismiss." *Edmonds v. McDonald's USA, LLC,* RSB-24-308, 2025 WL 1066193, at *3 (W.D. Va. Apr. 9, 2025); *see Gilbert v. Freshbikes, LLC,* 32 F. Supp. 3d 594, 602 (D. Md. 2014).

The Fourth Circuit recently reviewed the nine factors pertinent to the determination of whether an entity qualifies as a joint employer, as follows, *Hoffman,* 169 F.4th at 214:

(1) authority to hire and fire the individual;

(2) day-to-day supervision of the individual, including employee discipline;

(3) whether the putative employer furnishes the equipment used and the place of work;

(4) possession of and responsibility over the individual's employment records, including payroll, insurance, and taxes;

(5) the length of time during which the individual has worked for the putative employer;

(6) whether the putative employer provides the individual with formal or informal training;

(7) whether the individual's duties are akin to a regular employee's duties;

(8) whether the individual is assigned solely to the putative employer; and

(9) whether the individual and putative employer intended to enter into an employment relationship.

The factors are "not dispositive," however, and control remains the "'principal guidepost' in the analysis." *Butler,* 793 F.3d at 414 (quoting *Clackamas Gastroenterology Assocs., P.C. v.*

*Wells*, 538 U.S. 440, 448 (2003)); *see Hoffman*, 169 F.4th at 215.  The first three factors, which are all related to control, are the most important in determining whether there is joint employment.  *CSRA*, 12 F.4th at 414.  In contrast, "the ninth factor regarding the subjective intentions of the parties ordinarily will be of minimal consequence in the joint employment analysis."  *Butler*, 793 F.3d at 414 n.12.

As to the first factor, the ability to hire and fire, plaintiff alleged in the Complaint that Wheeler and Wenig were "Executive Producers" of Networks and they "originally hired Plaintiff" as the Production Stage Manager for the Tour.  ECF 1, ¶ 75.  Additionally, plaintiff claims that Wheeler and Wenig "carried out" his termination.  *Id.*   Moreover, the Termination Notice was signed by Vander Ploeg.  ECF 18-4 at 2.  In the Termination Notice, Vander Ploeg's signature block identifies him as the Senior Director, General Management of NETworks Presentations, LLC.  *Id*.  Both Wheeler and Wenig are copied on the email.  *Id.*  In addition, Vander Ploeg signed the SETA Contract, confirming plaintiff's position as stage manager for *Les Misérables.*  ECF 18-2 at 1.  Vander Ploeg's signature block lists his title as producer.  *Id.*  And, the Networks website lists Wheeler, Wenig, and Vander Ploeg as Networks employees.  *See Staff,* NETWORKS THEATRICAL PRODUCTION COMPANY, https://perma.cc/ZWX9-ALPP (last accessed March 30, 2026) (listing Wenig as President and Chief Production Officer; Wheeler as an Executive Producer; Vander Ploeg as Senior Director, General Management).

The fact that the individuals who hired and fired plaintiff were Networks employees who held high positions at Networks is noteworthy.  For pleading purposes, it supports the claim that Networks was a joint employer.  *See Gordon v. Maryland State Police,* GLR-22-1699, 2023 WL 6161089, at *5 (D. Md. Sept. 21, 2023) (finding defendant police officers were joint employers,

noting that defendants "had the power to remove plaintiffs" from a particular task force in the Maryland State Police and also "'assign[ed]' [plaintiffs] to the Task Force").

The Complaint does not include detailed descriptions of who supervised plaintiff in his role as Production Stage Manager. *See* ECF 1. But, plaintiff alleges that numerous Networks employees held positions of authority on the Tour. *See, e.g., id.* ¶ 30 (listing Juenker as the "Senior Production Manager"); *id.* ¶ 50 (describing Wheeler as an "Executive Producer"); *id.* ¶ 24 (labeling Guivas as "Production Manager"). These individuals are all listed on the Networks website as Networks staff. *See Staff,* NETWORKS THEATRICAL PRODUCTION COMPANY, https://perma.cc/ZWX9-ALPP (last accessed March 30, 2026). Although the Complaint does not contain specific allegations regarding the role that these individuals played in the day-to-day supervision of plaintiff or the Tour, at this juncture, plaintiff has adequately alleged that these individuals were involved in supervisory roles during the Tour.

As to the third factor, plaintiff claims that "NETworks provided Plaintiff's laptop and equipment used for his work." ECF 18 at 23. Although plaintiff cites to an allegation in the Complaint to support this assertion, *see id.* (citing ECF 1, ¶ 18), the allegation does not mention the issuance of a work laptop.[30] Accordingly, this factor does not weigh in favor of plaintiff. But, this factor is not dispositive.

Nevertheless, the facts alleged in the Complaint, if proven, are sufficient to support the conclusion that Networks and LMS22 have an enmeshed relationship in which Networks exercised

---

[30] Similarly, plaintiff relies on other facts that do not appear in the Complaint to support his claim that Networks and LMS22 are joint employers. For example, plaintiff claims: "The pre-tour management retreat was organized and facilitated by Gregory Vander Ploeg at NETworks' Maryland facility[.]" ECF 18 at 23 (citing ECF 1, ¶¶ 65–70). However, there is no mention of a retreat in these paragraphs or elsewhere. *See* ECF 1.

control over plaintiff's employment and constitutes a joint employer.[31]  Networks is not entitled to dismissal on this basis.

### B.  Preemption of Plaintiff's Claims Under the LMRA

Defendants assert: "Plaintiff's employment and any actions taken with regard to that employment were clearly governed by the provisions of the CBA."  ECF 17-1 at 6.  Because the claims require interpretation of the CBA, defendants maintain that McLeod's claims are preempted by the LMRA.  *Id.* at 9.

According to defendants, plaintiff's claims "are inextricably intertwined with the substance and meaning of the provisions of" the CBA.  ECF 22 at 4.  They posit that the CBA "provides broad protections against discharge without cause" and "specifically provides procedures and remedies for any discrimination in Plaintiff's employment", which defendants describe as "the exact claims asserted here."  *Id.* at 5; *see id.* at 6 ("Plaintiff's allegations of discrimination fall clearly within explicit provisions of the CBA, which provides procedures to remediate, . . . .").

As to McLeod's Title VII claim, defendants argue that it is "premised on whether the LMS22 leave policy violated the CBA."  ECF 17-1 at 10.  According to defendants, adjudicating McLeod's Title VII claim "would require the Court to interpret the CBA provisions covering leave and non-discrimination."  *Id.* at 11.  With respect to plaintiff's claims pursuant to the ADEA, ADA, and State law claims, defendants contend that these claims "are primarily based on" McLeod's "alleged differential treatment processing his workers' compensation claim and his purported blacklisting."  *Id.*  They posit: "The Court would also need to determine whether Plaintiff's CBA-governed settlement agreement, which contains a no-rehire clause, applied to his blacklisting

---

[31] Discovery may shed light on the issue.

claims and whether the settlement agreement complied with the CBA's grievance and arbitration procedures and substantive terms." *Id.*

Plaintiff counters that his "claims arise entirely from violations of federal statutes (the ADEA, ADA, and Title VII) and Maryland's tort of wrongful discharge in violation of public policy–not from the CBA." ECF 18 at 27. According to plaintiff, defendants' preemption argument "confuse[s] factual overlap with legal dependency." *Id.* at 28.

Regarding plaintiff's ADEA claim, plaintiff asserts that it "is based on repeated age-based comments by supervisors . . . replacement with a 26-year-old employee creating a 34-year age gap, and termination shortly after returning from medical leave." *Id.* at 27. With respect to plaintiff's Title VII claim, he contends that it rests on the assertion that his opposition to the leave policy, "restricting leave to 'one male and one female' at a time," was a protected activity under Title VII and that he was terminated in retaliation for his opposition. *Id.* Accordingly, plaintiff claims that no CBA interpretation is required to adjudicate his Title VII claim. *Id.* Further, plaintiff contends that his ADA claims rest on his "COPD disability, the adjuster's email denying his claim 'based off his pre-existing health conditions,' his requests for medical leave as reasonable accommodation, and his termination nine days after disclosing his disability." *Id.* at 28. Therefore, he asserts that his ADA claims do not require CBA interpretation. *Id.*

As discussed, "LMRA preemption applies to state law claims, not claims based upon federal statutes." *Clark*, 2007 WL 581650, at *4; *see Adkins v. Mireles*, 526 F.3d 531, 539 (9th Cir. 2008) ("LMRA § 301 preempts *state-law claims* that are 'substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract[.]'") (quoting *Allis–Chalmers Corp.,* 471 U.S. at 220) (emphasis added); *Freeman v. Duke Power Co.,* 114 F. App'x 526, 533 (4th Cir. 2004) (per curiam) ("Where state law claims are preempted by the LMRA,

the claim may still survive if it states a claim under the federal statute."); *Hibbert v. Montefiore Med. Ctr.*, RFT- 23-9589, 2025 WL 2978802, at *7 (S.D.N.Y. Sept. 2, 2025) ("[T]he LMRA does not preempt or preclude Plaintiff's federal law claims."); *Hernandez v. Creative Concepts, Inc.*, 862 F. Supp. 2d 1073, 1093 (D. Nev. 2012) (determining that a "federal civil RICO claim . . . is not LMRA preempted because the LMRA preempts only state law claims").

To the extent that defendants seek dismissal of plaintiff's claims as preempted under the LMRA, because the claims are dependent on the interpretation of the CBA, the Supreme Court has said: "[E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle,* 486 U.S. at 409–10.

Defendants premise their preemption claim on two cases interpreting the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq. See* ECF 17-1 at 10 (citing *Polk v. Amtrak Nat'l Railroad Passenger Corp.*, 66 F.4th 500 (4th Cir. 2023), and *Odell v. Kalitta Air, LLC,* 107 F.4th 523 (6th Cir. 2024)). "Collective bargaining in the railroad industry, on both the national and local levels, is covered by the RLA." *United Transp. Union v. S.C. Pub. Ry. Comm'n*, 130 F.3d 627, 628 (4th Cir. 1997). The RLA also applies to labor disputes in the airline industry. *Brown v. Trans World Airlines*, 127 F.3d 337, 339 (4th Cir. 1997).

The RLA "provid[es] a comprehensive framework for resolving labor disputes" and "establishes a mandatory arbitral mechanism" for the settlement "of two classes of disputes": major and minor. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994). Major disputes refer to "those related to the formation of collective bargaining agreements or efforts to secure them." *Giles v. Nat'l R.R. Passenger Corp.*, 59 F.4th 696, 702 (4th Cir. 2023) (cleaned up)

(quotation marks and citations omitted). Minor disputes "grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions that involve controversies over the meaning of an existing CBA in a particular fact situation." *Id.* (cleaned up).

"Minor disputes 'must be resolved only through the RLA mechanisms,' but 'the RLA's mechanism for resolving minor disputes does not pre-empt causes of action to enforce rights that are independent of the CBA.'" *Bell v. CSX Transportation, Inc.*, 733 F. Supp. 3d 385, 393 (D. Md. 2024) (quoting *Hawaiian Airlines*, 512 U.S. at 253). "Generally, the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court (because such claims are generally independent of the CBA and will be adjudicated under non-CBA standards). But a federal claim that depends for its resolution on the interpretation of a CBA lacks independence from the CBA, and the RLA precludes it." *Giles*, 59 F.4th at 702–03 (cleaned up) (internal citation and quotation marks omitted). Indeed, "a 'federal claim' can double as a minor dispute" and "be subject to RLA preclusion." *Polk,* 66 F.4th at 505.

In *Polk,* 66 F.4th 500, plaintiff filed suit against her employer, Amtrak National Railroad Passenger Corporation ("Amtrak"), lodging state claims of breach of contract and tort, as well as a Title VII claim of racial discrimination. *Id.* at 503. The district court granted defendants' summary judgment motion, finding that the RLA "preempted Polk's *state-law* claims and *precluded* her federal Title VII claim because all of these claims would 'require that the Court interpret the rights within the CBA' between Amtrak and [plaintiff's union]" *Id.* (quoting the district court) (emphasis and alteration added). On appeal, plaintiff argued in part that "Title VII claims are intrinsically different from RLA minor disputes[.]" *Id.* at 504. The Fourth Circuit

disagreed, concluding that "federal claims, such as those arising under Title VII, can constitute minor disputes." *Id.*

The Court explained that "the RLA's preemption inquiry for state claims and its preclusion inquiry for federal claims are founded upon common 'principles.'" *Id.* It reasoned: "The mere fact that [plaintiff's] claim arises under Title VII does not disqualify that claim from being a minor dispute within the RLA's ambit." *Id.* at 506 (alteration added). Of import, the Fourth Circuit emphasized that "arbitration is no death knell. In extending an arbitral forum, the RLA serves not to deny [plaintiff] due process but . . . afford[s] it." *Id.* (alteration added).

*Odell*, 107 F.4th 523, is also informative. There, the Sixth Circuit affirmed the district court's ruling that because the plaintiffs were subject to a collective bargaining agreement, the RLA "precluded [the district court] from hearing certain of [plaintiffs'] Title VII and ADA claims, which must first go through arbitration as minor disputes." *Id.* at 526 (alterations added).

Notably, "[t]he LMRA preemption standard is applied to resolve claims of state law preemption . . . ." *Sauerwein v. Int'l Bhd. of Locomotive Eng'rs*, MJG-02-2755, 2005 WL 1383169, at *4 (D. Md. May 10, 2005). The LMRA, "unlike the RLA, does not mandate arbitration, nor does it prescribe the types of disputes to be submitted to arbitration under bargaining agreements." *Hawaiian Airlines,* 512 U.S. at 263 n.9. Although courts apply the same preemption standard to determine whether federal law, the RLA, or the LMRA preempt state law, *id.* at 263, the distinction between major and minor disputes, and the mandatory arbitration procedure that applies to minor disputes is solely a creature of the RLA.

In my view, defendants improperly rely on RLA cases to buttress their argument that plaintiff's federal law claims are barred because they are allegedly intertwined with the CBA. If this Court barred plaintiff's federal law claims, as defendants request, plaintiff would be deprived

of the due process that RLA plaintiffs receive under the RLA's arbitration procedures. Although courts apply the same standard to determine whether a *state law* claim is so intertwined with a CBA that it is preempted under either the RLA or the LMRA, federal law claims are not precluded by the LMRA, whereas they can be under the RLA. Accordingly, plaintiff's federal claims of discrimination under the ADEA (Count I), ADA (Count II), Retaliation under Title VII (Count III), and the ADA (Count IV) are not preempted by the LMRA.

Plaintiff lodges two state law claims against defendants: (1) "Discrimination on the Basis of Maryland's Fair Employment Practices Act" (Count V) and (2) "Wrongful Termination Against Public Policy (Retaliation for Workers' Compensation Claim)" (Count VI). ECF 1, ¶¶ 159–78. The purpose of MFEPA is to "prohibit discrimination in employment by any person." S.G. § 20-602. "In the typical case a state tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the . . . language of a collective-bargaining agreement." *Lingle,* 486 U.S. at 413.

Notably, "[w]hen a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA [as amended by the LMRA], it conflicts with none of the purposes of the Act." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 757 (1985) (alteration added). "It would turn the policy that animated the [NLRA] on its head to understand it to have penalized workers who have chosen to join a union by preventing them from benefiting from state labor regulations imposing minimal standards on nonunion employers." *Id.* at 756.

However, "Section 301 preemption [is] appropriate" when a plaintiff's claims are "founded upon rights conferred to them by the governing CBA." *Bratton v. Starwood Hotels & Resorts Worldwide, Inc.*, 65 F. Supp. 3d 8, 17 (D.D.C. 2014). In other words, if "the appropriateness of the employer's conduct towards its employee is defined in the collective

bargaining agreement, then state law claims are preempted by the Labor Management Relations Act. Indeed, when "[t]he duties imposed and rights established through the state tort . . . derive from the rights and obligations established by contract", the state law claim is preempted. *Allis-Chalmers,* 471 U.S. at 217. If on the other hand . . . Plaintiff's claims depend on an independent right upon which the collective bargaining agreement cannot intrude, then state law will apply[.]" *Cheesebrew v. Felman Prod., Inc.*, RCC-09-1129, 2009 WL 5205458, at *5 (S.D.W. Va. Dec. 23, 2009).

In Count V, plaintiff asserts rights under MFEPA concerning protection from age and disability discrimination in the workplace as well as retaliation in the workplace. Such rights exist independent of private agreements. *See Smolarek v. Chrysler Corp.*, 879 F.2d 1326, 1338 (6th Cir. 1989) (Kennedy, C.J., concurring in part) ("The right to be free of race, sex, or age discrimination is independent of any ancillary right contained in a collective bargaining agreement.").

The elements of a MFEPA discrimination claim require a plaintiff to demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) that similarly situated employees outside of the plaintiff's class received more favorable treatment. *Alexander v. Marriott Int'l, Inc.*, RWT-09-2402, 2011 WL 1231029, at *6 (D. Md. Mar. 29, 2011); *see Jones v. Johns Hopkins Cmty. Physicians, Inc.*, No. 2567, Sept. Term, 2017, 2019 WL 2774303, at *9 (Md. Ct. Spec. App. July 2, 2019). For a MFEPA retaliation claim, plaintiffs must show that: (1) they engaged in a protected activity; (2) the employer acted adversely against them; and (3) there was a causal connection between the protected activity and the adverse action. *Barreto v. SGT, Inc.*, 826 F. App'x 267, 271 (4th Cir. 2020) (per curiam) (citation omitted). The state law claims do not arise from rights conferred by the CBA.

"There are relatively few appellate decisions interpreting Maryland's FEPA," so courts have been guided by federal courts' interpretation of Title VII to analyze claims under the state's analogue. *Peninsula Reg'l Med. Ctr. v. Adkins*, 448 Md. 197, 209, 137 A.3d 211, 217–18 (2016); *see Bomar*, 2026 WL 1031816, at *4; *Schwenke v. Ass'n of Writers & Writing Programs*, 510 F. Supp. 3d 331, 335 (D. Md. 2021). The elements of a MFEPA claim do not require reference to or interpretation of a CBA. When a state law claim depends on "purely factual" questions regarding the employee's conduct and/or the employer's conduct and motive, a CBA need not be interpreted, and the claim is therefore not preempted by § 301 of the LMRA. *See Lingle*, 486 U.S. at 407 (concerning a state law claim of retaliatory discharge);[32] *see also Hawaiian Airlines*, 512 U.S. at 262 (same); *cf. Knox v. Wheeling-Pittsburgh Steel Corp.*, 899 F. Supp. 1529, 1534 (N.D. W.Va. 1995) (stating that the elements of a discrimination or a retaliation claim "pertain to the conduct and motivation of the employer under statutory standards, rather than the standards of the CBA"). Although *Lingle* does not hold that every claim for retaliatory discharge, or otherwise similar claim, will avoid preemption under § 301, "it suggests that preemption will be rare." *Crosby v. Cooper B-Line, Inc.*, 725 F.3d 795, 801 (7th Cir. 2013); *see Rosenlieb v. Rock Creek Aluminum, Inc.*, JRG-08-00006, 2008 WL 11430017, at *8 (S.D.W. Va. Feb. 28, 2008) ("In *Lingle*'s wake, we have held that state law claims of handicap discrimination, retaliation, and intentional infliction of emotional distress are not preempted by § 301 of the LMRA.").

As *Lingle* noted, "[t]o defend against a retaliatory discharge claim, an employer must show that it had a nonretaliatory reason for the discharge[.]" *Lingle,* 486 U.S. at 407. This is a "purely

---

[32] The elements of the Illinois retaliatory discharge claim in *Lingle* are nearly identical to the elements for retaliatory discharge in Maryland. *Compare Lingle*, 486 U.S. at 407, *with Scott Miller-Phoenix v. Baltimore City Board of School Commissioners*, Sept. Term, 2022, 2024 WL 770599, at *6 (Md. App. Ct. Feb. 26, 2024).

factual inquiry" that "does not turn on the meaning of any provision of a collective-bargaining agreement." *Id.* Accordingly, the *Lingle* Court concluded that the resolution of the state law retaliatory discharge claim was "'independent' of the agreement for § 301 purposes." *Id.* at 410.

In short, plaintiff's MFEPA claim (Count V) is not founded on rights conferred by the CBA. Therefore, it is not preempted by § 301 of the LMRA.

With respect to plaintiff's wrongful discharge claim (Count VI), the Maryland Court of Appeals[33] has "recognized the tort of wrongful termination based on public policy when an employee is discharged for exercising his or her legal rights." *Yuan v. Johns Hopkins Univ.*, 452 Md. 436, 461, 157 A.3d 254, 269 (2017). Moreover, it is a criminal offense in Maryland for an employer covered under the Maryland Workers' Compensation Act ("MWCA"), Md. Code (2025 Repl. Vol.), § 9-101 *et seq.* of the Labor and Employment Article ("L.E."), to terminate an employee solely because he filed a claim for workers' compensation.

L.E. § 9-1105, titled "Discharge of employee for filing claim," provides:

(a)  An employer may not discharge a covered employee from employment solely because the covered employee files a claim for compensation under this title.

(b)  A person who violates this section is guilty under a misdemeanor and on conviction is subject to a fine not exceeding $500 or imprisonment not exceeding 1 year or both.

---

[33] In the general election held in Maryland in November 2022, the voters of Maryland approved a constitutional amendment to change the name of the Maryland Court of Appeals to the Supreme Court of Maryland. And, the voters also approved a change in the name of the State's intermediate appellate court, from the Maryland Court of Special Appeals to the Appellate Court of Maryland. These changes went into effect on December 14, 2022. *See* Press Release, Maryland Courts, *Voter-approved constitutional change renames high courts to Supreme and Appellate Court of Maryland* (Dec. 14, 2022), https://perma.cc/TL89-QFKR. However, I shall refer to the courts by the names that were in effect when the cited decisions were issued.

The Maryland high court has observed: "Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy. The Legislature has made a strong statement to that effect in making [L.E. § 9-1105] a criminal offense, and our perception of the magnitude of the public interest in preserving the full benefits of the worker's compensation system to employees, and deterring employers from encroaching upon those rights, is equally strong." *Ewing v. Koppers Co.*, 312 Md. 45, 50, 537 A.2d 1173, 1175 (1988). Accordingly, "terminating an employee for filing 'a workers' compensation claim contravenes the clear mandate of Maryland public policy.'" *Scott Miller-Phoenix v. Baltimore City Board of School Commissioners*, Sept. Term, 2022, 2024 WL 770599, at *6 (Md. App. Ct. Feb. 26, 2024) (quoting *Ewing*, 312 Md. at 50, 537 A.2d at 1175).

Plaintiff claims that he was terminated in retaliation for filing his WC Claim. *See* ECF 1, ¶¶ 176–77. "[T]o prevail on such a [retaliation] claim, a plaintiff must show that they were 'discharged solely and directly because of filing a workers' compensation claim.'" *Love v. Wayfair, LLC*, RDB-23-2632, 2025 WL 1884849, at *14 (D. Md. July 8, 2025) (quoting *Davis v. Baltimore Hebrew Congregation*, 985 F. Supp. 2d 701, 718 (D. Md. 2013)), *appeal dismissed,* 2025 WL 4119415 (4th Cir. Oct. 3, 2025). Plaintiff's allegations do not require an interpretation of the CBA. Accordingly, plaintiff's wrongful termination claim is not preempted by the LMRA.

As the Supreme Court has observed, "any alleged willful breach of contract can be restated as a tort claim for breach of a good-faith obligation under a contract[.]" *Allis-Chalmers*, 471 U.S. at 219. The state tort claim at issue in *Allis-Chalmers* was a breach of contract claim masquerading as a tort claim: it was "derive[d] from contract" and "defined by the contractual obligation of good faith[.]" *Id.* at 218. In contrast, plaintiff's State law tort claims are entirely independent of the

CBA. McLeod's claims arise from state laws designed to protect Maryland workers from discrimination, retaliation, and wrongful discharge. As the Supreme Court has explained, "notwithstanding the strong policies encouraging arbitration, 'different considerations apply *where the employee's claim is based on rights arising out of a statute designed to provide minimum substantive guarantees to individual workers*.'" *Lingle,* 486 U.S. at 412 (quoting *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 737 (1981)) (emphasis in *Lingle*). Preemption of plaintiff's state law claims is clearly not warranted.

### C. Exhaustion of Grievance Procedures and Arbitration

Defendants assert that plaintiff's discrimination claims "based on disability, age and gender are clearly covered by the CBA, which contains a provision prohibiting any discrimination in his employment on those bases and requires such claims to be submitted under the CBA's grievance procedures." ECF 22 at 3. According to defendants, "plaintiff has failed to comply with the CBA's mandatory arbitration procedures," and has "failed to exhaust available contractual remedies under the CBA." ECF 17-1 at 12. Therefore, they urge dismissal of McLeod's claims. *Id.* at 11, 12.

Further, defendants point out that the "settlement agreement requires arbitration of any issues concerning the 'applicability or enforceability' of the agreement." *Id.* at 11 (quoting ECF 17-2 at 376). They insist that the Complaint should be dismissed because plaintiff did not comply with mandatory arbitration procedures under the Settlement Agreement. ECF 17-1 at 11.

Plaintiff posits: "Defendants' argument that Plaintiff was required to exhaust CBA procedures contradicts forty years of Supreme Court precedent." ECF 18 at 29. He asserts: "Defendant [sic] fails to point to any specific language within the CBA that provides for a 'clear and unmistakable' waiver of the Plaintiff's rights under federal and Maryland law." *Id.* Moreover, plaintiff argues that, "[e]ven if exhaustion were required, Plaintiff satisfied it", noting that the

"Complaint alleges that Actors' Equity Association initiated grievances on Plaintiff's behalf in August and October 2023." *Id.* (citing ECF 1, ¶¶ 81, 82 and ECF 18-13 (AEA Grievances)).

As to the Settlement Agreement, plaintiff claims that it resolved grievances under the CBA, but preserved other rights under the CBA and other matters not waived by the Settlement Agreement. ECF 18 at 29–30. Plaintiff points out that the Settlement Agreement "does not mention the ADEA, ADA, Title VII, or Maryland law, and contains no language waiving statutory discrimination claims." *Id.* at 30. Specifically, as to the ADEA, plaintiff asserts that the Older Workers Benefit Protection Act ("OWPA") of the ADEA, 29 U.S.C. § 626(f)(1), "requires waivers to provide 21 days to consider the agreement, advice to consult counsel, and 7 days to revoke." ECF 18 at 30. Plaintiff notes that the "settlement agreement contains no OWBPA-compliant waiver." *Id.*

Therefore, the Court must determine whether the CBA, the Settlement Agreement, or both compelled plaintiff to arbitrate his claims or follow an internal grievance procedure in lieu of bringing them to federal court. [34] I consider each agreement, in turn.

## 1. The CBA

According to defendants, under the CBA, "Plaintiff was required to exhaust available contractually agreed upon grievance procedures *prior* to filing the instant suit", and the failure to do so precludes the suit. ECF 22 at 2 (emphasis added). But, they also contend, *id.*: "The requirement to exhaust the CBA remedies does not constitute a waiver of statutory rights and the

---

[34] I must first determine whether it is the Court or an arbitrator who must answer this question. *See Peabody*, 665 F.3d at 101. Neither the CBA nor the Settlement Agreement provides a clear and unmistakable statement that the parties agreed to have an arbitrator decide whether a particular issue is arbitrable. *See Simply Wireless*, 877 F.3d at 527. Nor does either side argue that an arbitrator should decide this issue. Accordingly, whether plaintiff's claims are arbitrable is an issue for the Court.

standard for such waiver to be clear and unmistakable is not applicable." *Id.* They insist that the Complaint should be dismissed for failure to abide by the grievance procedure established in the CBA, and after exhaustion plaintiff can "pursu[e] his statutory claims in a judicial forum . . . ." *Id.*

The text of the CBA requires claims under the non-discrimination policy of the CBA to be submitted to final and binding arbitration. It does not address rights under federal statutory law.

Rule 40(B) of the CBA provides, in part: "Any claimed violation of [the non-discrimination CBA policy] shall promptly be submitted for settlement to the Grievance Committee, pursuant to Rule 4, ARBITRATION AND GRIEVANCE." ECF 17-2 at 124.[35] Rule 4 provides: "A decision of the [Grievance] Committee . . . on a grievance or dispute shall be *final and binding* on the parties." *Id.* at 66 (emphasis added). And, Rule 4 states that when a dispute is submitted for arbitration, "the award of the Arbitrator shall be final and binding on all parties." *Id.* at 68. The CBA's Non-Discrimination provision states, in part, Rule 40(B)(2): "If the dispute is not decided by the Grievance Committee, the claim may then be submitted directly to arbitration in accordance with Rule 4." *Id.* at 124.

Because the CBA stipulates that resolution of claims brought either to the Grievance Committee or for Arbitration is "final and binding", *id.* at 68, submitting claims to that process constitutes a waiver of the right to proceed in a federal judicial forum. But, as discussed, in *Universal Maritime*, 525 U.S. 70, the Supreme Court "made clear that for claims brought pursuant to federal nondiscrimination statutes to be found subject to mandatory arbitration under a collective bargaining agreement, the agreement must include 'clear and unmistakable' language to that effect." *Moody*, 2025 WL 3119201, at *5. Even when a CBA requires the completion of a

---

[35] The CBA states: "The Grievance Committee shall consist of up to five representatives of Equity and up to five representatives of the League." ECF 17-2 at 66.

grievance procedure *before* an employee can pursue a claim in federal court, courts apply the *Universal Maritime* standard to determine whether the agreement contains clear and unmistakable language waiving the right to a federal forum. *See Moody*, 2025 WL 3119201, at *5 (applying the *Universal Maritime* standard to a CBA that contained a non-discrimination provision that forbade discharge based on discrimination and required an employee "to exhaust her contractual remedies through the grievance process *before* seeking a judicial remedy") (internal quotation marks and citation omitted) (emphasis added). Accordingly, the *Universal Maritime* standard applies to determine whether McLeod was required to follow the grievance process, including arbitration, set out in the CBA, in lieu of pursuing his statutory claims in federal court.

Although it is "possible to meet the clear and unmistakable waiver standard of *Universal Maritime,* it is not easy." *Massey*, 373 F.3d at 534. Courts have repeatedly found that clauses in a CBA that broadly prohibit discrimination in employment are not sufficient to meet the *Universal Maritime* standard. *See, e.g., Robinson v. Healthtex, Inc.*, 215 F.3d 1321, *2–3 (4th Cir. 2000) (per curiam); *Brown*, 183 F.3d at 320–23; *Birch v. The Pepsi Bottling Grp., Inc.*, 207 F. Supp. 2d 376, 381–85 (D. Md. 2002); *see Bedwell v. Mack Trucks Inc.*, 173 F.3d 423, at *3 (4th Cir. 1999) (per curiam) ("[A]lthough [in the CBA, defendants] agreed to support and implement governmental antidiscrimination programs, this is not the same as making compliance with the ADA a contractual commitment subject to arbitration and does not constitute a clear and unmistakable waiver of a judicial forum for discrimination claims."); *Gonzalez v. Prince George's Cnty., MD,* PWG-17-159, 2017 WL 2865015, at *3 (D. Md. July 5, 2017) ("While an employee may agree by contract to follow grievance procedures, including arbitration, for statutory claims instead of pursuing them in court, an employee is not required to do so unless the waiver of

litigation is 'clear and unmistakable' in the agreement between the party or his or her union and the employer.").

In *Brown*, 183 F.3d at 321, the Court said that a waiver is clear and unmistakable if:

First, and most obviously, such intent can be demonstrated through the drafting of an "explicit arbitration clause" pursuant to which the union agrees to submit all statutory employment-discrimination claims to arbitration. *Carson,* 175 F.3d 325, 331. Second, where the arbitration clause is "not so clear," employees might yet be bound to arbitrate their federal claims if "another provision, like a nondiscrimination clause, makes it *unmistakably clear* that the discrimination statutes at issue are part of the agreement." *Carson,* 175 F.3d 325, 331 (emphasis added).

*Carson*, 175 F.3d at 327, is informative.  There, the employee plaintiffs brought suit, claiming discrimination on the basis of race, age, and disability.  There were four CBAs between the employees and their employer.  *Id.*  "The nondiscrimination provisions in the four CBAs" all contained similar language.  *Id.*  As an example, one CBA provided, *id.*: "[T]he Employer and the Union in the performance of this Agreement agree not to discriminate against any employee or applicant for employment because of race, sex, age, color, religious creed, or national origin." Additionally, the CBAs required arbitration of "any 'controversy, dispute or disagreement . . . concerning the interpretation of the provisions of this Agreement.'"  *Id.* at 328 (quoting one of the CBAs that governed the relationship between employees and employers).

The Fourth Circuit considered "whether the parties agreed to arbitrate the discrimination claims arising under Title VII, 42 U.S.C. § 1981, the ADEA, and the ADA."  *Id.*  It explained that "this question is one of contract and is to be resolved by the parties' expressed intentions."  *Id.* The Court reiterated: "Union-negotiated collective bargaining agreements that require the arbitration of statutory discrimination claims are valid and binding on unionized employees."  *Id.* But, the Court explained that, "[i]n the collective bargaining context, the parties 'must be particularly clear' about their intent to arbitrate statutory discrimination claims."  *Id.*

Turning to the language of the CBAs in issue, the Court observed that although "[t]he arbitration clauses in the CBAs state broadly that the parties agree to arbitrate all disputes over the meaning of the agreement," there was "no mention . . . of disputes arising under federal law." *Id.* at 332. It said: "This sort of general arbitration clause does not satisfy the demand of particular clarity." *Id.* The Court made clear that although the CBAs contained "antidiscrimination provisions stating that the company and the union agree not to discriminate on the basis of race or age," they did not "begin to incorporate by reference federal statutory law." *Id.* It concluded: "The absence of transparency in both the arbitration and nondiscrimination clauses fails to meet the 'clear and unmistakable' standard set forth in *Universal Maritime.*" *Id.*

*Safrit v. Cone Mills Corp.*, 248 F.3d 306 (4th Cir. 2001) (per curiam), is also informative. The Fourth Circuit considered whether the plaintiff could "proceed with a Title VII claim in federal court in the face of a Collective Bargaining Agreement which explicitly states that Title VII claims would be subject to binding arbitration." *Id.* at 307. The CBA at issue stated "that the company and the union 'agree that they will not discriminate against any employee with regard to race, color, religion, age, sex, national origin or disability . . . . The parties further agreed that they will abide by all the requirements of Title VII of the Civil Rights Act of 1964.'" *Id.* (quoting the CBA) (alteration in original). Additionally, another clause of the CBA provided: "'Unresolved grievances arising under this Section are the proper subjects for arbitration.'" *Id.*

The defendant "urged the district court to dismiss the case, arguing that the CBA clearly and unmistakably permitted arbitration as the sole remedy for alleged violations of Title VII." *Id.* The district court granted summary judgment to the defendant, finding that the CBA constituted a valid waiver of the "employee's statutory rights to a federal forum." *Id.* at 307–08. The Fourth Circuit affirmed, stating that the "CBA indubitably provides such a clear and unmistakable

- 96 -

waiver." *Id.* at 308.  It elaborated:  "Indeed, it is hard to imagine a waiver that would be more definite or absolute.  The parties agreed that they would 'abide by all the requirements of Title VII' and that '[u]nresolved grievances arising under this Section are the proper subjects for arbitration.'" *Id.* at 308 (quoting the CBA).

*Moody*, 2025 WL 3119201, also provides guidance.  There, the plaintiff filed suit against her former employer, alleging wrongful termination, in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.,* and denial of her procedural due process rights, pursuant to 42 U.S.C. § 1983. *Id.* at *1.  The defendant employer moved to dismiss the complaint, "because Plaintiff ha[d] not sought to have her allegations addressed through the 'grievance process' articulated in the Collective Bargaining Agreement that governed Plaintiff's employment." *Id.* at *5 (alteration added).  The defendant argued:  "Plaintiff was required to submit her claim through the *grievance process*" in the CBA. *Id.* (emphasis in original)*.

> The CBA in *Moody* contained a "Non-Discrimination" provision that stated, *id.* at *6:
>
> The provisions of this Agreement shall be applied without regard to age, gender, race, color, religion, national origin, sexual orientation, and handicap. The parties further stipulate that this Agreement shall be interpreted in such a manner as to be consistent with and subject to the nondiscrimination provisions of the United States Constitution and statutes, regulations and guidelines enacted pursuant thereto.

On the basis of this clause, the defendant contended that "'discharge based on alleged discrimination would violate the CBA, requiring [plaintiff] to exhaust her contractual remedies through the grievance process before seeking a judicial remedy.'" *Id.* (quoting defendant's brief) (alteration added).  The district court determined that "the Non-Discrimination provision" in the CBA did not meet the standard of clear and unmistakable language, as defined in *Universal Maritime. Id.*

The court noted that "the Fourth Circuit has repeatedly emphasized that a non-discrimination provision that simply states the parties' agreement not to, themselves, engage in any discriminatory action, does not constitute an explicit incorporation of federal statutory discrimination law into an agreement." *Id.* at *7 (citing *Brown,* 183 F.3d at 322, and *Carson,* 175 F.3d at 332). The court added: "This is the case even where the nondiscrimination clause 'parallel[s], or even parrot[s], the language of federal antidiscrimination statutes.'" *Moody*, 2025 WL 3119201, at *7 (quoting *Brown,* 183 F.3d at 322). Accordingly, the court concluded that the plaintiff was not required to adjudicate her claims under the CBA's grievance process. *Moody*, 2025 WL 3119201, at *7.

I turn to the language of the CBA at issue here to determine whether the text is sufficient to constitute waiver under *Universal Maritime*.

Rule 40 of the CBA, titled "Non-Discrimination," is pertinent. *Id.* at 124. It provides, in relevant part, *id.* (emphasis in original)*:*

(A)  The parties hereto affirm their commitment to the policy that employment hereunder shall be without discrimination on the basis of race or ethnicity, gender/gender identity or expression, transgender status, age, religion, national origin, disability, familial status, sexual orientation, veteran status, or political persuasion or belief. Consistent with the foregoing and with the procedure set forth in Rule 5(E)(4), it is the intention of the parties that the casting of productions will be conducted in a manner which provides equal and fair consideration to all Actors including, but not limited to the aforementioned Actors. Quarterly meetings will be held between representatives of Equity and the League to assure that this fair employment policy is being observed and to monitor its implementation. This provision is also applicable to applicants for employment.

(B) **Claims.** Any claimed violation of this policy shall promptly be submitted for settlement to the Grievance Committee, pursuant to Rule 4, ARBITRATION AND GRIEVANCE.

(1) The Actor or applicant shall submit to Equity any claimed violation of these provisions within 28 days of the time when the claim arose or when the Actor became aware of the alleged discrimination, whichever

- 98 -

is later. Equity shall send written notice of the claim to the League and the Producer, in accordance with Rule 4(A)(2) within five business days thereafter. Any claim for which timely notice is not given shall be barred unless unusual circumstances can be shown for such delay. The Grievance Committee shall meet to consider the claim immediately thereafter.

(2) If the dispute is not decided by the Grievance Committee, the claim may then be submitted directly to arbitration in accordance with Rule 4. The Arbitrator may provide such remedies as in their discretion shall be deemed appropriate.

As noted, Rule 4 of the CBA is titled "Arbitration and Grievance." ECF 17-2 at 66. It provides, in relevant part, *id.*:

Except as otherwise expressly provided in these Rules, any dispute between a Producer and/or the League and the Actor and/or Equity relating to the interpretation or application of the Collective Bargaining Agreement between Equity and the League shall be submitted to the Grievance Committee at the request of either Equity, the Producer, or the League and, if not decided by the Grievance Committee, may be submitted to arbitration as provided below.

In addition, Rule 4 provides the procedure for arbitration and expeditious arbitration. *See id.* at 67–69. It states, in part: "There shall be a board of seven arbitrators designated to hear and determine disputes between a Producer and/or the League and Equity relating to the interpretation or application of this Agreement." *Id.* at 66.

In my view, the CBA lacks the "explicit, unambiguous language to satisfy the standard laid out in *Universal Maritime.*" *See Massey,* 373 F.3d at 534. Unlike the arbitration clause in *Safrit,* 248 F.3d at 308, there is no mention of the statutory rights that plaintiff waived as a party to the CBA. The arbitration clause, even when paired with the provision broadly prohibiting discrimination in the workplace, does not demonstrate a clear and unmistakable waiver of plaintiff's statutory claims. Crucially, the CBA's non-discrimination provision makes no mention of a federal statutory discrimination framework, like the CBA at issue in *Safrit,* 248 F.3d 306.

Accordingly, plaintiff's claims are not subject to dismissal for failure to exhaust the grievance process or to arbitrate.

### 2. The Settlement Agreement

Defendants contend that the Settlement Agreement "requires arbitration of any issues concerning the 'applicability or enforceability'" of the Settlement Agreement. ECF 17-1 at 11 (quoting ECF 18-14, ¶ 12). In relevant part, the Settlement Agreement provides: "Should issues arise as to the applicability or enforceability of this Agreement, such matters shall be decided by arbitration[.]" ECF 18-14, ¶ 12. Accordingly, the Court must determine whether the scope of the Settlement Agreement includes plaintiff's discrimination claims, claims of retaliation, and wrongful termination claim, and, if so, whether the claims are subject to arbitration.

As discussed, arbitration is favored as a matter of public policy, *Goldman Sachs*, 170 F.4th at 256, to "encourage the expeditious resolution of disputes." *Volt Info.*, 489 U.S. at 478; *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). But, arbitration is "a matter of consent." *Volt Info.*, 489 U.S. at 479. "Whether there is an arbitration agreement between the parties is a question of contract formation governed by state law." *Jackson v. Protas, Spivok, & Collins, LLC*, 176 F.4th 317, 320, (4th Cir. 2026). This implicates principles of contract interpretation.[36]

The Settlement Agreement provides: "This Agreement shall be construed in accordance with, and all disputes hereunder shall be governed by, the laws of the [sic] New York." ECF 18-14, ¶ 14. In New York, "general contract interpretation principles are well established." *Donohue v. Cuomo*, 38 N.Y.3d 1, 12, 184 N.E.3d 860, 866 (2022). "'The fundamental, neutral precept of

---

[36] The parties do not address principles of contract construction. New York's principles of contract construction appear quite similar to those of Maryland.

contract interpretation is that agreements are construed in accord with the parties' intent' and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing[.]'" *Id.* (quoting *Greenfield v. Philles Records,* 98 N.Y. 2d 562, 569, 750 N.Y.S. 2d 565 (2002)); *see Dibrino v. Rockefeller Ctr. North, Inc.*, __ N.Y.3d __, __ N.Y.S.3d __, __ N.E.3d __, 2025 WL 3670593, at *2, 2025 N.Y. Slip Op. 07077 (2025). And, "courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing[.]" *2138747 Ontario, Inc. v. Samsung C & T Corp.*, 31 N.Y.3d 372, 381, 103 N.E.3d 774, 780 (2018) (cleaned up) (quotation marks and citation omitted).

Indeed, "[e]vidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing[.]" *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162, 566 N.E.2d 639, 642 (1990). "That rule imparts 'stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses * * * infirmity of memory * * * [and] the fear that the jury will improperly evaluate the extrinsic evidence.'" *Id.* (quoting Fisch, New York Evidence § 42, at 22 (2d ed)) (alterations in *Giancontieri*).

"Extrinsic or parol evidence 'is admissible only if a court finds an ambiguity in the contract[.]'" *Donohue*, 38 N.Y.3d at 12–13, 184 N.E.3d at 866 (quoting *Schron v. Troutman Sanders LLP,* 20 N.Y.3d 430, 436, 963 N.Y.S.2d 613 (2013)). A "contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion." *Greenfield,* 98 N.Y.2d at 570, 750 N.Y.S.2d at 569 (cleaned up) (quotation marks, citation, and alterations omitted).

In the Complaint, plaintiff alleges that "Defendants unlawfully withheld $31,053.19 in wages and benefits owed to Plaintiff in violation of both federal law and the applicable union agreement[.]" ECF 1, ¶ 81. He also claims that the Settlement Agreement resolved only that particular dispute between McLeod and LMS22 and its subsidiaries, Cameron Mackintosh Limited. ECF 1, ¶¶ 82–83; *see* ECF 17-2 at 372–76.

The Settlement Agreement does not mention workplace discrimination. It recounts that the AEA "filed grievances on August 16, August 18, and October 27, 2023, regarding purported payment(s) owed to Employee following his separation from employment . . . alleging a violation of the CBA[.]" ECF 18-14 at 1; *see* ECF 18-13 (AEA Grievances). These grievances went to arbitration on November 11, 2023. ECF 18-14 at 1. Further, the Settlement Agreement provides: "WHEREAS, the Parties now desire to fully and finally settle the Grievances and Arbitration without the time, uncertainty, and expense of continued litigation." *Id.* In addition, the Settlement Agreement states: "It is understood that this Agreement is being entered into by the Parties *solely for the purpose of amicably resolving the Grievances and Arbitration*." *Id.* ¶ 4 (emphasis added). By its terms, the Settlement Agreement applies to the grievances and the arbitration that followed.

In another provision of the Settlement Agreement, McLeod "fully and forever release[d] and discharge[d] all grievances arising under the CBA, whether known or unknown, based on *any* act, omission, or occurrence through and including the execution of this Agreement arising out of, on account of, or *related to the Employee's employment with and separation from LMS22 Touring, LLC,* and the Grievances and Arbitration." *Id.* ¶ 6 (emphasis added).

It is clear that the Settlement Agreement, which includes the release, concerns grievances under the CBA. But, the question is whether the provisions extend to other issues concerning

plaintiff's employment.  In particular, the Court must determine whether "grievance" includes the claims lodged in the Complaint.

As stated, the CBA contains a non-discrimination provision.  ECF 17-2 at 124.  But, plaintiff's rights to be free from discrimination on the basis of age and disability; retaliation; and wrongful termination, do not, as defendants aver, "rest on the terms of the CBA."  ECF 17-1 at 3. Rather, plaintiff's rights under federal and state law "exist independently of the CBA even though the CBA specifically mentions the right to be free from discrimination . . . . Simply put, discrimination in the workplace is illegal regardless of whether such discrimination is also prohibited by the collective bargaining agreement."  *See Knox v. Wheeling-Pittsburgh Steel Corp.,* 899 F. Supp. 1529, 1534–35 (N.D.W. Va. 1995).

"Employees are free to release their rights to sue for discrimination under Title VII or the ADA in a private settlement so long as the waiver is knowing and voluntary."  *Briggman v. Republic Serv.*, SAL-21-3375, 2022 WL 17080146, at *4 (D.S.C. Nov. 18, 2022).  By its terms, in the Settlement Agreement McLeod released only "grievances arising under the CBA." ECF 18-14, ¶ 6.  And, plaintiff's claims in this suit do not arise from the CBA.

The language of the Settlement Agreement does not constitute a waiver of plaintiff's statutory discrimination claims.  Indeed, "[a]n employee's contractual rights under a CBA are distinct from an employee's statutory rights."  *Bedwell*, 173 F.3d 423, at *3.  Therefore, the Settlement Agreement does not bar plaintiff from pursuing his suit in this Court.  Nor is plaintiff bound to arbitrate his discrimination claims pursuant to the terms of the Settlement Agreement.

### D. Age Discrimination (Count I)

Defendants contend that the Complaint fails to state a claim for discrimination under the ADEA.  ECF 17-1 at 12.  They assert, *id.* at 13: "There is absolutely no basis for alleging that

Plaintiff's age, which was not an issue when he was hired, suddenly became the basis for his termination by the same decision-makers who hired him." They also note that plaintiff "was terminated by the same decision-makers who hired him less than a year before" he was fired. *Id.*; *see* ECF 22 at 7–8 ("When Defendant decided to terminate Plaintiff's employment, Plaintiff's age had not significantly changed and was not an issue preventing his hiring.").

According to defendants, the Complaint "does not allege anything evidencing discriminatory animus based on age in any of the individuals who made the decision to terminate him." ECF 17-1 at 13. And, they posit that "there is no allegation of any connection between a few, largely innocuous comments regarding Plaintiff's age by various co-workers and LMS22's upper management's decision to terminate his employment." ECF 17-1 at 13; *see* ECF 22 at 8. In other words, defendants contend that there is no "basis for imputing the comments by various employees to the Defendants." ECF 17-1 at 16. In this regard, defendants point out that "[t]here is no allegation that management knew about any of the limited comments cited in the Complaint." *Id.* Moreover, McLeod "never alleges that he notified anyone in management or considered the alleged comments on his age abusive or hostile." *Id.* Additionally, defendants observe that "management maintained a clear anti-discrimination policy, including in its CBA governing Plaintiff's employment." *Id.*

Defendants maintain that "the only fact" that McLeod alleges to support his age discrimination claim is that "the company promoted his direct subordinate who happened to be younger than him." *Id.* at 13. In their view, "that single allegation is not enough to establish discrimination." *Id.*

Further, defendants claim that plaintiff has failed to "allege sufficient facts to demonstrate" that the alleged age-based discriminatory conduct "was unwelcome or that it was sufficiently

severe or pervasive to alter the terms and conditions of" McLeod's employment. *Id.* at 15. Rather, defendants characterize the comments regarding McLeod's age at the workplace as "innocuous references to Plaintiff's age by his subordinates." *Id.* They add: "There is also no allegation anywhere in the Complaint that Plaintiff ever objected to the comments or conveyed to any of his co-workers that comments regarding his age were unwelcome." *Id.* According to defendants, "Plaintiff's failure to object undercuts any assertion that he was subject to severe and pervasive age-based harassment that altered the terms and conditions of his employment." *Id.*

Plaintiff alleges that beginning in August 2022, he "was subjected to pervasive age-based harassment." ECF 18 at 4. Moreover, he disputes defendants' argument that the Court cannot infer discrimination merely because McLeod was hired and fired by the same executives. *Id.* at 11. According to plaintiff, this argument is "improper at the Rule 12(b)(6) stage, where the Court must draw all inferences in Plaintiff's favor." *Id.*

In addition, plaintiff contends that he "was hired to work consecutively for Defendant NETworks beginning in 2015, not for the first time in 2022." *Id.* at 12.[37] He claims that there were "significant intervening events" that fundamentally altered "the circumstances between hire and termination." *Id.* Specifically, plaintiff notes that in the time between being hired and fired, McLeod "(1) suffered catastrophic workplace injuries requiring 10-week medical leave; (2) opposed discriminatory policies in violation of the CBA; (3) filed a workers' compensation claim; and (4) disclosed his COPD disability while correcting false medical information." *Id.*

---

[37] Although plaintiff worked for Networks before 2022, his suit concerns termination from his position as Production Stage Manager for the national tour of *Les Misérables*, pursuant to the SETA Contract, spanning the period from August 5, 2022, through his termination on July 2, 2023. *See* ECF 1, ¶¶ 17, 74; ECF 18-2.

Plaintiff emphasizes that he was replaced by his 26-year-old assistant, Ryan Gardner, who "had minimal experience compared to Plaintiff's 35 years." *Id.* at 13.  Furthermore, plaintiff notes that the Complaint "alleges repeated, specific age-based comments by management and supervisory personnel[.]" *Id.* at 12.  In his view, these remarks demonstrate "that Plaintiff's age was a subject of discussion and concern." *Id.* at 13.  According to plaintiff, "temporal proximity" between the age-based remarks and his termination "support an inference that age motivated the termination." *Id.*

It is undisputed that McLeod was 57 years old at the time of termination, and clearly a member of the protected class under the ADEA.  ECF 1, ¶ 14.  To survive the Motion, plaintiff must allege facts that, if proven, establish that he "experienced discrimination by an employer . . . because of his age." *Tickles,* 805 Fed. Appx. at 207.  As with all "discrimination cases, whether for disparate treatment or hostile work environment," there must be "some connective thread between the alleged mistreatment and the protected status, in order to state an "actionable claim for discrimination." *Gough v. Rock Creek Sports Club*, PJM-19-3533, 2021 WL 795447, at *2 (D. Md. Mar. 2, 2021).  "At the motion to dismiss stage, however, the connective thread may be reasonably inferred from the facts alleged in the complaint." *Hartle v. Transplant Genomics, Inc.,* RDB-24-3215, 2025 WL 2676536, at *6 (D. Md. Sept. 18, 2025).  Plaintiff has adequately woven that connective thread.

Plaintiff alleges that he was the subject of "frequent 'old man' jokes from coworkers and age-based bias from management[.]" ECF 1, ¶ 101.  A coworker allegedly told McLeod, in front of other colleagues, that he was "'too old and senile'" to do his job, and this same coworker repeatedly called McLeod "senile[.]" *Id.* ¶¶ 23–25.  When plaintiff arrived at a rehearsal, crew members frequently announced words like "'old man on deck[.]'" *Id.* ¶ 29.

To be sure, "statements referring to age do not always reflect forbidden age-based animus or discrimination." *Lee*, 2026 WL 1993164, at \*4. And, "[t]he context in which the statements were made is also important." *Id.* at \*6. But, contrary to defendants' contention (ECF 17-1 at 16; ECF 22 at 8), the fact that some of the coemployees who made allegedly ageist remarks were not members of upper management does not insulate defendants from the remarks. In *Kluge v. Brownsburg Community School Corp.*, 364 F.4th 861, 892 n. 17 (7th Cir. 2023), the court said: "[A]n adverse employment action based on the discriminatory preferences of others, including coworkers and customers, is unlawful." *See also E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1039 (10th Cir. 2011) ("[W]e acknowledge that an employer's accommodation of the discriminatory preferences of other employees, clients, or customers could, under certain circumstances, expose the employer to liability for discrimination."); *Pleener v. New York City Bd. of Educ.*, 311 F. App'x. 479, 482 (2nd Cir. 2009) ("[F]ederal law does not permit an employer to discriminate based on race to accommodate the actual or perceived invidious biases of its clientele."); *Mesnick v. General Elec. Co.*, 950 F.2d 816, 826 (1st Cir. 1991) (stating that "the intentions of a third party may not be attributed to an employer without some rational basis for attribution").

Curiously, defendants claim: "Plaintiff's Complaint does not allege anything evidencing discriminatory animus based on age in any of the individuals who made the decision to terminate him." ECF 17-1 at 13. The assertion is inaccurate.[38]

---

[38] In the Reply, defendants acknowledge that "Plaintiff alleges Mr. Wenig on a single occasion, over five months before his termination asked Plaintiff why he was still touring at his age." ECF 22 at 8.

Wenig and Wheeler are the two executives who terminated plaintiff's employment. ECF 1, ¶ 75. In the Complaint, plaintiff alleges that Wenig asked plaintiff "why he was 'still out here touring at [his] age' and why he had not 'just retire[d].'" *Id.* ¶ 28 (alterations in Complaint). Plaintiff also claims that "Wheeler made age-discriminatory comments to Mr. McLeod, including references to his spouse's profession and stating that Mr. McLeod had 'more money than Midas,' demonstrating age-based bias and stereotyping." *Id.* ¶ 26.[39] In addition, plaintiff claims that Wheeler and Wenig were present when a coemployee claimed that McLeod was "senile" and "ma[de] gestures suggesting mental instability." *Id.* ¶ 25(a). Moreover, plaintiff asserts that Wheeler was aware that a production assistant had "created a text message group specifically labeled 'Jack and the Millennials,' deliberately emphasizing the age disparity between Plaintiff and his younger assistants." *Id.* ¶ 25(b). Plaintiff also claims that "Producers Wheeler, Sklar-Heyn, and Company Manager Danner were informed of this age-based targeting, [but] none took corrective action." *Id.* ¶ 25(c).

As noted, plaintiff alleges that he was hired under the SETA in August 2022 and terminated in July 2023. *Id.* ¶¶ 17, 74. And, plaintiff alleges that the same decisionmakers, Wenig and Wheeler, hired him and then terminated him eleven months later. ECF 1, ¶ 75; ECF 18 at 12.

The Fourth Circuit has said that "in cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). But, the *Proud*

---

[39] Plaintiff does not explain how Wheeler's alleged comment to plaintiff that his spouse has "'more money than Midas'" reflected bias as to his age. *See* ECF 1, ¶ 26.

Court noted that it could "imagine egregious facts from which a discharge in this context could still be proven to have been discriminatory[.]" *Id.*

*Proud,* 945 F.2d 796, is distinguishable.   There, the plaintiff was fired after only five months of employment.   *Id.*at 796-97.   In contrast, McLeod was fired after almost a year of employment.  *See* ECF 1, ¶¶ 17, 74.  Furthermore, in *Proud*, 945 F.2d at 798, there was "evidence of [plaintiff's] enumerated job deficiencies in a supervisory position" that cut against any inference that age was the reason for his termination.   But, plaintiff has not alleged any deficiencies in his performance.  *See* ECF 1.  Although defendants may present evidence to that effect, at this juncture the Court must credit plaintiff's version of events.

In addition, plaintiff highlights that he was replaced by a "26-year-old Assistant Stage Manager." *Id.* ¶ 114.  This constitutes a gap of almost thirty years in age between plaintiff and his successor.  The Supreme Court has said: "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is *substantially younger* than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996) (emphasis added).  Moreover, the age discrepancy offsets any presumption that, because McLeod was hired and fired within a short period by the same individuals, he was not discriminated against on the basis of age.  *See Proud*, 945 F.2d at 798; *see also DeBord v. Washington Cnty. Sch. Bd.*, 340 F. Supp. 2d 710, 714 (W.D. Va. 2004) ("[T]he greater the age disparity between a replacement and a terminated employee, the stronger the inference of discrimination.").

In short, plaintiff describes a workplace in which he was frequently subjected to age-based comments from his coworkers.   Furthermore, plaintiff alleges that Wenig and Wheeler, the

- 109 -

executive producers who terminated McLeod, were witnesses to this harassment and did nothing to stop it, and made age-based comments themselves. The pervasive nature of the age-based comments to which McLeod was subjected permit the inference that he was treated negatively because of his age. *See Scheppelman v. Cnty. of Berrien,* HYJ-24-1104, 2025 WL 3119191, at *5 (W.D. Mich. Nov. 7, 2025) ("The pervasive nature of the age-based comments suggests that the officers generally looked down on [plaintiff] due to her age; this, in turn, supports the inference that their negative treatment of her was age-based."). And, plaintiff alleges that after he was terminated, defendants retained a substantially younger individual to take on McLeod's position.

McLeod has sufficiently alleged age discrimination under the ADEA.

### E. Disability Discrimination (Count II)

Defendants contend that the Complaint fails to state a claim for discrimination based on a disability. ECF 17-1 at 16. They claim that McLeod "alleges several separate conditions and attempts to conflate them as a single disability." *Id*. But, they argue that the illnesses alleged by McLeod "do not establish that any of his impairments 'substantially limited' a 'major life activity.'" *Id.* at 16–17 (quoting *Bennett v. Kaiser Permanente*, 931 F. Supp. 2d 697, 709 (D. Md. 2013)).

According to defendants, McLeod "offers vague allegations regarding the injuries requiring treatment during his 10-week leave and vague claims of partial impairments to hearing and vision." ECF 17-1 at 17. They also claim that McLeod "fails to offer any specific factual allegations regarding any injuries from his fall that constitute a physical impairment that substantially limits one of his major life activities." *Id.* Additionally, defendants claim that McLeod "alleges no impairments that required accommodation to enable him to perform his essential job functions." *Id.*

With respect to McLeod's COPD, defendants note that they would have been aware of the condition when plaintiff was hired.  *Id.*  Therefore, they assert that McLeod's "visible and known disability could not have been an issue at the time of his firing if it was not an obstacle to his hiring less than a year prior."  *Id.*  Moreover, they state: "There is no allegation of any connection between Plaintiff's COPD, which he had throughout his employment, and his termination."  *Id.* at 18.

As to McLeod's claim that he has been discriminated against "based upon his injuries from his fall, which he alleges was a workplace injury," defendants assert that plaintiff again "fails to establish a plausible disability discrimination claim under the ADA."  *Id.*  They argue that McLeod's workplace injuries "would not constitute a disability under the ADA," and they contend that "there is no basis for alleging any direct connection between his injuries in March 2023" and "his ultimate termination in July 2023[.]"  *Id.*  Further, defendants posit that "any claims pertaining to Plaintiff's purported workplace injuries are foreclosed because the Maryland Workers' Compensation Act provides the exclusive remedy for such injuries."  *Id.*

Plaintiff counters that the Complaint "alleges multiple severe impairments substantially limiting major life activities under" the ADA, ECF 18 at 14, such as COPD; permanent hearing loss on his right side; permanent vision loss in his left eye; 50% nasal obstruction on his right side; and constant pain levels averaging 5 out of 10, with some days reaching level 9.  ECF 1, ¶¶ 19, 44. McLeod asserts that because of his COPD, he requires "continuous use of a portable oxygen unit," and that "COPD substantially limits breathing–a major life activity explicitly recognized in ADA regulations."  ECF 18 at 14 (citing 29 C.F.R. § 1630.2(i)(1)(i)); *see* ECF 1, ¶ 19.  As to plaintiff's workplace injuries, he asserts that the incident caused "permanent impairments" that "substantially limit hearing, seeing, and working."  ECF 18 at 14.

In addition, plaintiff claims that "Defendants regarded Plaintiff as disabled and made employment decisions based on that perception." *Id.* at 15. He points to an email from an insurance adjuster to management, stating that McLeod's claim was denied "'based off his pre-existing health conditions'; including COPD, because 'if we start paying for his COPD issues then we may have to pay full lifetime benefits to him.'" *Id.* at 14.

Further, plaintiff alleges: "Defendants' workers' compensation exclusivity argument fails." *Id.* at 15. He reasons: "The ADA prohibits discrimination based on disability status; workers' compensation provides no-fault benefits for workplace injuries." *Id.* According to plaintiff, "[t]hese are distinct causes of action," and his ADA retaliation claim is not preempted by the workers' compensation statute, which is "an *alternative* theory of recovery . . . ." *Id.* (emphasis in original). Moreover, plaintiff notes that his Claim "was denied and remains on appeal in the Howard County Circuit Court." *Id.*

"[T]he determination of whether a particular impairment constitutes a disability must be made on a case-by-case basis." *Tangires v. Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 594 (D. Md.), *aff'd,* 230 F.3d 1354 (4th Cir. 2000). But, "'[t]he question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis.'" *Jacobs*, 780 F.3d at 572 (quoting Pub.L. No. 110–325, § 2(b)(5) (2008)). Congress has commanded that "the definition of disability 'shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by [its] terms.'" *Summers,* 740 F.3d at 329 (quoting 42 U.S.C. § 12102(4)(A)).

As to COPD, plaintiff alleges that this condition causes difficulty with breathing. ECF 1, ¶ 120. And, as plaintiff asserts, breathing is a major life activity under the ADA. *See* 42 U.S.C. § 12102(2)(A). Moreover, courts have repeatedly found that individuals struggling with COPD have

- 112 -

a disability within the meaning of the ADA.  *See, e.g., McCready v. United States Postal Serv.*, NJC-22-5899, 2025 WL 1284275, at *17 (E.D.N.Y. May 2, 2025); *Riemensnyder v. Paragon Sys.*, MCC-20-109, 2022 WL 22887723, at *9 (M.D. Pa. June 29, 2022), *report and recommendation adopted*, 2022 WL 22887683 (M.D. Pa. July 22, 2022); *see also Hale v. Johnson*, 245 F. Supp. 3d 979, 989–90 (E.D. Tenn. 2017) (finding plaintiff has established that he is disabled because "it is undisputed that Plaintiff suffers from COPD [and] . . . his ability to breathe is considerably hindered").  Where courts have found that plaintiffs with COPD do not have a disability, the condition has not caused severe difficulty breathing, or "require[d] any additional breathing devices or an oxygen mask."  *See Boykin v. Honda Mfg. of Alabama*, 288 F. App'x 594, 597 (11th Cir. 2008); *see also Johnson v. Kaemingk,* LLP-17-04043, 2020 WL 1441713, at *4 (D.S.D. Mar. 23, 2020) (concluding that plaintiff's COPD is not a disability; plaintiff had "only shown moderate limitations to his . . . breathing" and he did "not experience shortness of breath all the time, but only in situations that are short").

Here, plaintiff's alleged use of an oxygen machine would establish, if proven, that his COPD is severe enough to significantly impede his ability to breathe.  This is clearly a disability within the meaning of the ADA.  On the basis of plaintiff's COPD alone, he has sufficiently alleged that he has a disability under the ADA.

Defendants criticize plaintiff for conflating "several separate conditions" into "a single disability." ECF 17-1 at 16.  But, courts generally consider the breadth of medical conditions an individual faces to determine whether he is disabled.  *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) ("It is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.").  The combination of the permanent effects of

plaintiff's workplace injuries, *i.e.*, hearing loss, vision loss, and chronic pain, along with plaintiff's COPD, if proven, would qualify him as disabled under the ADA. *See Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999) ("[P]eople with monocular vision 'ordinarily' will meet the Act's [ADA] definition of disability"); *Johnson v. Pleasant Gardens Assisted Living*, EA-23-1830, 2025 WL 1650394 (D. Md. June 11, 2025) (concluding that plaintiff "plausibly alleged that she has a disability" based on "chronic pain due to endometriosis" and "titanium plates placed in her feet in 2018"); *Equal Emp. Opportunity Comm'n v. Cracker Barrel Old Country Store, Inc.*, PX-18-02674, 2020 WL 247305, at *3 (D. Md. Jan. 16, 2020) (finding deafness as an ADA-recognized disability); *Shiflett v. GE Fanuc Automation Corp.*, 960 F. Supp. 1022, 1024 (W.D. Va. 1997) (finding a disability based on "moderately severe to severe sensorineural hearing loss"), *aff'd,* 151 F.3d 1030 (4th Cir. 1998); *Bryant v. Better Bus. Bureau of Greater Maryland, Inc.*, 923 F. Supp. 720, 743 (D. Md. 1996) (finding plaintiff disabled within the meaning of the ADA due to "hearing loss approaching deafness"); *Bordonaro v. Johnston Cnty. Bd. of Educ.*, 938 F. Supp. 2d 573, 578–79 (E.D.N.C. 2013) (finding ADA protection based on "loss of peripheral vision" that "substantially limit[ed]" plaintiff's "ability to see").[40]

I reject defendants' contention that plaintiff has merely proffered "vague allegations" regarding his impairments and has failed to plead a disability that satisfies the ADA. *See* ECF 17-

---

[40] Plaintiff denies that he has any cardiac issues. He does not specify in the Complaint whether the false information about his heart condition led his employer to believe that his condition limited a major life activity. But, the employer's alleged belief that plaintiff suffered from a heart condition adds support to plaintiff's claim that his employer considered him disabled at the time of termination. The ADA, 42 U.S.C. § 12102(3)(A), states: "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

1 at 17.  In sum, plaintiff's alleged health conditions are sufficient to support a claim that, at the time of plaintiff's termination, he had a disability within the ambit of the ADA.

But, as stated, "[t]hat an employee has a disability does not automatically mean she is entitled to the ADA's protections."  *Haggins,* 163 F.4th at 877.  Defendants urge dismissal of plaintiff's ADA claim, arguing that "any claims pertaining to Plaintiff's purported workplace injuries are foreclosed because the" MWCA "provides the exclusive remedy for such injuries."  ECF 17-1 at 18.

The MWCA provides a remedy for "accidental personal injury sustained by the covered employee," without regard to fault.  L.E. § 9–501(b).  It defines "accidental injury" to include "an injury caused by a willful or negligent act of a third person directed against a covered employee in the course of the employment of the covered employee."  L.E. § 9–101(b).

Enacted by the Maryland legislature in 1914, the MWCA was "created to efficiently and uniformly handle employment injury claims, ensuring that employees and their families could receive swift compensation without a burdensome gap in income, and employers could provide that compensation without fear of costly negligence suits." *Ledford v. Jenway Contracting, Inc.*, 490 Md. 666, 679, 338 A.3d 563, 571 (2025); *see Polomski v. Mayor & City Council of Baltimore*, 344 Md. 70, 77, 684 A.2d 1338, 1341 (1996).  It "replaced common law negligence actions by injured employees against their employers with a system of quick and certain compensation for injuries sustained during the course of employment." *Plater v. UE&C Catalytic, Inc.*, HM-92-466, 1992 WL 414814, at *2 (D. Md. Oct. 14, 1992); *see Athas v. Hill,* 300 Md. 133, 139, 476 A.2d 710, 713 (1984).  Claims for accidental injury are adjudicated by the WCC.  *Matter of Collins*, 468 Md. 672, 685, 228 A.3d 760, 767 (2020). As an "independent entity of the Maryland state

government, the Commission conducts proceedings and investigations relating to workers' compensation claims." *Id.*

Ordinarily, under L.E. § 9-509, compensation pursuant to the MWCA is an injured employee's exclusive remedy with respect to the employer. *See, e.g., Ledford,* 490 Md. at 674, 338 A.3d at 568; *see also The Great Atl. & Pac. Tea Co., Inc. v. Imbraguglio*, 346 Md. 573, 578, 697 A.2d 885, 887 (1997); *Tynes v. Shoney's, Inc.,* 867 F. Supp. 330, 332 (D. Md. 1994). "'Compensation awarded on this fault-free basis under the statutory plan substitutes for an employee's common law right to bring a fault-based tort suit against an employer for damages resulting from the employee's injury . . . .'" *Matter of Collins*, 468 Md. at 686, 228 A.3d at 767–68 (quoting *DeBusk v. Johns Hopkins Hosp.*, 342 Md. 432, 438, 677 A.2d 73, 75 (1996)); *see Belcher v. T. Rowe Price,* 329 Md. 709, 736, 621 A.2d 872, 885 (1993); *Wagner v. Allied Chem. Corp.,* 623 F. Supp. 1412, 1414 (D. Md. 1985).[41]

But, plaintiff does not seek recovery for an accidental injury. Rather, he asserts that his workplace injuries led to disability discrimination by his employer. *See* ECF 1, ¶ 137 ("Defendants' conduct constitutes intentional discrimination against Plaintiff on the basis of his disability in violation of the ADA[.]")  Such "willful, wanton" conduct of defendants, *id.* ¶ 138,

---

[41] Although recovery pursuant to the MWCA is ordinarily an employee's "sole recourse" as against the employer, *Imbraguglio,* 346 Md. at 578, 697 A.2d at 888, the MWCA preserves an employee's right to bring suit against the employer for damages under certain circumstances. In particular, to obtain the protection of the MWCA, "an employer must 'secure compensation in accordance with' the Act, *id.* § 9-509(c), and the injury to the employee must not have been caused by the employer's deliberate act, *id.* § 9-509(d)." *Ledford*, 490 Md. at 674, 338 A.3d at 568; *see also Ledford v. Jenway Contracting, Inc*., 259 Md. App. 534, 545, 305 A.3d 498, 504 (2023) (describing L.E. §§ 9-509(c) and (d) as the "two exceptions" to "[t]he Act's exclusivity provision"), *aff'd,* 490 Md. 666, 338 A.3d 563 (2025); *but see Ruffin Hotel Corp. of Maryland v. Gasper*, 418 Md. 594, 617, 17 A.3d 676, 689 (2011) (refusing to grant an employer immunity under the MWCA when an employee lodged a negligent hiring/retention claim against her employer as a result of intentional and unlawful misconduct of a fellow employee).

is the kind of intentional conduct that is excepted from the MWCA's exclusivity provision. *See Ledford*, 490 Md. at 674, 338 A.3d at 568.

In other cases where an individual has asserted a discrimination claim against the employer as well as common law claims such as negligence or negligent retention, courts confine the analysis to whether the MWCA provides the exclusive remedy for the tort action. *See, e.g., Jarvis v. Enter. Fleet Servs. & Leasing Co.,* DKC-07-3385, 2010 WL 1068146, at *18–24 (D. Md. Mar. 17, 2010) (granting summary judgment to defendant regarding Title VII claims of retaliation, hostile work environment, and race discrimination but concluding that plaintiff's negligent training and supervision claim is preempted by the MWCA), *aff'd*, 408 F. App'x 668 (4th Cir. 2011) (per curiam); *Ladson v. Thompson,* DKC-2003-1685, 2003 WL 22889793, at *4 (D. Md. Dec. 3, 2003) (concluding that defendant was entitled to summary judgment on Title VII claims of failure to promote on the basis of race and sex and retaliation but ruling that claim for negligent hiring, supervision, and retention was precluded by the MWCA).

Plaintiff premises his ADA claim on alleged intentional discrimination by his employer based on his disability. The MWCA does not preempt federal statutory claims of discrimination. *See Demby v. Preston Trucking Co.*, 961 F. Supp. 873, 882 (D. Md. 1997). Moreover, the merits of the WC Claim are not at issue here. Accordingly, the MWCA's exclusion provision is not relevant.

I turn to whether plaintiff has alleged a claim of disability discrimination under the ADA (Count II). Plaintiff asserts, *inter alia*, ECF 1, ¶¶ 128, 130–34:

> 128. The denial and mishandling of Plaintiff's workers' compensation benefits was motivated, in whole or in part, by his disability status and Defendants' desire to avoid long-term benefit obligations for a disabled employee

***

130. The assignment of Plaintiff's position to a significantly younger employee with no known or visible disabilities during his medical leave was based on stereotypes and discriminatory assumptions about individuals with disabilities and their capacity to work effectively.

131. Defendants regarded Plaintiff as disabled and took adverse employment actions based on this perception, including the assumption that he would not return from medical leave due to his age-related disabilities and health conditions.

132. Defendants failed to engage in good faith regarding Plaintiff's return to work after his medical leave and instead demonstrated bias against him based on his disabilities.

133. Just five days after Plaintiff challenged discriminatory workplace policies that violated the collective bargaining agreement, actions taken in the course of performing his legitimate job duties, Defendants retaliated against him.

134. On July 2, 2023, Defendants terminated Plaintiff's employment in a hostile and unprecedented manner, providing no legitimate, non-discriminatory reason for the termination.

As stated, "[t]o plead a claim of disability discrimination under the ADA, a plaintiff must allege that (1) [he] had a disability as defined in the ADA; (2) [he] was a 'qualified individual,' *i.e.,* able to perform the essential functions of [his] job with or without reasonable accommodation; and (3) [his] employer took an adverse action against [him] on account of [his] disability.'" *Craddock,* 533 F. App'x at 336. The plaintiff's disability must be the "but-for" cause of the adverse employment action. *Gentry*, 816 F.3d at 235–36.

Moreover, as explained, plaintiff has sufficiently pleaded that he had a disability at the time of his termination. Defendants do not dispute that plaintiff has sufficiently pled that he was able to perform the essential functions of his job, *i.e.*, the second element. *See* ECF 17-1 at 18–19.

Defendants' failure at the time of termination to provide plaintiff with a legitimate reason for his termination could support an inference that the termination was motivated by bias against plaintiff because of his disability. But, this allegation alone is insufficient to support an inference

- 118 -

of disability discrimination. *See Chisholm v. Mountaire Farms of N. Carolina Corp.,* 629 F. Supp. 3d 368, 375 (M.D.N.C. 2022) (stating that the plaintiff's "contention that he was not provided with a reason for his termination, alone does not raise a reasonable inference of unlawful discrimination.") (internal quotation marks and citation omitted); *Santorocco v. Chesapeake Holding Co., LLC*, AW-08-3049, 2010 WL 2464972, at *7 (D. Md. June 10, 2010) ("[I]n order for the plaintiff to show that the defendant's proffered reason for the adverse employment action is pretextual 'the weakness of the employer's explanation, standing alone, is not sufficient; rather, the employee must produce affirmative evidence of discriminatory motive or affirmative evidence that the employer's proffered explanation is simply unworthy of credence.'") (quoting *Blankenship v. Buchanan Gen. Hosp.*, 140 F. Supp. 2d 668, 674 (W.D. Va. 2001)).

As noted, defendants contend that they "would have been aware of" plaintiff's COPD "at the time of his hiring or at least long before his termination", and so his "visible and known disability could not have been an issue at the time of his firing." ECF 17-1 at 17. It is true that an "inference of nondiscrimination applies to claims of disability discrimination when 'the person responsible for terminating [an employee] . . . is the same person who hired [the employee] with *full knowledge of her disability.*'" *Patton v. Shulkin*, EKD-16-00250, 2018 WL 1321589, at *10 (W.D. Va. Mar. 14, 2018) (quoting *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 214 (4th Cir. 1994)) (emphasis in *Patton*). But, COPD is a progressive condition, and it is plausible that plaintiff's COPD worsened since his hiring, such that the employer's attitude changed. Regardless, plaintiff contends that when he was terminated he also suffered from conditions that he did not have when he was hired: impaired hearing; loss of vision in one eye; and chronic pain. *See* ECF 1, ¶¶ 44, 72, 125, 127. Defendants' argument that plaintiff's COPD condition was known at the time of his hiring does not have any bearing on these other health conditions.

Moreover, while plaintiff was on medical leave, "his 26-year-old Assistant Stage manager was assigned to Plaintiff's position[.]" *Id.* ¶ 55. And, the 26-year old assistant ultimately replaced McLeod after he was terminated. *Id.* ¶¶ 78, 136. A plaintiff "usually" satisfies the fourth element of a prima facie case, pertaining to an inference of unlawful discrimination, by showing that he "was replaced by an individual outside [his] protected class[.]" *Collins v. Baltimore City Bd. of Sch. Comm'rs*, 528 F. App'x 269, 272 (4th Cir. 2013) (Title VII); *see McPherson v. Emp. Source, Inc.*, 827 F. Supp. 3d 668, 694 (E.D.N.C. 2026) ("Generally, the 'fact that a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination.'") (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 313 (2d Cir. 2015)); *Stancil v. Prisma Health*, JDA-23-6603, 2025 WL 3209271, at *9 (D.S.C. June 24, 2025) ("[I]nstances that may give rise to an inference of discrimination [include] Plaintiff being replaced by someone outside her protected class."), *report and recommendation adopted*, 2025 WL 3022566 (D.S.C. Oct. 29, 2025); *Denis v. Horry Cnty. Police Dep't*, TER-20-3849, 2022 WL 4181042, at *6 (D.S.C. June 28, 2022) ("Evidence that the position was filled with an applicant outside Plaintiff's protected classes is sufficient to give rise to an inference of discrimination."), *report and recommendation adopted*, 2022 WL 3357883 (D.S.C. Aug. 15, 2022).

I am satisfied that the facts alleged in the Complaint are sufficient to assert a plausible claim of discrimination under the ADA (Count II).

### F. Retaliation under Title VII (Count III)

Plaintiff alleges that he was terminated in retaliation for engaging in protected activity, in violation of Title VII (Count III). In particular, plaintiff contends that he engaged in protected activity when he objected to a policy that restricted leave to only one male and one female at a time. ECF 18 at 17. He asserts that "when a CBA violation *is* discriminatory, opposing it can

constitute protected Title VII activity." *Id.* According to plaintiff, he opposed the leave policy as discriminatory during a Zoom meeting in June 2023. *Id.* (citing ECF 1, ¶ 67(c)).[42] And, he notes that his "termination occurred five days after he approved time off for two male employees in defiance of the gender-based policy." ECF 18 at 18 (citing ECF 1, ¶¶ 73, 74). In plaintiff's view, this "temporal proximity . . . strongly supports causation." ECF 18 at 18.

Defendants contend that plaintiff has failed to state a claim for retaliation under Title VII. ECF 17-1 at 20. They assert that plaintiff's "objection that a policy violated the CBA does not constitute a protected activity under Title VII." *Id.* According to defendants, "Plaintiff's only alleged objection to the policy at issue was based upon an argument that it violated the CBA–*not* that the policy was discriminatory in violation of Title VII." *Id.* at 21 (citing ECF 1, ¶¶ 65–67, 141–42) (emphasis in original). Defendants reason: "An objection to a policy on the basis that it violates the terms and conditions of a contract does not constitute a protected activity under Title VII, as it is not based upon a belief that the practice violated Title VII." ECF 17-1 at 21. Furthermore, defendants assert: "Even if Plaintiff's objection to the policy was somehow protected, the Complaint fails to allege any facts to demonstrate the necessary causal connection with Plaintiff's termination." *Id.*

In addition, defendants emphasize that McLeod "alleges he opposed the policy from its outset in March 2023, over four months prior to his termination in July." *Id.* (citing ECF 1, ¶ 63). According to defendants, "[t]he gap between Plaintiff's objections and his termination, without more, undercuts any claim of retaliation under Title VII." ECF 17-1 at 21.

---

[42] ECF 1, ¶ 67(c) does not reference the Zoom meeting.

In the Complaint, plaintiff alleges that he opposed a "new policy" that "restricted time off to one male or one female employee at a time." ECF 1, ¶ 61. He asserts that this "sex-based leave policy was not only discriminatory, but violated clearly established union contract provisions." *Id.* Upon learning that defendants planned to implement this policy, plaintiff "contacted AEA business representative Kylie Kirk to inform him of the policy and inquire as to compliance with the CBA." *Id.* ¶ 63. Plaintiff also informed "Company Manager" Danner (*id.* ¶ 60) that the policy violated the CBA, but Danner "continued to push Mr. McLeod to implement the policy." *Id.* ¶ 66. On June 6, 2023, Danner sent an email to plaintiff instructing plaintiff to enforce the policy. *Id.* ¶ 67. And, during a Zoom meeting on June 22, 2023, "defendants demanded Plaintiff enforce the discriminatory policy[.]" *Id.* ¶ 73. Nevertheless, on June 27, 2023, five days after the Zoom meeting, "Plaintiff approved time off for two male employees . . . in accordance with the union agreement", *id.* ¶ 73, but "in defiance of the gender-based policy." ECF 18 at 18. He was terminated five days later. ECF 1, ¶¶ 73, 74, 75.

As noted, "Title VII generally prohibits employers from discriminating against employees on the basis of sex." *Thompson v. Comm'r of internal Revenue*, 866 F.2d 709, 711 (4th Cir. 1989); *see Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 254–55 (4th Cir. 2025) (citing 42 U.S.C. § 2000e *et seq.*). It is not clear why the employer here decided to limit by gender the employees granted leave at a given time. But, both genders were facially treated the same: one female and one male could have leave at a given time.

The Fourth Circuit has "recognized [that] protected oppositional activities may include staging informal protests and voicing one's own opinions in order to bring attention to an employer's discriminatory activities, . . . as well as complaints . . . about suspected violations[.]" *Navy Fed. Credit Union*, 424 F.3d at 406 (cleaned up) (internal citations and quotation marks

omitted).    Indeed, "[t]here is no question that directly complaining to an employer about a discriminatory policy is sufficient to constitute 'protected activity' for purposes of his Title VII . . . retaliation claim."  *Viscecchia v. Alrose Allegria LLC*, 117 F. Supp. 3d 243, 256 (E.D.N.Y. 2015).  Moreover, Section 704(a), Title VII's retaliation provision, "protects activity in opposition not only to employment actions actually unlawful under Title VII but also employment actions an employee reasonably believes to be unlawful."  *Id.*  On the other hand, even assuming that it was reasonable for plaintiff to regard the leave policy as discriminatory, he does not posit a ground that permitted him to disregard or defy his employer's instructions, particularly when it is the employer that sets Company policy; the employer may have had a legitimate basis to believe that the policy was lawful; and the plaintiff had other avenues to pursue his complaint.

An individual engages in a protected activity under Title VII when he has "complained about an action that discriminated on the basis of a protected class and thus violated Title VII." *Ghumman v. Boeing Intel. & Analytics, Inc.,* SAG-23-3371, 2025 WL 213971, at *3 (D. Md. Jan. 16, 2025); *see Lamb v. JG Mgmt. Servs., Inc.,* JPB-24-05713, 2025 WL 2023016, at *4 (N.D. Ga. July 1, 2025).  Here, plaintiff expressed concern as to a violation of the CBA because, in his view, the gender-based leave policy was discriminatory.    There is no requirement that plaintiff specifically mention Title VII or other antidiscrimination laws for an individual's opposition to constitute a protected activity under the statute.  *See, e.g., Goble v. Lexisnexis Special Servs., Inc.*, RDA-23-1774, 2025 WL 2380962, at *13 (E.D. Va. Aug. 15, 2025) ("The undisputed summary judgment record shows that Plaintiff engaged in a protected activity when she emailed Reynolds and Kearny on October 13, 2022, complaining of sex discrimination."); *Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 178–79 (D. Md. 2022) (concluding that plaintiff "engaged in protected activity on multiple occasions" when she "repeatedly voiced complaints to school

administrators about discrimination and the harassment by co-workers, students, and parents and attempted to secure commitments from her supervisors for remedial measures[.]"); *compare with Johnson v. Glob. Language Ctr.*, 2023 WL 3645055, at *5 (4th Cir. May 25, 2023) (concluding that plaintiff did not engage in protected activity under Title VII when her complaint was comprised of "sparse references to potentially problematic behavior . . . surrounded by what can only be called personal gossip").

However, plaintiff did not merely express his opposition.  He admits that he disregarded his employer's instructions.   Indeed, based on plaintiff's allegations it is plausible that plaintiff "was terminated for insubordination," which would merit dismissal of his retaliation and discrimination claims.  *See Aljizzani*, 178 F.4th at 869 (finding that "an inference of discrimination is unwarranted and implausible . . . in light of the obvious alternative explanation that [plaintiff] was fired for insubordination.") (cleaned up and citation omitted). But, defendants do not cite insubordination or defiance of their gender leave policy as a basis for the Court to conclude that plaintiff did not engage in a protected activity under Title VII.  *See* ECF 17-1 at 20–21; ECF 22 at 12–13.  Rather, defendants contend that plaintiff did not engage in a protected activity because he complained that the gender-based policy violated the CBA, not Title VII.  ECF 17-1 at 21.[43]  At this juncture, I will assume that plaintiff engaged in protected activity.

---

[43] "In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020); *see Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. __, 146 S. Ct. 1285, 1288 (2026) (per curiam). This means that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). Indeed, "Federal courts are not roving commissions licensed to sally forth each day looking for wrongs to right[.]" *Margolin*, 146 S. Ct. at 1288 (cleaned up) (quotation marks and citations omitted).

"That principle—the 'rule that points not argued will not be considered'—distinguishes our adversarial system of justice from an inquisitorial one." *Id.* (citation omitted). The "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per

Defendants also contend that there was no temporal proximity between plaintiff's challenge to the gender-based leave policy and his termination.  ECF 22 at 12–13.  They assert that plaintiff "began objecting to the policy over four months prior to his termination and suffered no adverse employment actions as a result."  *Id.*

Plaintiff "can prevail on his retaliation claim if and only if he can show a causal link between his protected activity . . . and the adverse action taken against him."  *Lee*, 2026 WL 1993164, at *7.  But, at the pleading stage, a plaintiff need only allege "facts entitling [him] to an inference of causation[.]"  *Zanders v. Lutnick*, JMC-24-02639, 2026 WL 1141156, at *8 (D. Md. Apr. 28, 2026) (alteration added); *see Vodi v. Univ. of Maryland - Dep't of Transportation Servs.*, CDA-24-02879, 2026 WL 879180, at *7 (D. Md. Mar. 31, 2026) ("[A]t [the motion to dismiss] stage, a plaintiff does not bear a heavy burden to sufficiently allege causation.")  Even at the prima facie stage, "'[v]ery little evidence of a causal connection is required to establish a prima facie case [of retaliation].'"  *Burgess*, 466 F. App'x at 283 (quoting *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir. 1998), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)) (alterations in *Burgess*); *see CSRA*, 12 F.4th at 417 ("'[E]stablishing a 'causal relationship' at the prima facie stage is not an onerous burden'") (quoting *Strothers*, 895 F.3d at 335) (alteration in *CSRA*); *Karpel v. Inova Health Sys. Servs.*, 134 F.3d 1222, 1229 (4th Cir. 1998) ("Although [plaintiff] presents little or no direct evidence of a causal connection between her protected activity and [defendant's] adverse action, little is required."); *McNairn v. Sullivan*, 929 F.2d 974, 980 (4th Cir. 1991) (finding that "it can be inferred that the termination

curiam); *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (stating that, in the context of pro se plaintiffs, the Court "will not . . . require the district courts to anticipate all arguments that clever counsel may present in some appellate future. To do so . . . would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party.").

was triggered by the" plaintiff engaging in a protected activity); *Calix-Hestick v. Dejoy*, AJT-21-971, 2022 WL 4343110, at *8 (E.D. Va. Sept. 19, 2022) ("Recent Fourth Circuit precedent makes clear that meeting the 'causation' element for a retaliation claim at the 'prima facie stage is not an onerous burden.'") (quoting *Strothers*, 895 F.3d at 335); *Barbier v. Durham Cnty. Bd. of Educ.*, 225 F. Supp. 2d 617, 627 (M.D.N.C. 2002) ("[U]nder Fourth Circuit law, very little proof is required to establish the causal link in a retaliation case; in fact, in many instances, the connection is inferred from the mere act of termination[.]" ).

With regard to temporal proximity, "courts examine the time lapse between an employer's knowledge of protected activity and an adverse action." *McPherson*, 827 F. Supp. 3d at 698; *see Perkins v. Univ. of Maryland, Baltimore Sch. of Nursing,* RDB-24-1688, 2025 WL 1371486, at *9 (D. Md. May 12, 2025) ("The causal relationship element of retaliation asks not whether the last instance of protected activity occurred in close temporal proximity to the adverse action but whether the time that elapsed 'between the employer's *knowledge of protected activity* and the alleged retaliation' is sufficiently close to support a causal relationship.") (quoting *Roberts*, 998 F.3d at 127) (emphasis in *Perkins*).  Plaintiff alleges that on March 28, 2023, he "contacted AEA business representative Kylie Kirk to inform him of the policy and inquire as to compliance with the CBA."  ECF 1, ¶ 63.  Kirk confirmed that the policy "violated the CBA and was unenforceable." *Id.* ¶ 64.  Plaintiff also asserts that he told Danner that "this new 'policy change' violated the CBA." *Id.* ¶¶ 65, 66.  Nevertheless, during a meeting on June 22, 2023, "Defendants demanded Plaintiff enforce the discriminatory policy." *Id.* ¶ 73.  Five days later, McLeod approved leave for two male actors. *Id.*  Five days later, on July 2, 2023, he was terminated. *Id.* ¶¶ 73–75.

This temporal proximity is sufficient to support the inference that plaintiff was terminated because of his resistance to what he regarded as a sex-based leave policy. And, taking plaintiff's allegations as true, he has plausibly alleged retaliation under Title VII.

**G. Retaliation in Violation of the ADA (Count IV)**

Plaintiff claims that he was terminated in retaliation for (a) taking medical leave for his workplace injury and resulting disabilities (ECF 1, ¶ 150); (b) filing his WC Claim (*id.* ¶ 152); (c) disclosing his COPD disability to Aghabala and correcting false medical information about his condition (*id.* ¶ 153); (d) requesting medical care for his workplace injuries, which plaintiff claims constitute requests for reasonable accommodation (*id.* ¶ 154); and (e) advocating for proper processing of his workers' compensation claim and correction of false medical information about his disabilities (*id.* ¶ 155). Moreover, according to the Complaint, because of the "deliberate failures" of the insurance broker who handled plaintiff's WC Claim, "Plaintiff was unable to access appropriate medical care for nearly an entire month[.]" *Id.* ¶ 41.

As to plaintiff's ADA retaliation claim, defendants contend that McLeod's filing of the WC Claim "and other advocacy or disputes relating to that claim are not protected activity under the ADA." ECF 17-1 at 19. Because plaintiff alleges an adverse employment action based upon the filing of his WC Claim, defendants contend that "he fails to allege that he engaged in a protected activity under the ADA." *Id.* at 19–20. They also argue that, "[t]o the extent Plaintiff is alleging his leave for alleged workplace injuries was protected activity, those allegations are intrinsically and inextricably intertwined with the workers' compensation claim and similarly do not constitute protected activity." *Id.* at 20; *see* ECF 22 at 11.

Moreover, defendants point out that plaintiff has alleged that "Defendants afforded him all necessary leave while he was receiving treatment for his injuries." ECF 17 at 20. Nor did

defendants deny any requested accommodation because of those injuries. *Id.* Rather, they assert that McLeod "remained employed following that leave, did not see his responsibilities or compensation diminish, and was not terminated until over a month after his return–over four months after his initial injury and request for leave." *Id.*

Even assuming that plaintiff's actions constitute protected activity, defendants argue that "there are no allegations that demonstrate that Plaintiff would not have been terminated by Mr. Wheeler and Mr. Wenig, but for his medical leave or disputes with Ms. Aghabala and the third-party regarding his workers' compensation claim." ECF 22 at 12. Therefore, defendants contend that the allegations do not meet the "'but-for'" causation standard under the ADA. *Id.*

Plaintiff disputes that his ADA claim is based "solely on [his] workers' compensation filing[.]" ECF 18 at 16. To the extent that plaintiff premises his retaliation claim on his WC Claim, *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143 (4th Cir. 2012), is instructive.

In *Reynolds,* the plaintiff claimed that he was terminated in retaliation for "mentioning that he wanted to file a workers' compensation claim" and "requesting that he not be required to lift items exceeding fifteen pounds in weight[.]" *Id.* at 154. The Fourth Circuit explained: "Filing a workers' compensation claim is not something that is covered by the ADA, but rather by retaliation provisions under state law[.]" *Id.* The Court noted that the "ADA's retaliation provision only prohibits retaliation against a person because the person 'opposed any act or practice made unlawful *by this chapter* or 'made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing *under this chapter*.'" *Id.* (quoting 42 U.S.C. § 12203(a)) (emphases in *Reynolds*). Therefore, the Fourth Circuit rejected plaintiff's "retaliation claim based on his workers' compensation request[.]" *Id.*

- 128 -

Accordingly, to the extent that plaintiff's retaliation claim is founded on the pursuit of workers' compensation, it fails as a claim for retaliation under the ADA. This includes plaintiff's assertion that he was terminated in retaliation for filing a workers' compensation claim (ECF 1, ¶ 152); for his advocacy in processing his workers' compensation claim; and for his effort to correct inaccurate medical information (*id.* ¶ 155).

To be sure, "[a] request for accommodation is paradigmatic protected activities for ADA purposes." *Hamilton v. Prince George's Cnty. Police Dep't*, DKC 17-2300, 2018 WL 1365847, at *7 (D. Md. Mar. 16, 2018). Plaintiff alleges that he complained about the processing of his WC Claim to receive medical care, and that his "requests for proper medical care" constituted a request for a reasonable accommodation under the ADA. *See* ECF 1, ¶ 154; *see id.* ¶¶ 150–155. In effect, plaintiff seeks to transform his dissatisfaction with the processing of his WC Claim by the insurance adjuster, and his delay in receiving medical care, into a request for a reasonable accommodation. This is too thin a reed to support plaintiff's contention that he engaged in a protected activity under the ADA.

In addition, plaintiff relies on his conversation with Aghabala on June 23, 2023, nine days before he was discharged, as a basis for his retaliation claim. ECF 1, ¶ 153. Plaintiff asked Aghabala "why he was removed from access to the Defendants' Uber account, which she managed." *Id.* ¶ 70. Plaintiff also claims that at the end of this conversation he stated:, *id.* ¶ 70(a), (b): "'As a friend, I wanted to make sure you knew there are no heart issues with me. I've never had a heart transplant. Bobby, the adjuster, was incorrect when he informed people of this, and that the Workers' Compensation Commission is concerned that he violated HIPAA on five occasions'" and that "'other than my COPD, there is no other medical concern.'" According to

plaintiff, after this meeting, "Aghabala sent an unprofessional email to management describing Mr. McLeod as 'just EXHAUSTING !!!!!'" *Id.* ¶ 71.

The disclosure of one's medical conditions is not a protected activity under the ADA. *See Thompson v. City of Charlotte*, 827 F. App'x 277, 279 (4th Cir. 2020) (per curiam) (concluding that plaintiff had not alleged that he engaged in a protected activity when he contacted the City's Employee Assistance Program about his mental health); *Thornock v. JES Found. Repair,* TTC-23-00638, 2024 WL 1739755, at *9 (W.D. Va. Apr. 23, 2024) ("This mere disclosure by [plaintiff] of his mental health problems is not 'protected activity' for purposes of an ADA retaliation claim."), *reconsideration denied*, 2024 WL 1828745 (W.D. Va. Apr. 26, 2024). Accordingly, on this basis plaintiff's retaliation claim cannot stand.

Plaintiff also contends that taking medical leave is a protected activity under the ADA. He alleges that after his workplace injury, he took a 10-week medical leave. ECF 1, ¶ 49. According to plaintiff, "Company management actively worked against" his "timely return to the workplace by falsifying statements to producers and deliberately delaying his return by two weeks after he was medically cleared[.]" *Id.* ¶ 57.

"Where an employee is unable to perform the essential functions of his or her job, permitting that employee to use annual or sick [leave] while the situation is resolved is a reasonable accommodation." *Frazier v. Donahoe*, PWG-14-3974, 2016 WL 1045853, at *7 (D. Md. Mar. 15, 2016); *see Terry*, 2021 WL 3418124, at *2 ("We have recognized that allowing an employee to take leave to attend medical appointments constitutes a reasonable accommodation."); *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1135–36 (9th Cir. 2001) ("[W]here a leave of absence would reasonably accommodate an employee's disability and permit him, upon his return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA.");

*Moore v. Maryland Dep't of Pub. Safety & Corr. Servs*., CCB-11-553, 2011 WL 4101139, at *3 (D. Md. Sept. 12, 2011) ("A temporary leave of absence may, in some circumstances, be a reasonable accommodation under the ADA").

Defendants' alleged conduct in blocking plaintiff from returning to work after his medical leave constitutes an adverse action. *See Suggs v. 7-Eleven, Inc*., DKC-14-1903, 2015 WL 3891949, at *13 (D. Md. June 23, 2015) ("Plaintiff has sufficiently alleged that Defendant's decision to cancel his return to work from approved unpaid medical leave is an adverse employment action because it affects the terms, conditions, or benefits of Plaintiff's employment."). And, plaintiff's subsequent termination is an adverse action for a retaliation claim. *See Dowe*, 145 F.3d at 656–57.[44]

Accordingly, plaintiff has sufficiently alleged that defendants retaliated against him for taking medical leave, in violation of the ADA.

### H. MFEPA (Count V)

Plaintiff alleges that defendants' conduct violated MFEPA by discriminating against him on the basis of his age and disability, and by retaliating against him for engaging in protected activities, including filing the WC Claim, taking medical leave, and opposing discriminatory workplace policies. ECF 1, ¶¶ 162–63.

Defendants argue that plaintiff's MFEPA claims "fail for the same reasons Plaintiff fails to state a claim for violation of any of the related Federal statutes." ECF 17-1 at 21. Plaintiff

---

[44] Plaintiff asserts that when he returned to work from his medical leave, "the work environment had become more antagonistic." ECF 1, ¶ 68. According to plaintiff, upon his return to work, Juenker, the senior production manager, "expressed surprise and stated, 'What are you doing here? I was told you weren't coming back.'" *Id.* These allegations do not support the inference that plaintiff was retaliated against for taking a medical leave, in violation of the ADA.

counters that, to the extent his factual allegations support his federal claims, "they equally support the MFEPA claims." ECF 18 at 18.

As discussed, "MFEPA is the state law analogue to federal employment discrimination statutes." *Anoruo v. MedStar Health, Inc.*, JRR-23-01970, 2025 WL 1635052, at *10 (D. Md. June 9, 2025). Beyond arguments reviewed earlier, defendants do not proffer any additional reasons to support dismissal of plaintiff's claims of discrimination and retaliation under MFEPA (Count V). Therefore, I shall rely on my analysis for plaintiff's analogous federal claim, and I shall deny the Motion as to Count V.

## I.    Wrongful Discharge (Count VI)

Defendants claim that the Complaint "fails to state a valid claim for wrongful discharge under Maryland law." ECF 17-1 at 22. They assert: "The filing of the workers' compensation claim must be the exclusive cause of the termination to establish a wrongful discharge claim under Maryland law." *Id.* But, defendants recognize that plaintiff "alleges numerous reasons for his termination and, therefore, acknowledges it was not solely attributable to the filing of the workers' compensation claim." *Id.* In any event, defendants argue that McLeod's "allegations regarding the insurance carrier's handling of his workers' compensation claim are irrelevant to his termination, because there is no allegation that the carrier was a decisionmaker in Plaintiff's termination." *Id.*

Plaintiff asserts that causation is established by the "temporal proximity" between his filing for workers' compensation and informing management that he was "concerned" that the insurance "adjuster had violated HIPAA and spread false medical information that was then used to deny his claim." ECF 18 at 19. In his view, "the fact that" he "also alleges other unlawful reasons for termination does not defeat" his claim. *Id.* Plaintiff posits: "The denial of workers' compensation

benefits does not preclude a *retaliation* claim for opposing the discriminatory denial process and correcting false medical information spread by the adjuster." *Id.* (emphasis in original).

Under Fed. R. Civ. P. 8(d)(3), "A party may state as many separate claims or defenses as it has, regardless of consistency." And, "it is well-established that a party may plead alternative theories of liability—indeed, as many theories as the facts will fit." *Howard v. Impossible Foods Inc.*, TTC-23-00016, 2023 WL 7549863, at *3 (W.D. Va. Nov. 14, 2023) (internal quotation marks and citation omitted). Put another way, plaintiff is "permitted to set out conflicting alternative theories in its complaint without one constituting an admission against the other." *Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*, 547 F. App'x 166, 168 n.3 (4th Cir. 2013) (per curiam).

Accordingly, defendants' contention that plaintiff's wrongful termination claim should be dismissed because plaintiff "alleges numerous reasons for his termination" (ECF 17-1 at 22) does not invalidate plaintiff's wrongful termination claim at this stage. For McLeod to succeed as to his wrongful termination claim under Maryland law, he must show that he was terminated solely because he filed the WC Claim. But, his contention that defendants were motivated by other nefarious reasons does not require dismissal of his claim at this juncture. Plaintiff's other claims are alternative theories of liability.

Plaintiff and LMS22 entered into a "Short Engagement Touring Contract" on August 5, 2022. ECF 18-2. The SETA states, in part: "Either party may terminate this contract upon four (4) weeks' written notice under Actors' Equity Rules regarding the same." *Id.* at 2, ¶ 3.

An employment agreement may either be for a fixed term or at will. *Shapiro v. Massengill*, 105 Md. App. 743, 754, 661 A.2d 202, 207 (1995) (Hollander, J.). An employment contract is deemed at will when it does not expressly specify a particular time or event terminating the relationship. *Id.*, 661 A.2d at 208; *see Samuels v. Tschechtelin*, 135 Md. App. 483, 525, 763 A.2d

209, 232 (2000) (Hollander, J.) ("An agreement is deemed at-will, and thus terminable without cause, when it fails to specify a particular time or event terminating the employment relationship."); *see also Molesworth v. Brandon*, 341 Md. 621, 628–29, 672 A.2d 608, 612 (1996). In general, an employer or an employee may terminate an at-will employment relationship at any time, for almost any reason or no reason. *Shapiro*, 105 Md. App. at 754, 661 A.2d at 207.[45]

"Although employment in Maryland is presumptively at-will . . . a contract, whether express or implied, may overcome that presumption and create an employment relationship whereby the employee may be terminated only for just cause. While the language of the contract itself may express a just cause requirement, a contractual delineation of the length of the employment period will also create a just cause employment relationship because by specifying the length or term of employment, the employer usually is considered to have surrendered its ability to terminate the employee at its discretion." *Towson Univ. v. Conte*, 384 Md. 68, 79–80, 862 A.2d 941, 947 (2004) (internal citations omitted). Here, McLeod's contract does not contain a contractual delineation of the length of employment or a just cause provision. Thus, it appears that McLeod was an at will employee. *See* ECF 18-2 at 2, ¶ 3.

Of import, "statutory exceptions have been 'engrafted' that limit the previously unfettered discretion to discharge at-will employees." *Brandon v. Molesworth*, 104 Md. App. 167, 179–80, 655 A.2d 1292, 1299 (1995) (Hollander, J.) (quoting *Adler v. Am. Standard Corp.*, 291 Md. 31, 35, 432 A.2d 464, 467 (1981)), *aff'd in part, rev'd on other grounds,* 341 Md. 621, 672 A.2d 608 (1996). And, "[i]n *Adler,* 291 Md. 31, 432 A.2d 464, the [Maryland] Court of Appeals recognized

---

[45] Neither side addresses whether plaintiff was an at will employee. This is relevant to his termination.

the common law tort of wrongful discharge,[] constituting in this State the first judicially created exception to the at-will doctrine." *Molesworth*, 104 Md. App. at 180, 655 A.2d at 1299.

"For an at-will employee to establish wrongful termination 'the employee must be discharged, the basis for the employee's discharge must violate some clear mandate of public policy, and there must be a nexus between the employee's conduct and the employer's decision to fire the employee.'" *Yuan*, 452 Md. at 451, 157 A.3d at 262 (quoting *Wholey v. Sears Roebuck*, 370 Md. 38, 50-51, 803 A.2d 482, 489 (2002)); *see Houedenou v. Camris Int'l, LLC*, TDC-25-3488, 2026 WL 936979, at *2 (D. Md. Apr. 7, 2026). The "generally accepted reason for recognizing the tort" is "that of vindicating an otherwise civilly unremedied public policy violation[.]" *Makovi v. Sherwin-Williams Co.*, 316 Md. 603, 626, 561 A.2d 179, 190 (1989). "The plaintiff must demonstrate the public policy with 'clarity, specificity, and authority.'" *Taylor v. Rite Aid Corp.*, 993 F. Supp. 2d 551, 562 (D. Md. 2014) (quoting *Shapiro*, 105 Md. App. at 764, 661 A.2d at 213). And, "absent a statute expressing a clear mandate of public policy, there ordinarily is no violation of public policy by an employer's discharging an at will employee[.]" *Molesworth*, 341 Md. at 630, 672 A.2d at 613 (quotation marks and citation omitted).

"In considering whether a clear mandate of Maryland public policy prohibits an employee's discharge courts are limited by two factors." *Houedenou*, 2026 WL 936979, at *2. "The first limiting factor with respect to adopting a 'new' public policy mandate for a wrongful discharge claim is derived from the generally accepted *purpose* behind recognizing the tort in the first place: to provide a remedy for an otherwise unremedied violation of public policy." *Wholey* , 370 Md. at 52, 803 A.2d at 490 (emphasis in original). Accordingly, the tort does not apply to cases alleging employment discrimination prohibited by Title VII or the MFEPA, because the law already supplies a civil remedy. *See Molesworth*, 341 Md. at 636–37, 672 A.2d at 616; *Makovi v.*

*Sherwin-Williams Co.*, 316 Md. 603, 626, 561 A.2d 179, 189 (1989); *Taylor*, 993 F. Supp. 2d at 562. The second limiting factor "is the notion that the policies should be reasonably discernible from prescribed constitutional or statutory mandates." *Wholey*, 370 Md. at 53, 803 A.2d at 490–91; *see Molesworth*, 104 Md. App. at 180–81, 655 A.2d at 1299 ("In deciding whether a policy will support a cause of action, however, the touchstone must be clarity.").

In Maryland, "[a]n employer may not discharge a covered employee solely because the covered employee files a claim for compensation" under the MWCA. L. E. § 9-1105. "Discharging an employee solely because that employee filed a worker's compensation claim contravenes the clear mandate of Maryland public policy." *Ewing*, 312 Md. at 50, 537 A.2d at 1175; *see Coleman v. Target Corp.*, TDC-25-0487, 2025 WL 3268686, at *6 (D. Md. Nov. 24, 2025). "To sustain a wrongful discharge action under Maryland's workers' compensation statute, an employee must allege that he or she was discharged solely and directly because of filing for benefits . . . or that his or her termination violated a recognized rule of law." *Kern v. South Baltimore General Hosp.*, 66 Md. App. 441, 452, 504 A.2d 1154, 1159 (1986); *see Morrison v. City of Cumberland*, DLB-21-1987, 2022 WL 1663747, at *7 (D. Md. May 25, 2022) (same).

In *Kern*, 66 Md. App. at 442–43, 504 A.2d at 1154, the plaintiff was employed by a hospital "as an operating room technician[.]" *Id.* at 443, 504 A.2d at 1155. During her employment, plaintiff "injured her thumb" and "filed a claim for workers' compensation benefits", which she received. *Id.* Because of her injury, Kern was absent from her job for extended periods and ultimately was terminated "for the stated reason of excessive absenteeism." *Id.* Plaintiff subsequently brought suit against the hospital for wrongful discharge. *Id.* at 444, 504 A.2d at 1155. The lower court granted defendant's motion for summary judgment "for failure to state a cognizable cause of action for wrongful discharge." *Id.*

On appeal, the plaintiff argued that her termination contravened two mandates of public policy: the provision of the MWCA barring termination of an employee because the employee filed a workers' compensation claim and public policy to protect employees from abusive discharge. *Id.* at 445, 504 A.2d at 1156. The Maryland Court of Special Appeals "turn[ed] to the workers' compensation law for guidance." *Id.* at 446, 504 A.2d at 1156. The court noted that the MWCA was enacted to provide "an expedient and inexpensive method for payment of compensation to injured employees," and to "fairly distribut[e] the financial burden of supporting injured workers and their families." *Id.*

In particular, the court considered the provision of the MWCA that prohibits an employer from terminating an employee "'*solely* because he files a claim for compensation under this article.'" *Id.* at 446, 504 A.2d at 1156 (quoting Section 39A of the MWCA, now codified at L. E. § 9-1105) (emphasis in *Kern*).[46] The court noted that "Webster's Dictionary defines the word 'solely' as 'without another' or 'to the exclusion of all else.'" *Kern*, 66 Md. App. at 447, 504 A.2d at 1157 (quoting Webster's Ninth New Collegiate Dictionary 1122 (1985)). Accordingly, the court concluded that the language of the MWCA "clearly states that the filing of a claim is the crucial and only violation triggering the statute's protection." *Id.* at 448, 504 A.2d at 1157. Because the plaintiff alleged that "she was not discharged solely for filing a claim," the court determined that "she has not stated a cause of action based on a violation of [the MWCA]." *Id.* The court explained: "'We must take the statute as we find it and if inequities result from its clear and unambiguous meaning, requests for relief therefrom should be addressed to the legislature, not the

---

[46] The Workers' Compensation Act was recodified in 1991 as Maryland Code (1991 Repl.Vol.), Title 9 of the Labor and Employment Article. The statutory language of this provision has been updated since *Kern,* 66 Md. App. 441, 504 A.2d 1154, but its substance remains the same.

courts.'" *Id.* (quoting *Schindele v. Nu-Car Carriers, Inc.,* 42 Md. App. 705, 710–11, 402 A.2d 1307, 1310 (1979)).

The court also rejected plaintiff's alternate contention that because "the workers' compensation law should be 'liberally construed,' it must be read broadly to protect work-connected absences." *Kern*, 66 Md. App. at 450, 504 A.2d at 1158. Plaintiff "provide[d]" the court "with no other source of this policy except what she alleges is the social purpose behind its passage and the doctrine of constructive discharge." *Id.* The court "agree[d] that the policy behind [L.E. § 9-1105] would be contravened if employers were allowed to take advantage of their exemption from liability while circumventing their duty to provide benefits by discharging employees for filing claims." *Id.* But, it noted that the purpose of the MWCA "was borne out less by social consciousness than by economic realities." *Id.*

Accordingly, the court said: "Whatever its benevolent quality may be in protecting the employee, we conclude the Legislature in exacting the Workmens' Compensation Act did not mean to penalize an employer for discharging an employee incapable of performing his or her responsibilities. . . . It is clear that the Legislature through statute has not imposed any limitation on this right, except that an employer may not discharge an employee solely because he or she has filed a claim for benefits." *Id.* at 450–51, 504 A.2d at 1158–59.

Moreover, the court determined "that an employee's protection from discharge in retaliation for claiming statutory benefits does not include protection for excessive absence from work due to work-related injury." *Id.* at 452, 504 A.2d at 1159. It stated: "To sustain a wrongful discharge action under Maryland's workers' compensation statute, an employee must allege that he or she was discharged solely and directly because of filing for benefits under [L.E. § 9-1105] or that his or her termination violated a recognized rule of law." *Id.* at 452, 504 A.2d at 1159.

Because plaintiff "failed to do so" the court upheld the lower court's grant of summary judgment to the defendant. *Id.*

As discussed, plaintiff recounts that on June 23, 2023, nine days before his termination, he met with Aghabala, the associate company manager, and denied that he had a heart condition, but stated that he does have COPD. ECF 1, ¶ 172. He sought to correct "the false medical information that adjuster Thatvihane had illegally shared with company management," which plaintiff claims was the basis for the denial of his WC Claim. *Id.* ¶ 173. Aghabala sent an email "to management" the day after her meeting with plaintiff, complaining that plaintiff is "'just EXHAUSTING !!!!!'" *Id.* ¶ 71; *see id.* ¶ 174. Plaintiff asserts that this email "displayed disdain and derision for Mr. McLeod [sic] self-advocacy in the workers' compensation process." *Id.* ¶ 174.

McLeod also relies on the "temporal proximity" between his WC Claim, "his disclosure of the adjuster's HIPAA violations, and his termination" to "establish[] a strong inference of retaliatory intent." *Id.* ¶ 176. Further, he notes that defendants never provided him with a reason for his termination but rather obliquely informed him "that they were 'taking the stage management department in a new direction' without providing any specific explanation or legitimate business justification." *Id.* ¶ 76.

As plaintiff observes (ECF 18 at 18), *Kern*, 66 Md. App. 441, 504 A.2d 1154, was decided at summary judgment after discovery had taken place, not at the motion to dismiss stage. At this stage, dismissal of the claim would be improper. Plaintiff is entitled to pursue discovery to determine whether, as he alleges, the sole reason for his termination was to punish him for filing his WC Claim.

## V.    Conclusion

For the foregoing reasons, I shall deny the Motion.  I shall also deny in part and grant in part the Motion to Strike.  In particular, the Motion to Strike is granted as to ECF 18-3; ECF 18-7; and ECF 18-9.  In all other respects, it is denied.

An Order follows.


Date: July 21, 2026                                                    /s/                       
                                                       Ellen Lipton Hollander
                                                       United States District Judge